Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr.
Bldg. 6, Suite 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| SOUTHERN CALIFORNIA EMERGENCY MEDICINE, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL WERFEL, in his official capacity as Commissioner of the U.S. Internal Revenue Service; the UNITED STATES INTERNAL REVENUE SERVICE; JANET YELLEN, in her official capacity as Secretary of the Treasury; the UNITED STATES DEPARTMENT OF TREASURY; and THE UNITED STATES OF AMERICA, <br><br> Defendants. | Case No. <br><br><br> **PLAINTIFF'S COMPLAINT FOR INJUNCTIVE RELIEF RE:** <br><br> 1. Violation of the APA [5 U.S.C. § 553] <br><br> 2. Violation of the APA [5 U.S.C. §§ 706(2)(A) & (C)] |

## **COMPLAINT FOR INJUNCTIVE RELIEF**

1.      This is an action for injunctive relief under the Administrative Procedure Act (5 U.S.C. § 701, *et seq.*).

2.      Congress charged the U.S. Department of Treasury and the Internal Revenue Service ("IRS") with implementing portions of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") of 2020.  *See* 15 U.S.C. § 9006; 26 U.S.C. § 3134(m).  Among the programs imposed by Congress, the IRS was tasked with reimbursing businesses through the Employee Retention Credit ("ERC").  The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on small business from the unprecedented challenges posed by the pandemic.  Congress intended for that credit to be broadly applied to help businesses through a historic pandemic that disrupted the global economy.

3.      The IRS has failed Congress and American businesses in its role as steward of the ERC program.

4.      The IRS improperly restricts the availability of ERC payouts based on unlawfully enacted legislative rules in violation of the APA, 5 U.S.C. § 553(b). Congress afforded the IRS rulemaking authority under the CARES Act. *See* 26 U.S.C. § 3134(m).  The IRS instead legislated improperly through guidance documents.  That process stripped taxpayers of their right to participate.  The IRS promulgated legislative rules without the transparency and deliberation required by Congress through the APA. Among those unlawful rules, the IRS published Notice 2021-20, a purported "guidance" document that fundamentally narrowed the ERC statutory scheme, thereby prohibiting otherwise eligible small businesses from recovering the ERC payouts to which they are entitled.

5.      The IRS now uses that improperly enacted rule as binding authority. The IRS cites to Notice 2021-20 routinely to deny ERC claims.  Plaintiff asks the Court to

invalidate Notice 2021-20 and enjoin the IRS from enforcing that guidance, or otherwise restricting the availability of ERC payments, absent compliance with the APA. The Court should hold that the IRS may not legislate through guidance in this context.

6.     Further, Notice 2021-20 is a major agency action that imposes substantial economic consequences on American taxpayers. But IRS's Notice was inconsistent with Congressional intent and plain language of the statutory scheme in the CARES Act because Notice 2021-20 substantially narrowed the ERC program. The IRS lacked authority to alter the statutory scheme. The IRS therefore violated the APA (5 U.S.C. §§ 706(2)(A) and (C)). The IRS also failed to provide reasonable explanation for substantive positions in Notice 2021-20. The failure to provide a reasoned basis for administrative action is an independent violation of 5 U.S.C. § 706(2)(A).

## I.     PARTIES

### A.  The Plaintiff

7.     Southern California Emergency Medicine (hereinafter "SoCal EM") is a medical corporation incorporated in 2003. SoCal EM filed a U.S. income tax return as an S-Corporation.

8.     On or about June 24, 2021, SoCal EM filed with the IRS a Form 941-X (i.e., an amended tax return), seeking a refund under the ERC for six calendar quarters in 2020 through 2021. SoCal EM explained that it was eligible for the ERC tax credit on several grounds. As most urgent care centers during the pandemic, SoCal EM's business operations were partially suspended by complying with multiple government COVIDl-19 orders.

9.     The IRS disallowed SoCal EM's six claims for refund on October 31, 2023, relying primarily on the unlawfully promulgated legislative rule in Notice 2021-20. Exh. C at 28–29 (SoCal EM ERC Claim Denial Letter).

10.     SoCal EM does not seek a refund through this lawsuit. It instead challenges the IRS's violation of 5 U.S.C. § 553(b) by promulgating a legislative-type

rule without notice-and-comment rulemaking through the guise of Notice 2021-20. The IRS's reliance on Notice 2021-20 has injured SoCal EM because it was a basis for the IRS's denial of ERC refunds to SoCal EM.

**B.  The Defendants**

11.    Defendant the IRS is an agency within the Executive Branch of the United States Government organized within the Department of Treasury. The IRS is an agency within the meaning of 5 U.S.C. § 701(b)(1).

12.    Defendant Danny Werfel is the Commissioner of the IRS.  In his capacity as Commissioner, Mr. Werfel is responsible for establishing, enforcing, and interpreting tax administration policies, including the IRS guidance known as "Notices."

13.    The United States Department of the Treasury is an arm of the Executive Branch of the United States Government which oversees the Internal Revenue Service. The Secretary of the Treasury is presently Janet Yellen.

## II.   JURISDICTION AND VENUE

14.    This Court has original subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1331 and 5 U.S.C §§ 702, 704, and 706 as to all claims arising from federal law, interpretation of federal statutes, rules, regulations, and/or orders, and the Constitution.

15.    Venue is proper under 28 U.S.C. § 1391(e)(1).

16.    Plaintiff files this action timely under 28 U.S.C. § 2401(a) and 5 U.S.C. § 704 because the claims are brought within six years after the right of action first accrued.

## III.   BACKGROUND

**A.  The Employee Retention Credit**

17.    Beginning in 2020, COVID-19 swept through all fifty states and resulted in governmental orders that disrupted the United States' local and national economies.

The governmental response to that public health emergency generally involved historically unprecedented measures, including lockdown orders, social distancing mandates, and business closures.  The profound economic effects of those policies were apparent.  Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVD-19 were forecast at $16 trillion.  *See* Cutler DM, Summers LH. The COVID-19 Pandemic and the $16 Trillion Virus. *JAMA*. 2020;324(15):1495–1496. doi:10.1001/jama.2020.19759.[1]

18.     Those realities led the federal government to enact a series of sweeping economic measures to assist businesses and American citizens.  Through emergency measures like the Paycheck Protection Program (PPP) and Economic Impact Payments, the government authorized payments directly to households and businesses.  Congress intended those remedial measures to have broad effect.

19.     The remedial purpose of the CARES Act, and specifically the ERC, was discussed by voting members of Congress.  *See, e.g.,* 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1897 (Sen. Collins explaining his support for the CARES Act); 166 Cong. Rec. S1897-02, 166 Cong. Rec. S1897-02, S1899 (Sen. Loeffler, same); 166 Cong. Rec. S2059-01, 166 Cong. Rec. S2059-01, S2059 (Sen. Schumer, same); 166 Cong. Rec. E347-01, 166 Cong. Rec. E347-01, E347 (Rep. Adams, same).

20.     Starting in March 2020, the CARES Act introduced broad, multifaceted relief.  For instance, the CARES Act provided Economic Impact Payments of up to $1,200 per adult for eligible individuals and $500 for qualifying children under age 17.  H.R. 748, 116th Cong. § 6428(a) (2020).  The Tax Relief Act of 2020 authorized payments of up to $600 per adult for eligible individuals and up to $600 for each qualifying child under age 17.  Consolidated Appropriations Act of 2021, Pub. L. No.

---

[1] *See also* Economic Advisors Council, "Evaluating the Effects of the Economic Response to COVID-19" (Aug. 2020), *available at*, https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/08/Evaluating-the-Effects-of-the-Economic-Response-to-COVID-19.pdf.

116-260, 134 Stat. 1965 § 6428A(a)(1) (2021).  The American Rescue Plan of 2021 provided additional Economic Impact Payments for eligible individuals and married couples.  H.R. 1319, 117th Cong. § 6428B (2021).  The purpose of these measures was to alleviate obvious financial burdens caused by the pandemic through broadly applied stimulus, credits, exemptions, and other financial valves.

21.    The CARES Act was intended to provide sweeping relief to individuals and businesses as part of the largest emergency appropriations package in U.S. history.

22.    Section 2301 of the CARES Act provides an Employee Retention Credit ("ERC") for employers whose business operations were fully or partially suspended due to COVID-19, but continued to pay qualified wages, including some health plan expenses, to their employees.  *See* 26 U.S.C. § 3134.  The statute created "a [refundable and non-refundable] credit against applicable employment taxes for each calendar quarter" in which a business was eligible.  *See* 26 U.S.C. § 3134(a).

23.    The ERC applies to qualified wages that employers paid in certain quarters from 2020 through 2021.

24.    A business can still claim relief under the ERC by filing an amended return or refund claim for prior quarters in which that business was eligible for the credit. Businesses can retroactively seek refunds for prior quarters by filing an IRS Form 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund).

25.    Congress defined "Eligible employer" under the ERC in Section 3134(c)(2).  For any applicable yearly quarter in which a business was operational, that business might qualify under the ERC in any one of three possible ways.

26.    First, and most relevant to this case, a business qualifies if it "is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

27.     Under this first prong, Congress included no requirement that a government order directly regulate the partially suspended business.  *See generally* 26 U.S.C. § 3134.  Congress also included no minimum threshold or magnitude of loss for a "partial" suspension that would qualify under Section 3134(c)(2)(A)(ii)(I).  *Id.* Congress's language was purposefully broad, and extended financial relief to any business that was forced to "fully or partially" suspend operations in connection with the many governmental orders that shuttered the economy.  The "orders from an appropriate governmental authority" were those that impacted "commerce, travel, or group meetings" for any purpose.  Congress did not restrict relief under the ERC only to those businesses that were directly ordered to close but, rather, the language in Section 3134(c)(2)(A)(ii)(I) extends to businesses that were constructively suspended through the widespread effects of lockdown orders and similar mandates.  The language used in Section 3134(c)(2)(A)(ii)(I) evidences Congress's intent to regulate the natural effects and impacts of governmental orders on a broad scale.

28.     Second, a business qualifies under the ERC if it suffered a certain diminution of its business during the pandemic.  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II) (where "the gross receipts … of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019").  As part of this second criterion, and in contrast with the first pathway under Section 26 U.S.C. § 3134(c)(2)(A)(ii)(I), Congress expressed an intent to apply specific numerical thresholds.

29.     Third, a business can qualify as a "recovery startup business."  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III).

**B.     Southern California Emergency Medicine Was Entitled to ERC Under the CARES Act**

30.     As it did with many employers in 2020, COVID-era governmental orders partially suspended SoCal EM's business operations.  For example, social distancing

mandates and lockdown orders ravaged emergency medical departments across the nation. *See, e.g., See* Cantor J, Sood N, Bravata DM, Pera M, Whaley C. The impact of the COVID-19 pandemic and policy response on health care utilization: Evidence from county-level medical claims and cellphone data. J Health Econ. 2022 Mar; 82:102581. doi: 10.1016/j.jhealeco.2022.102581 (noting drastic declines in in-person office visits during COVID); *See* Xu S, Glenn S, Sy L, Qian L, Hong V, Ryan DS, Jacobsen S. Impact of the COVID-19 Pandemic on Health Care Utilization in a Large Integrated Health Care System: Retrospective Cohort Study. J Med Internet Res. 2021 Apr 29;23(4):e26558. doi: 10.2196/26558 (showing that in-person health care utilization decreased drastically during the early period of the pandemic); Venkatesh AK, Janke AT, Shu-Xia L, Rothenberg C, Goyal P, Terry A, Lin M. Emergency Department Utilization for Emergency Conditions During COVID-19. Ann Emerg Med. 2021 Jul;78(1):84-91. doi: 10.1016/j.annemergmed.2021.01.011 (noting that CDC reported a 42% decline in emergency department (ED) visits during the early coronavirus disease).

31.     SoCal EM operated urgent care facilities in Southern California during the pandemic.  As a direct result of governmental orders that included lockdowns, social distancing measures, and equipment mandates, SoCal EM had to reduce and modify its normal business operations.   Although those governmental orders did not always amount to full suspension, the net effect of the orders on business operations was undeniably a partial suspension.

32.     For example, in March of 2020, the Governor of California mandated that residents follow State public health directives. Exh. E at 1 (California Executive Order N-33-20). In turn, on April 27, 2020, the California Department of Public Health issued guidance that required medical facilities to use personal protective equipment (PPE) to contain the spread of the COVID-19 virus.[2]   But the "severe shortages in personal

---

2  *See* California Dept. of Pub. Health, *Resuming California's Deferred and Preventive Health Care*, CDPH (April 27, 2020) *available at*

protective equipment in the US during the COVID-19 crisis" were well-documented. *See, e.g.,* Cohen J, Rodgers YVM. Contributing factors to personal protective equipment shortages during the COVID-19 pandemic. Prev Med. 2020 Dec;141:106263. doi: 10.1016/j.ypmed.2020.106263. In an effort to mitigate the effects of the shortage, there was a nationwide conservation strategy for PPE. *See Conserving Supplies of Personal Protective Equipment in Healthcare Facilities during Shortages*, CDC                    (last                    updated                    May                    2023), https://www.cdc.gov/niosh/topics/pandemic/conserving.html; Woolley K, et. al. Personal Protective Equipment (PPE) Guidelines, Adaptations and Lessons During the COVID-19 Pandemic, Ethics Med. Pub. Health.2020 Jul-Sep;1.100546. doi: 10.1016/j.jemep.2020.100546. Accordingly, SoCal EM routinely exhausted its supply of PPE.  It was therefore unable to lawfully continue operations under the Governor's mandate.  SoCal EM was forced to close certain clinics for periods of time while awaiting PPE supplies.

33.    SoCal EM would have qualified for the ERC credit but for the IRS's narrow position enacted through unlawful legislative rules.  In this particular instance, the IRS passed a rule stating that, unless a government order directly regulates the business (or that business's supplier), then a business is ineligible for the employee retention credit.  Exh. A at 29–30 (Notice 2021-20 Q/A No. 13).  No rational basis was supplied for that rule. *See id.*

34.    The Governor's mandate on PPE did not directly require the closure of SoCal EM's business, nor did it close suppliers of PPE who were frantically attempting to address nationwide shortages.  But the governmental order did unquestionably prevent SoCal EM from continuing business without PPE. In short, SoCal EM experienced the full or partial suspension of clinics as a direct result of the governmental order and widespread shortage of that equipment.  That happenstance was insufficient,

https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/ResumingCalifornia%E2%80%99sDeferredandPreventiveHealthCare.aspx.

claimed the IRS, citing positions promulgated in its unlawful substantive rules. Exh. C at 28–29.  Those substantive rules are here at issue.

35.     Plaintiff filed Form 941-X amended returns seeking reimbursement under the ERC.  The IRS denied Plaintiff's claim on October 31, 2023.  *See* Exh. C.

## C.  The IRS Promulgated Unlawful Legislative Rules Through "Notice 2021-20"

36.     The CARES Act authorized the Secretary of the Treasury to "issue forms, instructions, regulations, and guidance as are necessary" to oversee the ERC program and disbursements.  *See, e.g.,* 26 U.S.C. § 3134(m).

37.     The purpose of those "forms, instructions, regulations, and guidance" was to facilitate the expeditious payout of employee retention credits—not to reformulate or reimagine the statute.  For instance, under Section 3134(m)(1), the IRS was tasked with passing regulations "to allow the advance payment of the credit … based on such information as the Secretary shall require[.]"

38.     Congress did not exempt the agency from complying with the Administrative Procedure Act's requirements to proceed through notice-and-comment rulemaking.  *See* 5 U.S.C. § 553(b); *see generally* 26 U.S.C. § 3134.

39.     Although Congress granted the Secretary authority to issue "regulations" in association with the employee tax credit (26 U.S.C. § 3134(m)), the IRS never did so.  Instead, the IRS has applied the ERC through "guidance" documents that circumvented the APA's notice-and-comment rulemaking requirements.  As explained by the IRS in its refund denials:

> Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC.  Rather, consistent with statutory authority allowing the Secretary to issue "other guidance as may be necessary to carry out the purpose of the credit" …, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020.

Exh. C at 17 (pg. 5 of Form 886-A).

40.     Instead, the IRS published a 120-page guidance document titled "Notice 2021-20" on March 1, 2021, nearly a full year after the passing of the CARES Act. *See* Exh. A.

41.     The purpose of Notice 2021-20 was to provide the IRS's position on the application of Section 2301 of the CARES Act, as amended by section 206 of the Relief Act. *Id.* at 1.

42.     The IRS drafted Notice 2021-20 in a "Question and Answer" format.  The document set forth material changes to the ERC program.  Many of the IRS's positions imposed substantial obligations on regulated businesses that might claim the ERC, or significantly narrowed employer eligibility under that program.  *See Id.* at 29–30, 33–34, 39–40, 100–01.

43.     Notice 2021-20 included definitions of various terms, factors or elements necessary to claim the credit, imposed record-keeping requirements, and created thresholds for claiming the credit.  Those new provisions were not sourced from the Internal Revenue Code but were instead created by the IRS to govern payouts under the credit.

44.     The requirements imposed by the IRS in Notice 2021-20 were legislative in nature.  Those legislative provisions narrowed the applicability of 26 U.S.C. § 3134 for employers affected by COVID-19 mandates.  Because the IRS did not participate in notice-and-comment rulemaking, the agency issued those positions without public participation and without notice.

45.     For example, the IRS narrowed the universe of "government orders" that could result in full or partial business suspensions under Section 3134(c)(2). *Id.* 27–50 (defining what constitutes a full or partial shutdown for the purposes of the ERC).

46.     Notice 2021-20 narrowly applied the ERC only to governmental orders that directly compel a business closure or restriction. *Id.* at 29–30.  In doing so, the IRS excluded governmental orders that operate to logically and foreseeably restrict business based on indirect or collateral restrictions on commerce.  *Id.* (stating that an order

compelling customers to stay at home, but not requiring a business closure, is not an applicable governmental order).  In other words, according to Notice 2021-20, an order "that does not relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for the purposes of the employer's determination of its eligibility for the [ERC]."  This new position was not apparent in the Congressional record or the statutory language.[3]

47.    In Notice 2021-20, the IRS also concluded that any "voluntary" suspension of business eliminates eligibility under the ERC.  *Id.* at 29–30.  Under this new standard, if a business is forced to close in response to a lack of demand—rather than because of a closure *order*—the business is not deemed suspended by operation of a governmental order under 26 U.S.C. § 3134(c)(2)(A)(ii)(I).  Many businesses, like Plaintiff, logically saw that government lockdowns made continued operations economically infeasible.  Exh. C at 14 (pg. 2 of Form 886-A). Businesses struggled when governmental orders compelled their customer base to remain home.  But according to the IRS in Notice 2021-20, that point is irrelevant because only government orders that directly regulate a business would qualify.  Exh. A at 29–30.  The constructive closure from reduced business is, according to IRS, an inadequate basis to claim the credit under Section 3134(c)(2)(A)(ii)(I).

48.    Notice 2021-20 installs minimum thresholds for ERC eligibility.  Thus, even businesses that were directly shuttered by governmental orders do not qualify unless that shutdown affected a certain minimum percentage of its business.  Here under IRS's novel rule, a business qualifies under the ERC only if the governmental order caused more than a "nominal" disruption of business.  *Id.* at 27 (noting that an employer

---

[3] Section 3134(c)(2)(A)(ii)(I) states that a trade or business is fully or partially suspended due to orders from an appropriate governmental authority that "<u>limits commerce</u>, travel, or group meetings <u>(for commercial, social, religious, or other purposes)</u> due to the "COVID-19]." (emphasis added).  The IRS's Notice improperly disregarded the plain meaning of the statute, which puts the focus on the effect on "commerce" in a more general sense.  This issue could have been addressed had the agency proceeded through rulemaking under 5 U.S.C. § 553(b).

may "have a partial suspension if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order.").

49.     Having established that new requirement—which is absent from the CARES Act—the IRS then arbitrarily defined "nominal portion" of business operations to mean either "(i) the gross receipts from that [suspended] portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts from the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business[.]" *Id.* at 28.

50.     The IRS's "nominal portion" rule is ubiquitous in Notice 2021-20, and forms the basis of additional requirements that must be satisfied for eligibility under the ERC.  *Id.* at 27, 34–40, 100.

51.     Notice 2021-20 then sets parameters and "factors" that a business must satisfy to show that a governmental order had "more than a nominal" effect on the business's operations.  The IRS never explained why a "ten percent" threshold was appropriate or necessary.  Under the IRS's rule, a business suffering from a 9.5% reduction in receipts has not suffered an adequate "partial suspension" of business, but yet 10% qualifies.  Of course, for many small businesses operating on narrow margins, a nine percent reduction in business operations is significant.

52.     Notice 2021-20 confers new duties and obligations on businesses.  It requires employers to substantiate their eligibility for ERCs, in part, by maintaining records concerning, *inter alia*:  the governmental orders that suspended business operations; records that an employer relied upon to determine whether a governmental order had more than a nominal effect on its business operations; records the employer used to determine whether it experienced a significant decline in gross receipts; records concerning which employees received qualified wages and in what amounts; and, in the

case of large employers, work records and documentation showing whether wages were paid for time an employee was not providing services. *Id.* at 100–01.

53.    Notice 2021-20 also requires that employers maintain documents showing how they calculated allocable qualified health plan expenses; documents regarding whether an employer is a member of an aggregated group treated as a single employer for purposes of ERC; and documents showing how aggregation of businesses impacts the claimed credit.  Employers must maintain copies of completed and submitted Form 7200s and the complete and submitted federal employment tax returns. *Id.*

54.    Under Notice 2021-20, employers must maintain those records for a period of four years after the date each tax becomes due or is paid, whichever comes later.  *Id.* at 101. Notably, the four year retention period differs from the applicable five year statute of limitation for examining the credit. *See* 26 U.S.C. § 3134(l).

55.    In addition to those record-keeping requirements, Notice 2021-20 also requires employers to make self-determinations on whether the interruption or reduction to their business constituted "more than a nominal" disruption, as set forth in the Notice. *See* Exh. A at 39 (while leaving it open-ended, the Notice includes examples of such record-keeping to include documents showing:  limited occupancy to provide for social distancing, required services that were performed only on an appointment basis, changes to the format of services, and requirements on employees and customers to wear face coverings, etc.); *but see id.* at 39–40 (requiring, above all else, that the governmental order must result "in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent," and that requiring employees and customers to wear masks "will not result in more than nominal effect on the business operations."). The failure to maintain these records could subject taxpayers to penalties, including erroneous refund penalties. *See* I.R.C. § 6676.

56.    Notice 2021-20 has since been modified, expounded on, or allegedly clarified by subsequent guidance documents, including Notice 2021-23, Notice 2021-33, Notice 2021-49, and Notice 2021-65.

57.    These IRS Notices, which operate as legislative rules, lack transparency without having proceeded through notice-and-comment rulemaking.  The IRS provided no opportunity for public comment that would otherwise been afforded by the rulemaking process.  Because administrative agencies operate outside the scrutiny of the electorate, and administrative rules are not promulgated by elected officials, the rulemaking procedures guaranteed by Congress in 5 U.S.C. § 553 are essential safeguards that enable direct public participation.  This is an instance where public rulemaking would have benefited both agency and public.

58.    The IRS's failure to engage in that process has resulted in an unlawful narrowing of the employee retention credit in conflict with Congressional intent.

### D.  Notice 2021-20 Has the Force of Law

59.    The IRS relies on Notice 2021-20 as an authoritative position when denying refund claims under the ERC.  *See* Exh. C at 17–18, 23–29; ERC Denial Redirect, Exh. D at 4 (The IRS instructing that, "To the extent … legislation did not modify the original provisions of the ERC, Notice 2021-20 governs the ERC for all periods.").

60.    The IRS provides its substantive basis or a denial in a Form 866-A (Explanation of Items).  In those documents, the IRS takes the position that Notice 2021-20, and not 26 U.S.C. § 3134, governs the outcome.

61.    For instance, in the SoCal EM denial, the IRS relied on specific sections in Notice 2021-20 as legal justification for denying Plaintiff's ERC refund.  *See, e.g.*, Exh. C at 24 (12 of Form 866-A) (citing Notice 2021-20 for the agency's rule concerning certain governmental orders); *see also id.* at 24-29 (relying on Notice 2021-20).

62.    In that denial, the IRS repeatedly cited Notice 2021-20 as the operative rule for determining whether a business is eligible under the ERC, including whether

modifications to a business have a "more than nominal effect on business operations." *Id.* at 28.

63. In legal memoranda published by the IRS's Office of Chief Counsel concerning the application of ERC, the IRS counsel referenced Notice 2021-20 as operative "law" alongside other examples of statutory language. *See* Exh. F at 2-5 (The IRS Generic Legal Advice Memorandum). The IRS relies on Notice 2020-21 as an operational rule that defines eligibility under the ERC. *See id.* at 12 (citing Notice 2021-20 as legal authority alongside other Treasury regulations, including Treas. Reg. § 31.6001-1 and 1.6001-1); *id.* at 12 (explaining that, "To fall within the provisions of … Notice 2021-20, the determination of whether an employer experienced a full or partial suspension of operations depends upon whether more than a nominal portion of an employer's trade or business operations was suspended by a governmental order or a governmental order had more than a nominal effect on an employer's trade or business operations"). Thus, IRS counsel has publicly proclaimed that eligibility under the ERC depends on whether a business "fall[s] within the provisions of Notice 2021-20." *Id.* at 12, 13.

64. On information and belief, the IRS has consistently and routinely relied on Notice 2021-20 as a legal basis to deny countless applications for refunds under the ERC program. The agency is therefore relying on noncompliance with Notice 2021-20 to support denials under the ERC program. In this way, Notice 2021-20 has altered the rights and obligations of regulated employers. Moreover, official publications make clear that IRS agents are not free to disregard Notice 2021-20 when evaluating refund claims under the ERC. Similarly, the IRS's continued reliance on the Notice has a clear effect on regulated parties by requiring them to conform their submissions.

### E.  The IRS Unilaterally Suspends Processing of ERC Claims

65. The restrictive provisions in Notice 2021-20 have also contributed to the IRS's immediate suspension of the entire employee retention credit program.

66.     Because Notice 2021-20 substantially narrowed the universe of "eligible employers" under the statute, the IRS has used that Notice to deny a larger portion of ERC claims that would otherwise have qualified under the CARES Act criteria in 26 U.S.C. § 3134(c)(2).

67.     A claim that fails the Notice 2021-20 criteria is, according to IRS, an "improperly" submitted claim.

68.     Thus, on September 14, 2023, the IRS stated in a public news release that it was unilaterally suspending the ERC program under a moratorium on new ERC claims through at least the end of 2023, with no specific end date mentioned. *See* Exh. B at 1 (Moratorium News Release).

69.     In its press release, the IRS "announced an immediate moratorium through at least the end of the year on processing new claims for the pandemic-era relief program…" *Id.* The IRS has given no indication that it will resume processing new ERC claims in 2024.

70.     As its basis for that suspension, the IRS cited "growing concerns inside the tax agency, from tax professionals as well as media reports that a substantial share of new claims from the aging program are ineligible…" *Id.* The agency then cautioned would-be "ineligible" filers to review the IRS's unlawfully promulgated legislative rules: "Taxpayers are encouraged to review IRS guidance and tools for helping to determine ERC eligibility, including frequently asked questions" like, for instance, the unlawful Notice 2021-20. *Id.* at 2. Thus, again, the agency held out its Notice 2021-20 as an authoritative position on the law the imposed its substantive requirements on the applicability of employee retention credits.[4]

---

[4] The IRS provided no prior notice of the moratorium to employers or taxpayers. The agency first announced its moratorium through the official press release on September 14, 2023. Although Congress afforded the Secretary of the Treasury authority to issue "forms, instructions, regulations, and other guidance" that were necessary to carry out the ERC program (*see* 26 U.S.C. § 3134(m)), Congress never delegated to the Department of the Treasury legislative authority to unilaterally terminate or suspend payments of the employee retention credit.

71.     Had the IRS engaged the notice-and-comment requirements of the APA, the agency's perspective on purportedly "improper" ERC claims could have been appropriately addressed in advance through the aid of public participation.

72.     By failing to comply with the APA's rulemaking requirements, the IRS has created a situation in which it has materially altered businesses' duties and obligations, as well as IRS's own congressionally mandated duties.

## COUNT ONE

### Violation of the APA's Notice-and-Comment Rulemaking Requirement

### [5 U.S.C. § 553]

73.     Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 72, *supra*.

74.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

75.     The Court may therefore "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. 706(2)(D).

76.     The IRS is an "agency" within the definition of the APA.  *See* 5 U.S.C. § 551(1).

77.     "Agency action" includes the whole or part of an agency rule.  5 U.S.C. § 551(13).

78.     The IRS Notice 2021-20 is a "rule" within the meaning of the APA.  *See* 5 U.S.C. § 551(4).

79.     Agency rules can be "interpretative" or "substantive."[5]

---

[5] Substantive rules are sometimes referred to as "legislative" rules.  *United States v. Managort*, 312 F. Supp. 3d 60, 75 (D.D.C. 2018).

80.     Substantive or legislative rules impact rights and obligations, and have the force and effect of law.  Legislative rules therefore impose new rights or obligations on the regulated class, and can change a party's legal status.

81.     When evaluating whether a rule is "legislative," Courts broadly consider whether the rule imposes new obligations.  The imposition of even minor duties, such as recordkeeping requirements, is grounds to deem a rule legislative in nature.  *See Green Valley Invs., LLC v. Comm'r of Internal Revenue*, No. 17379-19, 2022 WL 16834499, *5 (T.C. Nov. 9, 2022) (finding the IRS imposed new duties in the form of reporting obligations and recordkeeping requirements, and are "hallmarks of a legislative, not an interpretive rule.").

82.     The APA requires that certain rules promulgated by an agency must be published in through notice-and-comment procedures. 5 U.S.C. § 553.  "Substantive" or "legislative-type" rules are subject to the APA's notice-and-comment procedures. *See* 5 U.S.C. § 553.

83.     An agency's failure to meet those obligations is grounds to invalidate a substantive rule.  *Mann Construction, Inc. v. U.S.*, 27 F.4th 1138, 1148 (6th Cir. 2022); *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2021); *Bullock v. Internal Revenue Service*, CV-18-103, 2019 WL 3423485, (D. Mont. July 30, 2019).

84.     The IRS holds out Notice 2021-20 as a legislative rule.

85.     The IRS has given Notice 2021-20 the force and effect of law.

86.     Notice 2021-20 creates new substantive duties and limitations, in part, by requiring employers to substantiate and document eligibility under the ERC; by promulgating new legislative standards governing the payment of the employee retention credits; and by creating retention requirements.

87.     Notice 2021-20 is not an "interpretative rule" under 5 U.S.C. § 553(b)(3)(A).

88.     In connection with the employee retention credit, Congress did not exempt the IRS from rulemaking requirements under the APA.  *See* 26 U.S.C. 3134.

89.     One year before the nationwide shutdowns under COVID-19, the Department of the Treasury and the IRS published a policy statement purporting to "reaffirm their commitment to a tax regulatory process that encourages public participation, fosters transparency, affords fair notice, and ensures adherence to the rule of law." Exh. G at 1 (Dept. of Treasury Policy Stmt.). The IRS acknowledged that "[t]he best practice for agency rulemaking is the notice-and-comment process established by the [APA]." *Id.* The IRS committed to follow notice-and-comment procedures even for interpretive rules. *Id.* (pledging that, "IRS will continue to adhere to their longstanding practice of using the notice-and-comment process for interpretive tax rules published in the Code of Federal Regulations.").

90.     Despite recognizing that guidance documents should not have the force of law, the IRS has held out Notice 2021-20 as a purported rule with the force and effect of law. *Compare* Exh. D at 4 *with* Exh. G at 2.

91.     Notice 2021-20 makes no showing of good cause legally sufficient to avoid notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b)(3)(B). The IRS issued Notice 2021-20 one year after the CARES Act. It's failure to engage the proper rulemaking process was not the result of an exceptional circumstance. *See* Exh. G at 2.

92.     The IRS and Treasury failed to follow applicable procedures under 5 U.S.C. § 553 when issuing the rules found in Notice 2021-20. The IRS's Notice 2021-20 is therefore unlawful.

93.     The IRS and Treasury failed to follow their own policies, requiring a public evaluation of several factors to determine whether Notice 2021-20 should have proceeded through the notice-and-comment process. *See* Exh. G at 1.

94.     The notice-and-comment procedures would have fostered a productive exchange of information and public input on material points. That process was likely to have caused changes in the IRS's position. It would have at least provided the statutorily mandated transparency and explanation for IRS's substantive positions,

which is necessary for the courts to evaluate whether a rule is supported by a rational basis or is arbitrary and capricious.

95.     Taxpayers also have a right to be informed of the IRS's positions and underlying reasoning under the Taxpayer Bill of Rights. *See* 26 U.S.C. § 7803(C). That right to information extends to transparency in IRS decisions regarding substantive issues. *Id.* The IRS therefore violates the Taxpayer Bill of Rights by failing to comply with the APA's rulemaking requirements.

96.     The IRS had ample time and opportunity to proceed through notice-and-comment rulemaking. The IRS issued Notice 2021-20 nearly a full year after Congress passed the CARES Act. The agency has yet to initiate a rulemaking despite the passage of three years.

97.     The IRS's failure to abide by the APA injures SoCal EM. Notice 2021-20 subjects Plaintiff to arbitrary standards for ERC refund applications, as well as onerous record-keeping requirements. The IRS relied on the unlawful Notice 2021-20 in denying SoCal EM's refund claim. But for Notice 2021-20, SoCal EM would have been entitled to recover the ERC refund.

98.     Under the APA, the court shall set aside agency action that is "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(D).

99.     Plaintiff seeks a mandatory, national injunction barring the IRS from enforcing the unlawfully promulgated Notice in any administrative forum or proceeding.

100.   Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax. Plaintiff does not seek a refund of taxes or credits through this Count, and instead limits its challenge to the IRS's failure to meet APA requirements under 5 U.S.C. § 553. *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1588 (2021).

## COUNT TWO

**Unlawful Agency Action in Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right**

**[5 U.S.C. § 706(2)(A) & (C)]**

101.   Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 100, *supra*.

102.   The Department of the Treasury and the Internal Revenue Service are federal agencies subject to the requirements of the APA.

103.   The publication of Notice 2021-20 is a final agency action for purposes of the APA.

104.   The IRS publication of Notice 2021-20 is a major agency action that could not lawfully be conducted without compliance with the APA.

105.   The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitution right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)-(C).

106.   IRS Notice 2021-20 violates 5 U.S.C. § 706(2)(A) and (C) because it imposes arbitrary thresholds and obligations (e.g., a 10% threshold for "nominal" effects on a business) without explanation, inconsistent with Congressional intent, and without Congressional authority.

107.   Upon information and belief, the IRS provides no explanation as to why the threshold requirements and factors imposed by Notice 2021-20 are necessary per the CARES Act.

108.   Agency positions must conform to the scope of Congressional mandates. Where an agency claims to impose decisions of vast economic and political significance, the courts require that agency to identify a clear Congressional command enabling that interpretation. *Id.* (citing *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)). When evaluating whether the agency's chosen rule or policy fits within

the statutory scheme, the court must look at the entire statutory context—not just isolated words in a vacuum. *See, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). "[T]he Court overprotects the nondelegation principle by increasing the cost of delegating authority to agencies—namely, by requiring Congress to speak unequivocally in order to grant them significant rule-making power." *See Biden v. Nebraska*, 143 S. Ct. 2355, 2377 (2023) (Barrett, J., concurring). "The [major questions] doctrine serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 133).

109.   IRS Notice 2021-20 has a substantial economic significance.  The IRS claims to have received "approximately 3.6 million" ERC claims over the course of the program. Exh. B at 3.  The IRS has used Notice 2021-20 as a basis to deny hundreds of millions of dollars in economic relief that Congress directed to businesses that were harmed a during the pandemic.  Under the ERC program, the IRS presides over billions of dollars in emergency relief funding. An IRS rule that substantially narrows that statutory scheme implicates the major questions doctrine.

110.   Because the IRS's Notice 2021-20 adopts substantive positions that are inconsonant with Congressional command, the agency has acted beyond the scope of its authority. The text of the CARES Act does not authorize the IRS to impose requirements or conditions on taxpaying employers that would substantially narrow the scope of eligible businesses under the ERC program.

111.   The text of the CARES Act is clear and unambiguous.

112.   Congress specifically defined "eligible employers" using broad language consistent with the legislative goal of sustaining businesses during and after the historic pandemic. *See* 26 U.S.C. § 3134(C)(2).  As alleged, *supra* Section III.C at ¶¶ 41–42, 44–50, the IRS's alterations in Notice 2021-20 are not apparent from the plain text of

the CARES Act or its amending legislation.  Congress did not give the IRS authority to create threshold requirements for a business to qualify as an "eligible employer."

113.    Congress broadly defined governmental orders that would qualify under the ERC statute.  *Supra* Section III.A at ¶ 27. Section 3134 describes orders limiting group meetings for "social, religious, or other purposes".  26 U.S.C. § 3134(c)(2)(A)(ii)(I). The plain language of the statute includes orders that impact businesses broadly, rather than just orders specifically directed at businesses.  *See id.* Further, Congress's amendments to the law are evidence of legislative intent, extending the ERC by making it easier, not harder, for employers to qualify for the credit.  *See* The Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, 134 Stat. 1965; The American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 6428B; The Infrastructure Investment and Jobs Act of 2021, Pub. L., 117-58, 135 Stat. 429 (Nov. 15, 2021).

114.    The IRS fundamentally altered the scope of eligible governmental orders, replacing Congress's unambiguous definition with its own that significantly narrowed employer eligibility. *Compare* 26 U.S.C. § 3134(2)(A)(ii)(I) *with* Exh. A at 25–26.

115.    Congress afforded the Secretary with authority to issue "regulations and guidance" solely to "allow the advance payment of the credit" under the Act.  *See* 26 U.S.C. § 3134(m).  But that regulatory authority was circumscribed.  Congress did not delegate power to modify the statute.  IRS's approach therefore violates law.  *See Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023) (invalidating Secretary of Education's adjustments to federal programs under the HEROES Act where those changes created a "fundamentally different loan forgiveness program").

116.  The IRS Notice 2021-20 exceeds the boundaries and purpose of the CARES Act by unduly narrowing the universe of "eligible employers" under 26 U.S.C. § 3134(c)(2) in several material respects.  *See supra* Section III.C at ¶¶ 48–49; *see also Biden*, 143 S.Ct. at 2369-70 (holding that Dept. of Education exceeded statutory authority by enacting a plan that "augments and expands" the law).

117.   By exceeding statutory authority, Defendants have also violated the constitutional separation of powers.

118.   The Court should invalidate and strike Notice 2021-20 and enjoin the IRS from enforcing the terms of that Notice in any administrative or judicial forum.

119.   Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax under this Count.  Plaintiff does not seek a refund of taxes or credits through this Count, and instead limits its challenge to the IRS's violation of the APA under, *inter alia*, 5 U.S.C. § 706.  *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1588 (2021).

## COUNT THREE

### Arbitrary & Capricious Agency Action
### [5 U.S.C. § 706(2)(A)]

120.   Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 119, *supra*.

121.   "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n. v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021).  An agency must reasonably consider the relevant issues and reasonably explain their decisions.  *Id.; Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983) (agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

122.   Agency action is arbitrary and capricious "if it exhibits internally inconsistent reasoning." *Braeburn v. U.S. Food and Drug Admin.*, 389 F. Supp. 3d 1, 28 (D.D.C. 2019) (citing *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

123.   The 120-page Notice 2021-20 is arbitrary and capricious because the IRS relied on factors which Congress has not intended it to consider, entirely failed to consider important aspects of the problem, and fashioned rules that were not supported by transparent and reasoned decision-making.  *Supra* Section III.C at ¶¶ 41–42, 44–50.

124.   The IRS provided no explanation or reasoning for choosing certain eligibility requirements over others.  For example, the agency offered no explanation for why a 10% effect on business was beyond a "nominal" disruption, but a 9% reduction was not.  The IRS provided no explanation for why a governmental order that required businesses to adopt social distancing measures could render a business eligible, but an order that prevents customers from even visiting that same business would not similarly qualify.  Exh. A at 24–25 (Q/A No. 11), 29 (Q/A No. 13).  In fact, the IRS provided no explanation for any of its limitations in Notice 2021-20.

125.   Notice 2021-20's factors also show inconsistencies in the application of various factors affecting an employer's eligibility.   For instance, Notice 2021-20 provides factors for determining whether a business's operations were more than nominally affected through, *inter alia,* changes to the format of certain services, including "requiring employees and customers to wear face coverings."  *See* Exh. A at 39 (stating that, "Whether a modification … has more than a nominal effect on the business operations is based on the facts and circumstances.").  But after directly stating that such modifications are potentially qualifying on a case-by-case basis, the Notice then takes the contradictory, categorical position that that such "[m]odifications altering customer behavior (for example, mask requirements…") … will not result in more than a nominal effect on the business operations." *Id.* at 40.  Absent the agency's explanation (which was not provided), the IRS positions are definitionally arbitrary.

126.   Because the IRS has taken substantive positions which are arbitrary and capricious, the Court should enjoin the IRS from either enforcing the terms of Notice 2021-20 or from mandating compliance with that notice.

127. Plaintiff does not seek to enjoin, impede, or restrain the collection of any tax under this Count. Plaintiff does not seek a refund of taxes or credits through this Count, and instead limits its challenge to the IRS's violation of the APA under, *inter alia*, 5 U.S.C. § 706. *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1588 (2021).

## PRAYER FOR RELIEF:

WHEREFORE, Plaintiff hereby prays for judgment in its favor and against Defendants, and requests that this Court award Plaintiff the following:

A. Enjoin Defendants from enforcing Notice 2021-20 in any administrative or judicial forum.

B. Enjoin Defendants from requiring compliance with the unlawfully imposed obligations under Notice 2021-20.

C. Any other relief that the Court deems just and appropriate.

DATED: December 1, 2023.

Respectfully submitted,

By:  */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)
Emord & Associates, P.C.
E-mail: parhangelsky@emord.com
*Attorney for Plaintiff Southern California Emergency Medicine, Inc.*