# Exhibit A

Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act

Notice 2021-20

I. PURPOSE

This notice provides guidance on the employee retention credit provided under section 2301 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), which was enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (December 27, 2020). The guidance provided in this notice addresses the employee retention credit as it applies to qualified wages paid after March 12, 2020, and before January 1, 2021. This notice does not address the changes made by section 207 of the Relief Act that apply to the employee retention credit for qualified wages paid after December 31, 2020. The Department of the Treasury (Treasury) and the Internal Revenue Service (IRS) will address the modifications made by section 207 of the Relief Act applicable to calendar quarters in 2021 in future guidance.

II. BACKGROUND

Section 2301 of the CARES Act allows a credit (employee retention credit or credit) against applicable employment taxes for eligible employers, including tax-exempt organizations, that pay qualified wages, including certain health plan expenses, to some

1

or all employees after March 12, 2020, and before January 1, 2021.  Section 206 of the

Relief Act adopts amendments and technical changes to section 2301 of the CARES

Act for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily

relating to who may claim the credit.[1]  Section 207 of the Relief Act amends section

2301 of the CARES Act to extend the application of the employee retention credit to

qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify

the calculation of the credit amount for qualified wages paid during that time.[2]

Following the enactment of the CARES Act, the IRS posted Frequently Asked

Questions (FAQs) on IRS.gov to aid taxpayers in calculating and claiming the employee

retention credit.  As of the publication date of this notice, the FAQs have not been

updated to reflect the changes made by the Relief Act.  This notice incorporates the

information provided in the FAQs and addresses additional issues, including the

amendments to section 2301 of the CARES Act made by section 206 of the Relief Act.

This notice also identifies instances in which section 206 of the Relief Act made

_____

[1] The amendments made by section 206 of the Relief Act take effect as if included in the provisions of the CARES Act to which they relate.

[2] Section 207 of the Relief Act makes substantial changes to the employee retention credit that apply to qualified wages paid during the first and second quarter of 2021.  Among other changes, section 207 of the Relief Act (1) makes the employee retention credit available for eligible employers paying qualified wages that are paid after December 31, 2020, and before July 1, 2021; (2) increases the maximum credit amount that may be claimed per employee (making it equal to 70 percent of $10,000 of qualified wages paid to an employee per calendar quarter); (3) expands the category of employers that may be entitled to claim the credit; (4) modifies the gross receipts test; (5) modifies the definition of qualified wages; (6) broadens the denial of double benefit rule and applies it to sections 41, 45A, 45P, 51, and 1396 of the Code; and (7) changes the eligibility to receive advance payments and limits the amount of the advances.

2

Exh. A
Complaint

changes to section 2301 of the CARES Act that resulted in rules that are substantially similar to the interpretation provided in the FAQs.

The remainder of this Section II provides a summary of the relevant provisions of section 2301 of the CARES Act, as amended by section 206 of the Relief Act, as they apply to qualified wages paid in 2020.  References to section 2301 of the CARES Act include the amendments made by section 206 of the Relief Act, unless otherwise noted. This Section II also includes an overview of the options for employers to defer the deposit and payment of the employer's share of social security tax under section 2302 of the CARES Act and to defer the withholding and payment of the employee's share of social security tax under Notice 2020-65, as modified by Notice 2021-11, which may affect the amount that an employer can request as an advance payment of the credit. Section III of this notice provides guidance in Q/A format regarding the application of section 2301 of the CARES Act.  Any term defined in this Section II or within a Q/A in Section III applies to all Q/A's in Section III.

### A.  Claiming the Employee Retention Credit and Accessing Funds in Anticipation of the Credit

An employer that is an eligible employer as defined in section 2301(c)(2) of the CARES Act and that, after March 12, 2020, and before January 1, 2021, pays qualified wages, as defined in section 2301(c)(3) of the CARES Act, is entitled to claim the employee retention credit against the taxes imposed on employers by section 3111(a) of the Internal Revenue Code (Code) (employer's share of the Old Age, Survivors, and Disability Insurance (social security tax)), after these taxes are reduced by any credits

3

Exh. A
Complaint

claimed under section 3111(e) and (f) of the Code,[3] sections 7001 and 7003 of the

Families First Coronavirus Response Act (FFCRA), Pub. L. No. 116-127, 134 Stat. 178

(March 18, 2020),[4] and section 303(d) of the Relief Act.[5]  Eligible employers subject to

the Railroad Retirement Tax Act (RRTA) are entitled to take the employee retention

credit against the taxes imposed on employers by section 3221(a) of the Code (Tier 1

tax under the RRTA) that are attributable to the rate in effect under section 3111(a) of

the Code, after these taxes are reduced by any credits allowed under sections 7001 and

7003 of the FFCRA and section 303(d) of the Relief Act.

---

[3] Section 3111(e) of the Code permits qualified tax-exempt organizations that hire qualified veterans to claim a credit against the employer's share of social security tax imposed under section 3111(a) of the Code.  Section 3111(f) of the Code permits a qualified small business to elect to apply part or all of its research credit available under section 41 against the tax imposed under section 3111(a) of the Code.

[4] Under sections 7001 and 7003 of the FFCRA, employers with fewer than 500 employees that provide paid sick and family leave, up to specified limits, to employees unable to work or telework due to certain circumstances related to COVID-19 may claim tax credits.  The FFCRA, as amended by the COVID-related Tax Relief Act of 2020 (COVID Relief Act), provides employers with fewer than 500 employees (eligible FFCRA employers) refundable tax credits that reimburse them for the cost of providing paid sick and family leave wages to employees unable to work or telework for reasons related to COVID-19 under the Emergency Paid Sick Leave Act (EPSLA) and the Emergency Family and Medical Leave Expansion Act (Expanded FMLA), respectively.  The credits are allowed against the employer's share of social security tax imposed under section 3111(a) of the Code, and so much of the taxes imposed on employers under section 3221(a) of the Code as are attributable to the rate in effect under section 3111(a) of the Code.  The FFCRA required eligible FFCRA employers to provide paid leave to such employees for periods after March 31, 2020, and before January 1, 2021.  The COVID Relief Act extended the period for which tax credits are available for employers providing paid sick and family leave that otherwise would meet the requirements of the FFCRA until March 31, 2021, although the requirement that employers provide the leave expired on December 31, 2020.  See Section 286 of the COVID Relief Act, which was enacted as Subtitle B of Title II of Division N of the Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat.1182 (Dec. 27, 2020).

[5] Section 303(d) of the Relief Act relates to a separate, unrelated employee retention credit for certain tax-exempt organizations affected by qualified natural disasters.  Section 303(d)(3)(C)(iii) of the Relief Act added a reference to section 303(d) to section 2301(b)(2) of the CARES Act, which impacts the ordering of the credits.

4

Exh. A
Complaint

Section 2301(b)(3) of the CARES Act provides that if the amount of the credit exceeds the applicable employment taxes (reduced by any credits claimed under section 3111(e) and (f) of the Code, sections 7001 and 7003 of the FFCRA, or section 303(d) of the Relief Act) for any calendar quarter, then the excess is treated as an overpayment and refunded to the employer under sections 6402(a) or section 6413(b) of the Code.

Eligible employers report their total qualified wages for purposes of the employee retention credit and claim the employee retention credit (including any refund in excess of the employer portion of social security tax) on their federal employment tax returns; for most employers, this is the quarterly Form 941, *Employer's Quarterly Federal Tax Return*.[6]

Section 2301(k) of the CARES Act instructs the Secretary of the Treasury (or the Secretary's delegate) to waive the penalty under section 6656 of the Code for failure to deposit the employer share of social security tax in anticipation of the allowance of the refundable credit under the CARES Act.  In addition, section 2301(l)(1) and (2) of the CARES Act provides for the advance payment of the credit (subject to the limitations of

---

[6] Some eligible employers will use other federal employment tax returns, such as the Form 944, *Employer's Annual Federal Tax Return*, Form 943, *Employer's Annual Federal Tax Return for Agricultural Employees*, or Form CT-1, *Employer's Annual Railroad Tax Return*, to report the amount of total qualified wages paid.

5

Exh. A
Complaint

the credit and based on information the Secretary requires) and the reconciliation of the advance payment at the time of filing the employment tax return.

Notice 2020-22, 2020-17 I.R.B. 664, provides eligible employers relief from the failure to deposit penalty imposed by section 6656 of the Code for an employer's failure to timely deposit employment taxes to the extent the amounts not deposited are equal to or less than the amount of refundable tax credits to which the eligible employer is entitled under the FFCRA and the CARES Act.[7]  Under the notice, an eligible employer will not be subject to a penalty under section 6656 for failing to deposit employment taxes in a calendar quarter if (1) the eligible employer paid qualified wages to its employees in the calendar quarter prior to the time of the required deposit, (2) the amount of employment taxes that the employer does not timely deposit, reduced by the amount of employment taxes not deposited in anticipation of the credits claimed under sections 7001 and 7003 of the FFCRA, is less than or equal to the amount of the employer's anticipated employee retention credit for the calendar quarter as of the time of the required deposit, and (3) the employer did not seek payment of an advance credit by filing Form 7200, *Advance Payment of Employer Credits Due to COVID-19*, with respect to the anticipated credits it relied upon to reduce its deposits.  Accordingly, in anticipation of receiving the employee retention credit, eligible employers can (1) reduce

_____

[7] Treasury and IRS will address the application of Notice 2020-22 in relation to the employee retention credit available for quarters in 2021 in future guidance.

6

Exh. A
Complaint

their deposits of federal employment taxes, including withheld taxes, that would otherwise be required, up to the amount of the anticipated credit, and (2) request an advance of the amount of the anticipated credit that exceeds the reduced federal employment tax deposits by filing Form 7200.  Reductions in deposits and advance payments are accounted for on the eligible employer's employment tax return.

### B.  Definition of "Eligible Employer"

The employee retention credit is available only to employers that are eligible employers.  Section 2301(c)(2)(A) of the CARES Act defines the term "eligible employer" as any employer carrying on a trade or business during calendar year 2020, and, with respect to any calendar quarter, for which (1) the operation of the trade or business carried on during calendar year 2020 is fully or partially suspended due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to COVID-19, or (2) such calendar quarter is within the period in which the employer had a significant decline in gross receipts, as described in section 2301(c)(2)(B) of the CARES Act.

Section 2301(c)(2)(B)(i) of the CARES Act provides that the period during which an employer experiences a significant decline in gross receipts begins with the first calendar quarter beginning after December 31, 2019, for which gross receipts (within the meaning of section 448(c) of the Code) for the calendar quarter are less than 50 percent of gross receipts for the same calendar quarter in the prior year.  Section 2301(c)(2)(B)(ii) of the CARES Act provides that the period during which an employer experiences a significant decline in gross receipts ends with the calendar quarter that

7

Exh. A
Complaint

follows the first calendar quarter beginning after a calendar quarter described in section 2301(c)(2)(B)(i) of the CARES Act for which gross receipts of the employer are greater than 80 percent of gross receipts for the same calendar quarter in the prior year.

Section 2301(c)(2)(C)(i) of the CARES Act provides that in the case of an organization described in section 501(c) of the Code and exempt from tax under section 501(a) of the Code (a tax-exempt organization), sections 2301(c)(2)(A)(i) (relating to the requirement of carrying on a trade or business) and 2301(c)(2)(A)(ii)(I) (relating to a full or partial suspension of the operation of a trade or business due to a governmental order) apply to all operations of the organization.  Section 2301(c)(2)(C)(ii) of the CARES Act provides that, in the case of a tax-exempt organization, any reference to gross receipts in section 2301 of the CARES Act is treated as a reference to gross receipts within the meaning of section 6033 of the Code.  Therefore, tax-exempt organizations should refer to the definition of gross receipts under section 6033 of the Code to determine whether they experienced a significant decline in gross receipts under section 2301 of the CARES Act.[8]

Section 2301(f) of the CARES Act provides that the employee retention credit does not apply to the Government of the United States, the government of any State or

_____

[8] Prior to the changes made by the Relief Act, section 448(c) of the Code applied to determine gross receipts of tax-exempt organizations under section 2301 of the CARES Act.  Although the Relief Act changed the definition of gross receipts applicable to tax-exempt organizations to reference the definition under section 6033 of the Code, the result under section 2301 of the CARES Act, as revised by the Relief Act, is substantially the same as the interpretation of "gross receipts" applicable to tax-exempt organizations in the FAQs posted on IRS.gov in 2020.

8

Exh. A
Complaint

political subdivision thereof, or any agency or instrumentality of those governments. Accordingly, these entities are not eligible employers.

Prior to the Relief Act amendments, section 2301(j) of the CARES Act provided that an eligible employer that received a covered loan under paragraph (36) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as added by section 1102 of the CARES Act (a Paycheck Protection Program loan or PPP loan) would not be eligible for the employee retention credit.  Section 206 of the Relief Act amended section 2301 of the CARES Act to permit an employer that received a PPP loan to be eligible to claim an employee retention credit under section 2301 of the CARES Act by striking section 2301(j) of the CARES Act, effective retroactive to the original effective date of the CARES Act.

### C.  Definition of "Qualified Wages"

Section 2301(a) of the CARES Act provides that the credit amount is equal to 50 percent of qualified wages with respect to each employee for each applicable calendar quarter in 2020.

For purposes of determining "qualified wages," section 2301(c)(5)(A) of the CARES Act provides that the term "wages" generally means wages as defined in section 3121(a) of the Code and compensation as defined in section 3231(e) of the Code.  Section 2301(c)(5)(B) of the CARES Act provides that "wages" include amounts paid by an eligible employer to provide and maintain a group health plan (as defined in section 5000(b)(1) of the Code), but only to the extent that the amounts are excluded from the gross income of employees by reason of section 106(a) of the Code.  Amounts

9

Exh. A
Complaint

treated as wages under section 2301(c)(5)(B) of the CARES Act are treated as paid with respect to any employee (and with respect to any period) to the extent the amounts are properly allocable to the employee (and to the period), and, except as otherwise provided by the Secretary of the Treasury (Secretary), the allocation will be treated as proper if made on the basis of being pro rata among periods of coverage.  References to "allocable qualified health plan expenses" or "qualified health plan expenses" in this notice are to the health plan expenses described in section 2301(c)(5)(B) of the CARES Act.[9]

Section 2301(c)(3)(A) of the CARES Act provides different definitions of "qualified wages" depending on the size of the employer, which is measured by the average number of full-time employees (within the meaning of section 4980H of the Code) employed by the eligible employer during 2019.

Section 2301(c)(3)(A)(i) of the CARES Act provides that if an eligible employer averaged more than 100 employees during 2019 (large eligible employer), qualified wages are those wages paid by the eligible employer with respect to which an employee is not providing services due to circumstances described in section 2301(c)(2)(A)(ii)(I) of the CARES Act (relating to a full or partial suspension of the

---

[9] The Relief Act removed the term "qualified health plan expenses" from the definition of qualified wages under section 2301(c)(3) of the CARES Act and included health plan expenses as part of the definition of wages in section 2301(c)(5) of the CARES Act.  The result under section 2301 of the CARES Act, as revised by the Relief Act, is substantially the same as the interpretation provided in the FAQs posted on IRS.gov in 2020.

Exh. A
Complaint

operation of a trade or business due to a governmental order) or section 2301(c)(2)(A)(ii)(II) of the CARES Act (relating to a significant decline in gross receipts). For large eligible employers, section 2301(c)(3)(B) of the CARES Act limits qualified wages that may be taken into account to the amount that the employee would have been paid for working an equivalent duration during the 30 days immediately preceding the period in which the qualified wages are paid or incurred.

Section 2301(c)(3)(A)(ii) of the CARES Act provides that if an eligible employer averaged 100 or fewer employees in 2019 (small eligible employer), qualified wages are those wages paid by the eligible employer with respect to an employee during any period described in section 2301(c)(2)(A)(ii)(I) of the CARES Act (relating to a calendar quarter for which the operation of a trade or business is fully or partially suspended due to a governmental order) or during a calendar quarter within the period described in section 2301(c)(2)(A)(ii)(II) of the CARES Act (relating to a significant decline in gross receipts).

The flush language in section 2301(c)(3)(A) of the CARES Act provides that qualified wages do not include any wages taken into account for purposes of the credits under sections 7001 or 7003 of the FFCRA.

Section 2301(b)(1) of the CARES Act limits the amount of qualified wages with respect to any employee that may be taken into account under section 2301(a) of the CARES Act to $10,000 for all calendar quarters in 2020.  Therefore, the maximum credit amount with respect to each employee for all four calendar quarters in 2020 is $5,000.

11

Exh. A
Complaint

**D. Election Not to Take Certain Wages into Account and Coordination with PPP Loan**

Section 2301(g)(1) of the CARES Act provides that section 2301 of the CARES Act does not apply to qualified wages paid by an eligible employer to the extent the employer elects not to take them into account for purposes of section 2301 of the CARES Act (at such time and in such manner as the Secretary may prescribe). Section 2301(g)(2) of the CARES Act provides that the Secretary, in consultation with the Administrator of the Small Business Administration, will issue guidance providing that payroll costs paid during the covered period for a PPP loan will not fail to be treated as qualified wages under section 2301 of the CARES Act, if an employer makes an election under section 2301(g)(1) of the CARES Act, to the extent that the PPP loan of the eligible employer is not forgiven by reason of a decision under section 7A(g) of the Small Business Act.[10]

Related to section 2301(g)(2) of the CARES Act, section 206(e)(2) of the Relief Act provides a special rule for employers that filed an employment tax return before December 27, 2020. Section 206(e)(2)(A) of the Relief Act provides that those employers may elect to treat any "applicable amount" as an amount paid in the fourth

---

[10] Section 7A(g) of the Small Business Act (15 U.S.C. 636(a)) sets forth the timing rule for lenders that receive an application for loan forgiveness from eligible recipients that received a Paycheck Protection Program loan. Specifically, section 7A(g) of the Small Business Act requires lenders to provide a decision regarding forgiveness no later than 60 days after the date on which the lender receives an application of loan forgiveness from an eligible recipient. The Relief Act added section 2301(g)(2) to the CARES Act when it struck section 2301(j) of the CARES Act, discussed above.

Exh. A
Complaint

calendar quarter of 2020.  Section 206(e)(2)(B) of the Relief Act defines the "applicable

amount," in part, as the amount of wages that are permitted to be treated as qualified

wages under guidance issued pursuant to section 2301(g)(2) of the CARES Act

(relating to the decision not to forgive a loan under section 7A(g) of the Small Business

Act), that were paid in the first, second, or third calendar quarter of 2020, and that were

not taken into account by the taxpayer in calculating the employee retention credit for

such calendar quarter (special fourth quarter rule).[11]

### E.  Aggregation Rules

Section 2301(d) of the CARES Act provides that all persons treated as a single

employer under section 52(a) or (b) of the Code, or section 414(m) or (o) of the Code,

will be treated as a single employer for purposes of the employee retention credit.

While this notice describes the aggregation rules under sections 52(a) and (b) and

414(m) and (o) in general terms, it does not provide separate guidance on the

substantive requirements of those aggregation rules or otherwise interpret those rules.

### F.  Other Rules Related to the Employee Retention Credit

Section 2301(e) of the CARES Act provides that rules similar to section 280C(a)

of the Code apply for purposes of the employee retention credit.  Section 280C(a) of the

Code generally disallows a deduction for the portion of wages or salaries paid or

------

[11] The special fourth quarter rule also applies to the applicable amount described in section 2301(c)(5)(B) of the CARES Act, which is qualified health plan expenses.

13

incurred equal to the sum of certain credits determined for the taxable year. Accordingly, a similar deduction disallowance applies under section 2301(e) of the CARES Act with regard to the employee retention credit, such that an employer's deduction for qualified wages, including qualified health plan expenses, is reduced by the amount of the employee retention credit.

Section 2301(e) of the CARES Act also provides that rules similar to the rules of section 51(i)(1) of the Code (relating to the work opportunity credit) apply for purposes of the employee retention credit. Section 51(i)(1) provides that wages paid to "related individuals" (within the meaning of section 51(i)(1)) may not be taken into account for determining the credit under section 51(a) of the Code. Accordingly, wages paid to related individuals may not be taken into account for determining qualified wages for the employee retention credit. Similarly, section 2301(h)(1) of the CARES Act provides that an employee will not be included for purposes of computing the employee retention credit for any period that an employer is allowed a work opportunity credit under section 51 with respect to that employee for that period.

Section 2301(h)(2) of the CARES Act states that any wages taken into account in determining the employee retention credit will not be taken into account for purposes of determining the credit allowed under section 45S of the Code (relating to paid and family medical leave).

14

Exh. A
Complaint

Finally, section 2301(h)(3) of the CARES Act provides that the employee retention credit is treated as a credit described in section 3511(d)(2) of the Code.[12]

### G. Regulations and Guidance

Section 2301(l) of the CARES Act requires the Secretary to issue forms, instructions, regulations, and guidance, as necessary, to allow for the advance payment of the credit, provide for reconciliation of the advance payment at the time of filing the employment tax return, and to apply the credit to third-party payers.  Section 2301(l) of the CARES Act also gives the Secretary authority to issue guidance on the application of the definition of a "significant decline in gross receipts" in the case of any employer that was not carrying on a trade or business for all or part of the same calendar quarter in the prior year and to prevent avoidance of the purposes of the limitations applicable to the employee retention credit.

### H. Deferral Under Section 2302 of the CARES Act

Section 2302 of the CARES Act provides that employers may defer the deposit and payment of the employer's share of social security tax and the portion of Tier 1 tax

---

[12] Section 3511 provides rules for Certified Professional Employer Organizations (CPEOs) and their customers with regard to employment taxes on wages paid by the CPEO to the customer's employees.  Section 3511(d) provides the following rules for certain credits specified in section 3511(d)(2): (1) credits with respect to a customer's work site employee apply to the customer, not the CPEO; (2) the customer, not the CPEO, takes into account wages and employment taxes paid by the CPEO with respect to the work site employee and for which the CPEO receives payment from the customer; and (3) the CPEO must furnish the customer and the Secretary with any information necessary for the customer to claim the credits.

15

Exh. A
Complaint

under the RRTA that is equivalent to the employer's share of social security tax for the period of March 27, 2020, through December 31, 2020.  Section 2302 does not impact an employer's eligibility to claim the employee retention credit.  However, because an employer may defer deposits under section 2302 before reducing deposits in anticipation of claiming the credit, the deferral may affect the amount that an employer may request as an advance of the credit.

### I.   Deferral Under Notice 2020-65 as Modified by Notice 2021-11

Notice 2020-65, 2020-38 I.R.B. 567, as modified by Notice 2021-11, 2021-6 I.R.B. 827, permits employers to postpone the withholding and payment of the employee's share of social security tax or the employee's share of Tier 1 tax under the RRTA that is equivalent to the employee's share of social security tax with respect to applicable wages (as defined in Notice 2020-65) paid to an employee on a pay date during the period beginning on September 1, 2020, and ending on December 31, 2020. Deferral under Notice 2020-65, as modified by Notice 2021-11, during the third or fourth quarter of 2020 does not impact an employer's eligibility to claim the employee retention credit.  However, because an employer may defer deposits of the employee's share of social security tax before reducing deposits in anticipation of claiming the credit, the deferral may affect the amount that an employer may request as an advance of the credit.

III. GUIDANCE

This Section III provides guidance in Q/A format on the following topics:

16

Exh. A
Complaint

A.  Eligible Employers

B.  Aggregation Rules

C.  Governmental Orders

D.  Full or Partial Suspension of Trade or Business Operations

E.  Significant Decline in Gross Receipts

F.  Maximum Amount of Employer's Employee Retention Credit

G.  Qualified Wages

H.  Allocable Qualified Health Plan Expenses

I.  Interaction with Paycheck Protection Program (PPP) Loans

J.  Claiming the Employee Retention Credit

K.  Special Issues for Employees: Income and Deduction

L.  Special Issues for Employers: Income and Deduction

M.  Special Issues for Employers: Use of Third-Party Payers

N.  Substantiation Requirements

**A. Eligible Employers**

**Question 1**: What is a "trade or business" for purposes of the employee retention credit?

**Answer 1**: For purposes of the employee retention credit, "trade or business" has the same meaning as when used in section 162 of the Code other than the trade or business of performing services as an employee.  Under section 162, an activity does not qualify as a trade or business unless its primary purpose is to make a profit and it is carried on with regularity and continuity.  The facts and circumstances of each case

17

Exh. A
Complaint

determine whether an activity is a trade or business.  A taxpayer does not necessarily need to make a profit in any particular year in order to be in a trade or business as long as a good faith profit motive is present.

For purposes of the employee retention credit, a tax-exempt organization described in section 501(c) of the Code that is exempt from tax under section 501(a) of the Code is deemed to be engaged in a "trade or business" with respect to all operations of the organization.

**Question 2**: How does an organization determine if it is considered an "instrumentality" of the Federal government, or of a State or local government, for purposes of the employee retention credit?

**Answer 2**: In general, for employment tax purposes, the IRS considers six factors in determining whether an organization is a government instrumentality.  The six factors that are used to determine whether an organization is an instrumentality are:

- whether the organization is used for a governmental purpose and performs a governmental function;

- whether performance of the organization's function is on behalf of one or more States or political subdivisions;

- whether there are any private interests involved, or whether the States or political subdivisions involved have the powers and interests of an owner;

- whether control and supervision of the organization is vested in a public authority or authorities;

18

Exh. A
Complaint

- if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and

- the degree of financial autonomy and the source of its operating expenses.

See Rev. Rul. 57-128, 1957-1 C.B. 311.  No one factor is determinative; instrumentality status is based on all the facts and circumstances.  These same factors apply to identify an instrumentality of the Federal government, or of a State or local government, for purposes of the employee retention credit.

**Question 3**: Are tribal governments and tribal entities eligible for the employee retention credit?

**Answer 3**: Yes.  Any tribal government or tribal entity that operates a trade or business may be an eligible employer for purposes of the employee retention credit if it otherwise satisfies the eligibility requirements to claim the credit.

As a general rule, whether activities constitute a trade or business for purposes of the employee retention credit is determined under section 162 of the Code. However, because tribal governments are not subject to income tax under the Code and, therefore, are generally not otherwise required to determine whether an activity of the tribe constitutes the carrying on of a trade or business under section 162, the Treasury Department and IRS have concluded that the section 162 standards are not the appropriate bases for determining whether a tribal government is carrying on a trade or business for purposes of the employee retention credit.  Instead, solely for purposes of the employee retention credit, a tribal government is treated as carrying on trade or business activities, and all activities conducted by the tribal government will be

19

Exh. A
Complaint

considered part of such trade or business activities, without the need for further analysis of whether those activities meet a particular standard for identifying trade or business operations.  In addition, solely for purposes of the employee retention credit, any entity that a tribal government reasonably believes shares the same tax status as the tribal government (tribal entity employer) may also consider all of its activities as trade or business activities.  Any entity other than a tribal government or a tribal entity employer must determine whether its activities constitute carrying on a trade or business under section 162 for purposes of determining eligibility for the employee retention credit.

**Question 4**: Are employers in U.S. Territories eligible for the employee retention credit?

**Answer 4**: Yes.  If an employer in a U.S. Territory otherwise qualifies for the employee retention credit then the employer is entitled to claim the credit.  Section 2301(c)(5)(A) of the CARES Act provides that qualified wages are, in general, wages as defined in section 3121(a) of the Code for purposes of the Federal Insurance Contributions Act (FICA) tax.  Payments of wages by employers in U.S. Territories are wages within the meaning of section 3121(a).  Accordingly, eligible employers include employers in the U.S. Territories that pay qualified wages and otherwise meet the requirements for the credit.

**Question 5**: Are self-employed individuals eligible for the employee retention credit?

**Answer 5**: Self-employed individuals are not eligible for the employee retention credit with respect to their own self-employment earnings.  However, a self-employed

Exh. A
Complaint

individual who employs other individuals in the self-employed individual's trade or business and who otherwise meets the requirements to be an eligible employer may be eligible for the employee retention credit with respect to qualified wages the self-employed individual pays to the employees.

**Question 6**: Are household employers eligible for the employee retention credit?

**Answer 6**: No.  Household employers are not considered to operate a trade or business and, therefore, are not eligible for the employee retention credit with respect to their household employees.  However, household employers who are also employers operating a trade or business and who generally report employment taxes attributable to their household employees on the same federal employment tax return used to report the employment taxes attributable to the employees of the trade or business, may be eligible for the employee retention credit, but only with respect to the trade or business employees and their qualified wages paid with respect to the trade or business.

### B. Aggregation Rules

**Question 7**: What is the general impact of the aggregation rules that treat certain entities as a single employer?

**Answer 7**: All entities that are members of a controlled group of corporations or trades or businesses under common control under sections 52(a) or (b) of the Code, members of an affiliated service group under section 414(m) of the Code, or otherwise aggregated under section 414(o) of the Code are treated as a single employer for purposes of applying the employee retention credit.  As a result, employers required to

21

Exh. A
Complaint

be aggregated are treated as a single employer for purposes of the following rules applicable to the employee retention credit:

- Determining whether the employer has a trade or business operation that was fully or partially suspended due to orders related to COVID-19 from an appropriate governmental authority;

- Determining whether the employer experiences a significant decline in gross receipts;

- Determining whether the employer averaged more than 100 full-time employees; and

- Determining the maximum credit amount per employee.

The aggregation rules under section 52(a) and (b) generally apply to determine which entities are treated as a single employer for purposes of the tax credits available to an employer under section 51 of the Code, as well as for other Code provisions.

Under section 52(a), corporate taxpayers that are members of a controlled group of corporations are treated as a single employer.  A controlled group of corporations may be either a parent-subsidiary controlled group, a brother-sister controlled group, or a combined group of corporations.[13]  The section 52(b) aggregation rules apply to

_____

[13] A parent-subsidiary controlled group of corporations is one or more chains of corporations where the common parent corporation owns more than 50 percent of the total combined voting power of all classes of stock entitled to vote, or more than 50 percent of the value of all classes of stock of each corporation.  A brother-sister controlled group of corporations is two or more corporations where (1) five

22

Exh. A
Complaint

partnerships, trusts, estates, corporations, or sole proprietorships in trades or businesses under common control. Under this rule, entities are treated as a single employer if they are under common control applying rules similar to the parent-subsidiary or brother-sister controlled group rules or the rules for a combined group of corporations.

Section 414(m)(1) provides that employees of members in an affiliated service group under section 414(m)(2) and (5) are treated as employed by a single employer for purposes of employee benefit requirements listed in section 414(m)(4).[14] In addition, section 414(o) generally provides that the Secretary shall prescribe regulations necessary to prevent avoidance of any of the employee benefit requirements listed in section 414(m)(4) through the use of separate organizations or other arrangements. Many Code provisions, particularly those addressing employee benefits, apply the aggregation rules of section 414(m) and (o). For example, section 414(t) generally

---

or fewer persons who are individuals, estates, or trusts own at least 80 percent of the total combined voting power of all classes of stock entitled to vote, or the total value of shares of all classes of stock of each corporation; and (2) the same five or fewer persons, taking into account ownership only to the extent that it is identical with respect to each corporation, own more than 50 percent of the total voting power of all classes of stock entitled to vote, or total value of shares of all classes of stock of each corporation. A combined group of corporations is three or more corporations, each of which is a member of either a parent-subsidiary or a brother-sister controlled group, and at least one of which is both the common parent of a parent-subsidiary controlled group and also a member of a brother-sister controlled group. See Treas. Reg. § 1.52-1.

[14] There are three types of affiliated service groups described in section 414(m). The first and second types of affiliated service groups are described under section 414(m)(2) and require a combination of common ownership and performance of services among certain organizations. The third type of affiliated service group is described under section 414(m)(5), requires no common ownership, and aggregates employers based on the performance of management functions by one organization for another organization (and related organizations).

23

provides that the aggregation rules in section 414(m) and (o) apply to various Code provisions listed in section 414(t)(2).

**Question 8**: How is the employee retention credit allocated to an eligible employer that is a member of an aggregated group?

**Answer 8**: The amount of the employee retention credit with respect to a member of the aggregated group is based on the member's proportionate share of the qualified wages giving rise to the credit for each calendar quarter (or other prescribed period for which a tax return is required to be filed) for which the credit is claimed.

**Question 9**: How do the aggregation rules apply to tribes and tribal entities?

**Answer 9**: In determining eligibility for the employee retention credit, all employers must apply the aggregation rules under section 52(a) and (b) and section 414(m) and (o) of the Code.  For purposes of the employee retention credit, tribal governments and tribal entity employers (as defined in Q/A–3) should use a reasonable, good faith interpretation in determining how the aggregation rules apply.

### C. Governmental Orders

**Question 10**: What "orders from an appropriate governmental authority" may be taken into account by an employer for purposes of determining eligibility for the employee retention credit?

**Answer 10**: Orders, proclamations, or decrees from the Federal government or any State or local government may be taken into account by an employer as "orders from an appropriate governmental authority" only if they limit "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the

24

Exh. A
Complaint

coronavirus disease 2019 (COVID-19)" and relate to the suspension of an employer's operation of its trade or business.  Orders that are not from the Federal government must be from a State or local government that has jurisdiction over the employer's operations.  These orders are referred to as "governmental orders."  Whether orders, proclamations or decrees are governmental orders is determined without regard to the level of enforcement of the governmental order.

Statements from a governmental official, including comments made during press conferences or in interviews with the media, do not rise to the level of a governmental order for purposes of the employee retention credit.  Additionally, the declaration of a state of emergency by a governmental authority is not sufficient to rise to the level of a governmental order if it does not limit commerce, travel, or group meetings in any manner.  Further, such a declaration that limits commerce, travel, or group meetings, but does so in a manner that does not relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for purposes of the employer's determination of its eligibility for the employee retention credit.

Governmental orders include:

- An order from the city's mayor stating that all non-essential businesses must close for a specified period;

- A State's emergency proclamation that residents must shelter in place for a specified period, other than residents who are employed by an essential business and who may travel to and work at the workplace location;

25

- An order from a local official imposing a curfew on residents that impacts the operating hours of a trade or business for a specified period;

- An order from a local health department mandating a workplace closure for cleaning and disinfecting.

Whether the operations of a trade or business are considered essential or non-essential will often vary from jurisdiction to jurisdiction.  An employer should determine whether it is operating an essential or non-essential business by referring to the governmental order affecting the employer's operation of its trade or business.

_Example 1_: Governor of State Y issues an order that all non-essential businesses must close from March 20, 2020, until April 30, 2020.  The order provides a list of non-essential businesses, including gyms, spas, nightclubs, barber shops, hair salons, tattoo parlors, physical therapy offices, waxing salons, fitness centers, bowling alleys, arcades, racetracks, indoor children's play areas, theaters, chiropractors, planetariums, museums, and performing arts centers.  The governor's order is a governmental order limiting the operations of non-essential businesses; therefore, employers with non-essential businesses to which the governmental order applies may be considered eligible employers for purposes of the employee retention credit.

_Example 2_: Mayor of City Y holds a press conference encouraging residents to practice social distancing to prevent the spread of COVID-19.  The statement during the press conference is not an order limiting commerce, travel, or group meetings. Accordingly, the mayor's statement would not be a governmental order for purposes of the employee retention credit.

26

Exh. A
Complaint

*Example 3*: A restaurant is ordered by a local health department to close due to a health code violation.  Since the order is unrelated to COVID-19, it would not be considered a governmental order for purposes of the employee retention credit.

### D.  Full or Partial Suspension of Trade or Business Operations

**Question 11**: If a governmental order requires non-essential businesses to suspend operations but allows essential businesses to continue operations, is an essential business considered to have a full or partial suspension of operations due to a governmental order?

**Answer 11**: An employer that operates an essential business is not considered to have a full or partial suspension of operations if the governmental order allows all of the employer's operations to remain open.  However, an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order.  For example, an employer that maintains both essential and non-essential business operations, each of which are more than nominal portions of the business operations, may be considered to have a partial suspension of its operations if a governmental order restricts the operations of the non-essential portion of the business, even if the essential portion of the business is unaffected.  In addition, an essential business that is permitted to continue its operations may, nonetheless, be considered to have a partial suspension of its operations if a governmental order requires the business to close for a period of time during normal working hours.

Exh. A
Complaint

Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

**Question 12**: If a governmental order causes the suppliers to a business to suspend their operations, is the business considered to have a suspension of operations due to a governmental order?

**Answer 12**: An employer may be considered to have a full or partial suspension of operations due to a governmental order if, under the facts and circumstances, the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations.  If the facts and circumstances indicate that the business's operations are fully or partially suspended as a result of the inability to obtain critical goods or materials from its suppliers because they were required to suspend operations, then the business would be considered an eligible employer for calendar quarters during which its operations are fully or partially suspended and may be eligible to receive the employee retention credit.

28

*Example*: Employer A operates an auto parts manufacturing business.  Employer A's supplier of raw materials is required to fully suspend its operations due to a governmental order.  Employer A is unable to procure these raw materials from an alternate supplier.  As a consequence of the suspension of Employer A's supplier, Employer A is not able to perform its operations for a period of time.  Under these facts and circumstances, Employer A would be considered an eligible employer during this period because its operations have been suspended due to the governmental order that suspended operations of its supplier.

**Question 13**: If a governmental order causes the customers of a business to stay at home, or otherwise causes a reduction in demand for its products or services, and the business responds to the lack of demand by suspending some or all of its operations, is the business considered to have a suspension of operations due to a governmental order?

**Answer 13**: No.  An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension of its operations due to a governmental order.

If an employer's operations are not suspended due to a governmental order but the employer experiences a reduction in demand, the employer may be considered an eligible employer if it experiences a significant decline in gross receipts.

29

Exh. A
Complaint

*Example*: Employer B, an automobile repair service business, is an essential business and is not required to close its locations or suspend its operations.  Due to a governmental order that limits travel and requires members of the community to stay at home except for certain essential travel, such as going to the grocery store, Employer B's business has declined significantly.  Employer B suspends its operations due to the lack of demand.  Employer B is not considered to have a full or partial suspension of operations due to a governmental order.

**Question 14**: If an employer voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19, but the suspension or reduction in hours is not due to a governmental order, may the employer qualify as an eligible employer solely on the basis of the voluntary suspension or reduction in hours?

**Answer 14**: No.  An employer that voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19 is not eligible for the employee retention credit on the basis of a full or partial suspension of its operations.

**Question 15**: If a governmental order requires an employer to close its workplace, but the employer is able to continue operations comparable to its operations prior to the closure by requiring employees to telework, is the employer considered to have a suspension of operations?

**Answer 15**: No.  If an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are

Exh. A
Complaint

not considered to have been fully or partially suspended as a consequence of a governmental order.

However, if the closure of the workplace causes the employer to suspend business operations for certain purposes, but not others, it may be considered to have a partial suspension of operations due to the governmental order.

*Example 1*: Employer C, a software development company, maintains an office in a city where the mayor has ordered that only essential businesses may operate. Employer C's business is not essential under the mayor's order, and therefore Employer C is required to close its office.  Prior to the governmental order, all employees at the company teleworked once or twice per week, and business meetings were held at various locations.  Following the governmental order, the company ordered mandatory telework for all employees and limited client meetings to telephone or video conferences.  Employer C's business operations are not considered to be fully or partially suspended due to the governmental order because the employer is able to continue its business operations in a comparable manner.

*Example 2*: Employer D operates a physical therapy facility in a city where the mayor has ordered that only essential businesses may operate.  Employer D's business is not considered essential under the mayor's order, and therefore Employer D is required to close its workplace.  Prior to the governmental order, none of Employer D's employees provided services through telework and all appointments, administration, and other duties were carried out at Employer D's workplace.  Following the governmental order, Employer D moves to an online format and is able to serve some

31

Exh. A
Complaint

clients remotely, but employees cannot access specific equipment or tools that they typically use in therapy and not all clients can be served remotely.  Employer D's business operations are considered to be partially suspended due to the governmental order because Employer D's workplace, including access to physical therapy equipment, is central to its operations, and the business operations cannot continue in a comparable manner.

_Example 3_: Employer E, a scientific research company with facilities in a state in which the governor has ordered that only essential businesses may operate, conducts research in a laboratory setting and through the use of computer modeling.  Employer E's business is not essential under the governor's order, and therefore Employer E is required to close its workplace.  Prior to the governmental order, Employer E's laboratory-based research operations could not be conducted remotely (other than certain related administrative tasks) and employees involved in laboratory-based research worked on-site.  Employer E's computer modeling research operations could be conducted remotely, and employees who engaged in this portion of the business often teleworked.  Following the governmental order, the employees engaged in the laboratory-based research cannot perform their work while the facility is closed and are limited to performing administrative tasks during the closure.  In contrast, all employees engaged in computer modeling research are directed to telework, and those business operations are able to continue in a comparable manner.  Employer E's business operations are considered to be partially suspended due to the governmental order

32

Exh. A
Complaint

because Employer E's laboratory-based research business operations cannot continue in a comparable manner.

**Question 16**: What factors should be considered in determining if an employer is able to continue operations comparable to its operations prior to closure such that the employer's operations are not considered to have been fully or partially suspended due to a governmental order?

**Answer 16**: The following factors should be considered in determining if an employer is able to continue comparable operations, although additional factors may be considered as well if relevant:

(1) Employer's telework capabilities.  Determine whether an employer has adequate support (IT and otherwise) such that operations can continue via work from another location.

(2) Portability of employees' work.  Determine the amount of portable work, or work otherwise adaptable to be performed from a remote location, within an employer's trade or business operations.

(3) Need for presence in employee's physical work space.  Evaluate the role that the employer's physical work space plays in an employer's trade or business (may be critical and necessary, beneficial but not necessary, or merely convenient).  If the employer's physical work space is so critical to its trade or business operations that tasks central to the trade or business's operations are unable to be performed remotely, then this factor alone indicates that the employer is not able to continue comparable operations.  Examples of work

33

space that is critical include laboratories or manufacturing involving special

equipment or materials that cannot be accessed or operated remotely.

(4) Transitioning to telework operations.  If an employer can conduct comparable

operations via telework, but the employer's operations did not previously

allow for telework, or allowed for only minimal telework, then some

adjustment period is expected, and, generally, the employer's operations are

not considered partially suspended during that period.  However, if an

employer incurs a significant delay (for example, beyond 2 weeks) in moving

operations to comparable telework (for example, implementing telework

policies or providing employees with equipment to telework), then the

employer's trade or business operations may be deemed subject to a partial

suspension during that transition period.

**Question 17**: If a governmental order requires an employer to close its

workplace for certain purposes, but the workplace may remain operational for other

limited purposes, is the employer considered to have a suspension of operations due to

the governmental order?

**Answer 17**: If an employer's workplace is closed due to a governmental order for

certain purposes, but the employer's workplace may remain open for other limited

purposes, the employer's operations would be considered to be partially suspended if,

under the facts and circumstances, the operations that are closed are more than a

nominal portion of its business operations and cannot be performed remotely in a

comparable manner.  If all, or all but a nominal portion, of an employer's business

34

operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances. See Q/A 18 for a description of factors that may be used for determining if a modification required by a governmental order has more than a nominal effect on business operations.

_Example 1_: Employer F, a restaurant business, must close its restaurant to on-site dining due to a governmental order closing all restaurants, bars, and similar establishments for sit-down service.  Employer F is allowed to continue food or beverage sales to the public on a carry-out, drive-through, or delivery basis.  On-site dining is more than a nominal portion of Employer F's business operations.  Employer F's business operations are considered to be partially suspended because, under the facts and circumstances, more than a nominal portion of its business operations—its indoor and outdoor dining service—is suspended due to the governmental order.

_Example 2_: Same facts as Example 1, except that two months later, under a subsequent governmental order, Employer F is permitted to offer sit-down service in its outdoor space, but its indoor dining service continues to be closed.  During this period, Employer F is allowed to operate only its outdoor sit-down and carry-out service in accordance with the order.  Indoor dining is more than a nominal portion of Employer F's business operations.  Employer F's business operations are considered to be

35

Exh. A
Complaint

partially suspended because, under the facts and circumstances, more than a nominal portion of its business operations – its indoor dining service – is suspended due to a governmental order.  The following month, under a further governmental order, Employer F is permitted to offer indoor dining service, in addition to outdoor sit-down and carry-out service, provided that all tables in the indoor dining room must be spaced at least six feet apart.  This spacing constraint has more than a nominal effect on Employer F's business operations.  During this period, even though Employer F resumed all categories of its business operations, Employer F's business operations continue to be partially suspended because, under the facts and circumstances, the governmental order restricting its indoor dining service has more than a nominal effect on its operations.

*Example 3*: Employer G, a retail business, must close its retail storefront locations due to a governmental order.  The retail business also maintains a website through which it continues to fulfill online orders; the retailer's online ordering and fulfillment system is unaffected by the governmental order.  The retail storefront locations are more than a nominal portion of Employer G's business operations.  Employer G's business operations are considered to have been partially suspended due to the governmental order requiring it to close its retail storefront locations, which are more than a nominal portion of its business operations.

*Example 4*: Employer H, a hospital, is considered to be operating an essential business under a governmental order with respect to its emergency department, intensive care, and other services for conditions requiring urgent medical care.

36

However, the governmental order treats Employer H's elective and non-urgent medical procedures as non-essential business operations and prevents Employer H from performing these services.  Employer H suspends operations related to elective and non-urgent medical procedures, which are more than a nominal portion of Employer H's business operations.  Although Employer H is an essential business, Employer H is considered to have a partial suspension of operations due to the governmental order that prevents Employer H from performing elective and non-urgent medical procedures, which are more than a nominal portion of its business operations under the facts and circumstances.

*Example 5*: Employer I, a grocery store, is considered to be operating an essential business under a governmental order.  However, the governmental order requires grocery stores to discontinue their self-serve offerings, such as salad bars, though they may offer prepared or prepackaged food.  Employer I modifies its operations to close its salad bar and other self-serve offerings and instead offers prepackaged salads and other items.  The salad bar and other self-serve offerings are not more than a nominal portion of Employer I's business operations.  Further, the governmental order requiring Employer I to discontinue its self-serve offerings does not have more than a nominal effect on Employer I's business operations under the facts and circumstances, even though Employer I was required to modify its business operations.  Accordingly, Employer I's business operations are not considered to be partially suspended due to a governmental order.

37

Exh. A
Complaint

*Example 6*: Employer J, a large retailer, is required to close its storefront location due to a governmental order, but is permitted to provide customers with curbside service to pick up items ordered online or by phone.  The retail storefront location is more than a nominal portion of Employer J's business operations.  During this period, Employer J's business operations are considered to have been partially suspended due to the governmental order requiring it to close its storefront location.  Two months later, under a subsequent governmental order, Employer J is permitted to reopen its storefront location.  Under the subsequent governmental order, however, Employer J must enforce social distancing guidelines that require Employer J to admit only a specified number of customers into the store per 1,000 square feet.  While the governmental order results in customers waiting in line for a short period of time to enter the store during certain busy times of the week, the size of Employer J's storefront is large enough that it is able to accommodate all of its customers after these short waits outside the store.  The governmental order requiring Employer J to enforce social distancing guidelines does not have more than a nominal effect on Employer J's business operations under the facts and circumstances, even though Employer J is required to modify its business operations.  During this period, Employer J's business operations are not considered to be partially suspended due to the governmental order because the governmental order requiring enforcement of social distancing guidelines does not have more than a nominal effect on its operations.

38

Exh. A
Complaint

**Question 18**: What factors should be taken into account in determining whether a modification required by a governmental order has more than a nominal effect on business operations for purposes of Q/A–17?

**Answer 18**: The types of modifications that are contemplated by Q/A–17 are those required by a governmental order as a condition of reopening a physical space for business or service to the public.  Examples of these modifications include: limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis (for businesses that previously offered walk-in service), changing the format of service (for example, restrictions on buffet or self-serve, but not prepackaged or carry-out), or requiring employees and customers to wear face coverings.

The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations. Whether a modification required by a governmental order has more than a nominal effect on the business operations is based on the facts and circumstances.  A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations.  For example, occupancy restrictions at a restaurant with indoor dining service may result in an actual, and more than nominal, reduction of the restaurant's ability to service customers; however, an occupancy restriction at a retailer with

39

Exh. A
Complaint

sufficient physical space to accommodate its customers regardless of the restriction will likely not result in an actual, and more than nominal, reduction of the retailer's ability to provide goods to its customers.

Modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations.

**Question 19**: Are an employer's operations considered to be partially suspended for purposes of the employee retention credit if the employer is required to reduce its operating hours by a governmental order?

**Answer 19**: Yes.  An employer that reduces its operating hours due to a governmental order is considered to have partially suspended its operations since the employer's operations have been limited by a governmental order.

*Example*: Employer K operates a food processing facility that normally operates 24 hours a day.  A governmental order issued by the local health department requires all food processing businesses to deep clean their workplaces once every 24 hours in order to reduce the risk of COVID-19 exposure.  In order to comply with the governmental order, Employer K reduces its daily operating hours by five hours per day so that a deep cleaning may be conducted within its workplace once every 24 hours. Employer K is considered to have partially suspended its operations due to the governmental order requiring it to reduce its hours of operation.

**Question 20**: Is an employer that operates a trade or business in multiple locations and is subject to governmental orders requiring full or partial suspension of its operations in some jurisdictions, but not in others, considered to have a partial suspension of operations?

**Answer 20**: Yes.  Employers that operate a trade or business in multiple locations and are subject to State and local governmental orders requiring full or partial suspension of operations in some, but not all, jurisdictions are considered to have a partial suspension of operations.  Employers that operate a trade or business on a national or regional basis may be subject to governmental orders requiring closure of their locations in certain jurisdictions, but may not be subject to a governmental order in other jurisdictions.  To operate in a consistent manner in all jurisdictions, these employers may establish a policy that complies with the local governmental orders, as well as the Center for Disease Control and Prevention (CDC) recommendations and the Department of Homeland Security (DHS) guidance; in this case, even though the employer may not be subject to a governmental order to suspend operations of its trade or business in certain jurisdictions, and may merely be following CDC or DHS guidelines in those jurisdictions, the employer would still be considered to have partially suspended operations due to the governmental orders requiring closure of its business operations in certain jurisdictions.  Therefore, the employer would be an eligible employer with respect to all of its operations in all locations for calendar quarters during which the employer's operations are partially suspended whether or not the employer voluntarily adopts consistent measures for its business operations in other jurisdictions.

41

*Example*: Employer L is a national retail store chain with operations in every state in the United States.  In some jurisdictions, Employer L is subject to a governmental order to close its stores to customers, but is permitted to provide customers with curbside service to pick up items ordered online or by phone.  In these jurisdictions, Employer L determines that it is not continuing comparable operations and that the stores that are closed to customers are more than a nominal portion of its business operations.  In other jurisdictions, Employer L is not subject to any governmental order to close its stores to customers or is considered an essential business permitting its stores to fully remain open.  Employer L establishes a company-wide policy, in compliance with the local governmental orders and consistent with the CDC and DHS recommendations and guidance, requiring the closure of all stores and operating with curbside pick-up only, even in those jurisdictions where the business was not subject to a governmental order.  As a result of the governmental orders requiring closure of Employer L's stores to customers in certain jurisdictions, Employer L has a partial suspension of operations of its trade or business whether or not Employer L chooses to take consistent measures for stores in other jurisdictions.  The partial suspension results in Employer L being an eligible employer nationwide for calendar quarters during which the employer's operations are partially suspended.

**Question 21**: If the operations of a trade or business of one member of an aggregated group are fully or partially suspended due to a governmental order, are the operations of the trade or business of the other members of the aggregated group

42

Exh. A
Complaint

considered to be fully or partially suspended for purposes of the employee retention credit?

**Answer 21**: Yes.  All members of an aggregated group that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of the employee retention credit.  If a trade or business is operated by multiple members of an aggregated group, and if the operations of one member of the aggregated group are suspended due to a governmental order, then all members of the aggregated group are considered to have their operations partially suspended, even if another member of the group is in a jurisdiction that is not subject to a governmental order.

*Example*: Employer Group M is a restaurant chain that operates a single trade or business through multiple subsidiary corporations located in various jurisdictions.  Employer Group M is treated as a single employer under the aggregation rules for purposes of the employee retention credit.  Certain members of Employer Group M's operations are fully suspended due to a governmental order, while other members of Employer Group M's operations are not subject to a governmental order and remain open.  Because Employer Group M is treated as a single employer for purposes of the employee retention credit, the operations of all members of Employer Group M are treated as fully or partially suspended due to governmental orders suspending the operations of certain of Employer Group M members.

**Question 22**: If an employer is subject to a governmental order to fully or partially suspend its business operations and the order is subsequently lifted in the

43

Exh. A
Complaint

middle of a calendar quarter, is the employer an eligible employer for the entire calendar quarter?

**Answer 22**: Yes.  An employer with business operations that are fully or partially suspended due to a governmental order during a portion of a calendar quarter is an eligible employer for the entire calendar quarter.  However, only wages paid with respect to the period during which the employer is fully or partially suspended due to a governmental order may be considered qualified wages.

*Example*: State Y issued a governmental order for all non-essential businesses to close from March 10, 2020, through April 30, 2020, and the governmental order was not extended.  Pursuant to the order, Employer N, which operates a non-essential business in State Y, closes from March 10 through April 30.  Employer N is a large eligible employer in the first quarter and second quarter of 2020, but may claim the credit only for qualified wages paid from March 13, 2020, the effective date of section 2301 of the CARES Act, through April 30, 2020, with respect to employees who were not providing services during this period because of the suspension of operations due to State Y's governmental order.

### E.  Significant Decline in Gross Receipts

**Question 23**: How is the period during which there is a significant decline in gross receipts determined?

**Answer 23**: The period during which there is a significant decline in gross receipts is determined by identifying the first calendar quarter in 2020 (if any) in which an employer's gross receipts are less than 50 percent of its gross receipts for the same

Exh. A
Complaint

calendar quarter in 2019.  The period during which there is a significant decline in gross receipts ends with the earlier of January 1, 2021, or the calendar quarter that follows the first calendar quarter in which the employer's 2020 quarterly gross receipts are greater than 80 percent of its gross receipts for the same calendar quarter in 2019

*Example*: Employer A's gross receipts were $100,000, $190,000, and $230,000 in the first, second, and third calendar quarters of 2020, respectively.  Its gross receipts were $210,000, $230,000, and $250,000 in the first, second, and third calendar quarters of 2019, respectively.  Thus, Employer A's 2020 first, second, and third quarter gross receipts were approximately 48 percent, 83 percent, and 92 percent of its 2019 first, second, and third quarter gross receipts, respectively.  Accordingly, Employer A experienced a significant decline in gross receipts commencing on the first day of the first calendar quarter of 2020 (the calendar quarter in which gross receipts were less than 50 percent of those in the same quarter of 2019) and ending on the first day of the third calendar quarter of 2020 (the quarter following the first quarter in which the gross receipts were more than 80 percent of those in the same quarter of 2019).  Thus, Employer A is an eligible employer during the first and second calendar quarters of 2020.

**Question 24**: What are "gross receipts" for an employer other than a tax-exempt organization?

**Answer 24**: "Gross receipts" for purposes of the employee retention credit, for an employer other than a tax-exempt organization, has the same meaning as when used under section 448(c) of the Code.  Under the section 448(c) regulations, "gross receipts"

45

Exh. A
Complaint

means gross receipts of the taxable year and generally includes total sales (net of returns and allowances) and all amounts received for services.  In addition, gross receipts include any income from investments, and from incidental or outside sources. For example, gross receipts include interest (including original issue discount and tax-exempt interest within the meaning of section 103 of the Code), dividends, rents, royalties, and annuities, regardless of whether those amounts are derived in the ordinary course of the taxpayer's trade or business.  Gross receipts are generally not reduced by cost of goods sold, but are generally reduced by the taxpayer's adjusted basis in certain property used in a trade or business or capital assets sold.  Gross receipts do not include the repayment of a loan, or amounts received with respect to sales tax if the tax is legally imposed on the purchaser of the good or service, and the taxpayer merely collects and remits the sales tax to the taxing authority.

**Question 25**: What are "gross receipts" for a tax-exempt employer?

**Answer 25**: "Gross receipts" for purposes of the employee retention credit, for a tax-exempt organization, has the same meaning as under section 6033 of the Code. Under the section 6033 regulations, "gross receipts" means the gross amount received by the organization from all sources without reduction for any costs or expenses including, for example, cost of goods or assets sold, cost of operations, or expenses of earning, raising, or collecting such amounts.  Thus, gross receipts includes, but is not limited to, the gross amount received as contributions, gifts, grants, and similar amounts without reduction for the expenses of raising and collecting such amounts, the gross amount received as dues or assessments from members or affiliated organizations

46

Exh. A
Complaint

without reduction for expenses attributable to the receipt of such amounts, gross sales or receipts from business activities (including business activities unrelated to the purpose for which the organization qualifies for exemption), the gross amount received from the sale of assets without reduction for cost or other basis and expenses of sale, and the gross amount received as investment income, such as interest, dividends, rents, and royalties.

To determine whether there has been a significant decline in gross receipts, a tax-exempt employer computes its gross receipts received from all of its operations during the calendar quarter and compares those gross receipts to the gross receipts received for the same calendar quarter in 2019.

**Question 26**: For members of an aggregated group, is a significant decline in gross receipts determined based on the entire group?

**Answer 26**: Yes.  All entities that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of determining whether the employer experienced a significant decline in gross receipts.

To be an eligible employer on the basis of a significant decline of gross receipts, the employer must take into account the gross receipts of all members of the aggregated group.  If the aggregated group does not experience a significant decline in gross receipts, then no member of the group may claim the employee retention credit on that basis.

*Example*: Employer B and Employer C are members of a section 52(a) controlled group of corporations and are treated as a single employer under the aggregation rules.

47

Exh. A
Complaint

Because Employer B and Employer C are treated as a single employer under the aggregation rules, they must be treated as a single employer for purposes of determining whether there has been a significant decline in gross receipts.  Neither Employer B nor Employer C is subject to a governmental order suspending business operations.  Employer B has gross receipts of $1,000,000 in the second quarter of 2019 and $400,000 in the second quarter of 2020.  Employer C has gross receipts of $1,000,000 in second quarter of 2019 and $750,000 in second quarter of 2020.  Although Employer B's gross receipts in the second quarter of 2020 were 40 percent of its 2019 second quarter gross receipts, neither Employer B nor Employer C can claim the employee retention credit due to a significant decline in gross receipts.  This is because Employers B and C are treated as a single employer for purposes of the employee retention credit and had combined gross receipts of $2,000,000 in the second quarter of 2019 and $1,150,000 in the second quarter of 2020.  Their combined gross receipts for the second quarter of 2020 would have had to be less than $1,000,000 (50 percent of $2,000,000) for Employers B and C to have experienced a significant decline in gross receipts for the second quarter of 2020.

**Question 27**: How does an employer that started its business in 2019 determine whether it experienced a significant decline in gross receipts for purposes of the employee retention credit?

**Answer 27**: An employer that started its business in the first quarter of 2019 should use the gross receipts for the applicable quarter of 2019, as described below, for

48

Exh. A
Complaint

comparison to the gross receipts for the same quarter in 2020 to determine whether it experienced a significant decline in gross receipts in any quarter of 2020.

An employer that started its business in the second quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for the first two quarters in 2020 and should use the third and fourth quarters of 2019 for comparison to the third and fourth quarters of 2020, respectively, to determine whether it experienced a significant decline in gross receipts for those quarters.

An employer that started its business in the third quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for the first three quarters in 2020 and should use the fourth quarter of 2019 for comparison to the fourth quarter of 2020 to determine whether it experienced a significant decline in gross receipts for that quarter.

An employer that started its business in the fourth quarter of 2019 should use that quarter as the base period to determine whether it experienced a significant decline in gross receipts for any quarter in 2020.

If an employer commenced business in the middle of a quarter in 2019, the employer should estimate the gross receipts it would have had for the entire quarter based on the gross receipts for the portion of the quarter that the business was in operation.  To calculate this amount, the employer may use any reasonable method, including extrapolating the gross receipts for the quarter based on the gross receipts for the number of days its business was operating during the quarter.

49

Exh. A
Complaint

**Question 28**: How does an employer that acquires a trade or business during the 2020 calendar year determine if the employer experienced a significant decline in gross receipts?

**Answer 28**: For purposes of the employee retention credit, to determine whether an employer experiences a significant decline in gross receipts, an employer that acquires (in an asset purchase, stock purchase, or any other form of acquisition) a trade or business during 2020 (an acquired business) is required to include the gross receipts from the acquired business in its gross receipts computation for each calendar quarter that it owns and operates the acquired business.  Solely for purposes of the employee retention credit, when an employer compares its gross receipts for a 2020 calendar quarter when it owns an acquired business to its gross receipts for the same calendar quarter in 2019, the employer may, to the extent the information is available, include the gross receipts of the acquired business in its gross receipts for the 2019 calendar quarter.  Under this safe harbor approach, the employer may include these gross receipts regardless of the fact that the employer did not own the acquired business during that 2019 calendar quarter.

An employer that acquires a trade or business in the middle of a calendar quarter in 2020 and that chooses to use this safe harbor approach must estimate the gross receipts it would have had from that acquired business for the entire quarter based on the gross receipts for the portion of the quarter that it owned and operated the acquired business.  However, an employer that chooses not to use this safe harbor approach is

50

required to include only the gross receipts from the acquired business for the portion of the quarter that it owned and operated the acquired business.

*Example*: Employer D acquired all of the assets of a trade or business in a taxable transaction on January 1, 2020.  The gross receipts of the acquired business were $50,000 for the quarter beginning January 1, 2020, and ending March 31, 2020, and $200,000 for the quarter beginning January 1, 2019, and ending March 31, 2019.  Employer D has access to the books and records from the prior owner of the acquired trade or business and can determine the amount of gross receipts attributable to the trade or business for the quarter beginning January 1, 2019, and ending March 31, 2019.  For purposes of the employee retention credit, Employer D must include $50,000 in its gross receipts computation for the quarter beginning January 1, 2020, and ending March 31, 2020 (because Employer D actually owned the trade or business) and may include $200,000 in its gross receipts computation for the quarter beginning January 1, 2019, and ending March 31, 2019.

### F.  Maximum Amount of Employer's Employee Retention Credit

**Question 29**: How is the maximum amount of the employee retention credit available to eligible employers determined?

**Answer 29**: The credit equals 50 percent of qualified wages (including allocable qualified health plan expenses) that an eligible employer pays in a calendar quarter. The maximum amount of qualified wages (including allocable qualified health plan expenses) taken into account with respect to each employee for all calendar quarters in

51

Exh. A
Complaint

2020 is $10,000, which means that the maximum credit for qualified wages (including allocable qualified health plan expenses) paid to any employee in 2020 is $5,000.

If an employee is employed by two or more entities treated as a single employer under the aggregation rules, the maximum amount of qualified wages for all calendar quarters that may be taken into account with respect to that employee is $10,000 in the aggregate; thus, an aggregated group treated as a single employer may not claim more than the maximum credit of $5,000 with respect to any one individual employed by the members of the aggregated group.  With respect to such an employee, the amount of the employee retention credit that may be claimed by any member of an aggregated group is based on the member's proportionate share of qualified wages giving rise to the credit per the return period for which the credit is claimed.

*Example 1*: Employer A is an eligible employer and pays $10,000 in qualified wages to Employee B in the second quarter of 2020.  The employee retention credit available to Employer A for the qualified wages paid to Employee B is $5,000.

*Example 2*: Employer C is an eligible employer and pays $8,000 in qualified wages to Employee D in the second quarter 2020 and $8,000 in qualified wages in the third quarter 2020.  The credit available to Employer C for the qualified wages paid to Employee D is equal to $4,000 in the second quarter and $1,000 in the third quarter due to the overall limit of 50 percent of $10,000 of qualified wages per employee for all calendar quarters.

*Example 3*: Employer E and Employer F are members of an aggregated group treated as a single employer and together are an eligible employer.  Employee G is

52

Exh. A
Complaint

employed by both Employer E and Employer F.  Employee G received $10,000 in
qualified wages from each employer during the second quarter of 2020, for a total of
$20,000.  Because Employers E and F are treated as a single employer under the
aggregation rules, the total amount of qualified wages that may be taken into account
for determining the employee retention credit with respect to Employee G is limited to
$10,000, and the maximum credit available for qualified wages paid to Employee G is
$5,000.  Employers E and F can claim their proportionate share of the $5,000 credit.
Since Employers E and F paid equal amounts of qualified wages to Employee G, they
can each claim $2,500.  Additionally, because Employers E and F each paid the
maximum amount of qualified wages ($10,000) to Employee G during the second
quarter, Employers E and F are not entitled to the employee retention credit for wages
paid to Employee G in any remaining quarter in 2020.

### G. Qualified Wages

**Question 30**: What are "qualified wages"?

**Answer 30**: Qualified wages are generally limited to wages (as defined in section
3121(a) of the Code) and compensation (as defined in section 3231(e) of the Code),
both determined without regard to the social security wage base, paid by an eligible
employer to some or all of its employees after March 12, 2020, and before January 1,

53

2021.[15]  Section 2301(c)(5)(B) of the CARES Act provides that "wages" include amounts paid by an eligible employer to provide and maintain a group health plan (as defined in section 5000(b)(1) of the Code), but only to the extent that the amounts are excluded from the gross income of employees by reason of section 106(a) of the Code.  Amounts treated as wages under section 2301(c)(5)(B) of the CARES Act are treated as paid with respect to any employee (and with respect to any period) to the extent the amounts are properly allocable to the employee (and to the period), and, except as otherwise provided by the Secretary, the allocation will be treated as proper if made on the basis of being pro rata among periods of coverage.  See Q/As 41 and 42.  Qualified wages do not include qualified sick leave wages and qualified family leave wages taken into account under sections 7001 and 7003 of the FFCRA.

The specific circumstances in which wage payments by an eligible employer will be considered qualified wages depend, in part, on the average number of full-time employees the eligible employer employed during 2019.  For a large eligible employer (more than 100 employees), qualified wages are the wages paid to an employee for time that the employee is not providing services due to either (1) a full or partial suspension of the employer's business operations due to a governmental order, or (2) the business experiencing a significant decline in gross receipts.  For a small eligible

---

[15] As noted above, this notice does not provide guidance with respect to the extension of the credit for qualified wages paid after December 31, 2020, and before July 1, 2021.

54

Exh. A
Complaint

employer (100 or fewer employees), qualified wages are the wages paid with respect to an employee during any period in the calendar quarter in which the business operations are fully or partially suspended due to a governmental order or during any calendar quarter in which the business is experiencing a significant decline in gross receipts.

*Example*: Employer A is a small eligible employer that has had a partial suspension of its business operations due to a governmental order.  Employer A offers its employees various benefits that provide for pre-tax salary reduction contributions, including a qualified section 401(k) plan, a fully-insured group health plan, a dependent care assistance program satisfying the requirements of section 129 of the Code, and qualified transportation benefits satisfying the requirements of section 132(f) of the Code.  Employer A also makes matching and nonelective contributions to the qualified section 401(k) plan and pays the portion of the cost of maintaining the group health plan remaining after the employees' share.  None of these amounts are wages taken into account for purposes of the credits claimed under sections 7001 and 7003 of the FFCRA.

Employer A may treat as qualified wages the amounts its employees contribute as pre-tax salary reduction contributions to the qualified section 401(k) plan with respect to the period of the partial suspension of operations because those amounts are wages within the meaning of section 3121(a).

Employer A may also treat all amounts paid toward maintaining the group health plan (including any employee pre-tax salary reduction contribution) with respect to the

55

period of the partial suspension of operations as qualified health plan expenses and thus as qualified wages.

Employer A may not treat as qualified wages the amounts Employer A contributes as matching or nonelective contributions to the qualified section 401(k) plan, nor may it treat as qualified wages any employee pre-tax salary reduction contributions toward the dependent care assistance program or qualified transportation benefits. These amounts do not constitute wages within the meaning of section 3121(a) and therefore are not qualified wages for purposes of the employee retention credit.

**Question 31**: How does an eligible employer identify the average number of full-time employees employed during 2019?

**Answer 31**: The term "full-time employee" means an employee who, with respect to any calendar month in 2019, had an average of at least 30 hours of service per week or 130 hours of service in the month (130 hours of service in a month is treated as the monthly equivalent of at least 30 hours of service per week), as determined in accordance with section 4980H of the Code.  An employer that operated its business for the entire 2019 calendar year determines the number of its full-time employees by taking the sum of the number of full-time employees in each calendar month in 2019 and dividing that number by 12.

An employer that started its business operations during 2019 determines the number of its full-time employees by taking the sum of the number of full-time employees in each full calendar month in 2019 in which the employer operated its

56

Exh. A
Complaint

business and dividing that sum by the number of full calendar months in 2019 in which the employer operated its business.

An employer that started its business operations during 2020 determines the number of its full-time employees by taking the sum of the number of full-time employees in each full calendar month in 2020 in which the employer operated its business and dividing by that number of months, consistent with the approach described above for employers that began business operations during 2019.

**Question 32**: For members of an aggregated group, is the average number of full-time employees determined based on the entire group?

**Answer 32**: Yes.  All entities that are treated as a single employer under the aggregation rules are treated as a single employer for purposes of determining the employer's average number of employees.

*Example*: Employers B and C each averaged 75 full-time employees in 2019. Employers B and C are treated as a single employer under the aggregation rules and therefore are treated as a single employer for purposes of determining the employee retention credit; they are an eligible employer.  Employers B and C together averaged 150 full-time employees in 2019.  Because Employers B and C are a large eligible employer, each employer is eligible for the employee retention credit only for wages paid to an employee that is not providing services due to either (1) a full or partial suspension of operations by governmental order, or (2) a significant decline in gross receipts.

57

Exh. A
Complaint

**Question 33**: What wages may a small eligible employer treat as qualified wages?

**Answer 33**: Small eligible employers may treat all wages (other than any wages taken into account under sections 7001 and 7003 of the FFCRA) paid after March 12, 2020, and before January 1, 2021, with respect to their employees during any period in the calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages. Only $10,000 of qualified wages may be taken into account for the employee retention credit per employee for all calendar quarters.

**Question 34**: What wages may a large eligible employer treat as qualified wages?

**Answer 34**: Large eligible employers may treat wages (other than any wages taken into account under sections 7001 and 7003 of the FFCRA) paid to employees after March 12, 2020, and before January 1, 2021, only for the time they are not providing services during the period in the calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages. Large eligible employers may not treat wages as qualified wages if they were paid to employees for the time that they provide services to the employer. Also, only $10,000 of qualified wages may be taken into account for the employee retention credit per employee for all calendar quarters.

58

Exh. A
Complaint

*Example 1*: Employer D, a large eligible employer operating a local chain of full service restaurants in State X, is subject to a governmental order for restaurants to discontinue sit-down service to customers inside the restaurant, but may continue food or beverage sales to the public on a carry-out, drive-through, or delivery basis. Employer D continues to pay wages to kitchen staff and certain waitstaff needed to facilitate fulfillment of carry-out orders. Wages paid to these employees for the time that they provide carry-out service are not qualified wages.

*Example 2*: Employer E is a large eligible employer and was forced to suspend operations at the end of the first calendar quarter in 2020. Its employees performed services during the first part of the calendar quarter but then stopped due to the suspension of operations; however, Employer E continued to pay the employees' normal wages for the entire quarter, including the period during which they were not providing services. None of the wages were taken into account under sections 7001 and 7003 of the FFCRA. The wages paid during the period when employees were not providing services are qualified wages.

**Question 35**: May a large eligible employer claim an employee retention credit for an increase in the amount of wages it paid its employees during the time that employees are not providing services?

**Answer 35**: No. For large eligible employers, qualified wages paid to an employee may not exceed what the employee would have been paid for working an equivalent duration during the 30 days immediately preceding the commencement of the full or partial suspension of the operation of the trade or business or the first day of

59

Exh. A
Complaint

the calendar quarter in which the employer experienced a significant decline in gross receipts.  For a variable hour employee, the amount paid for working an equivalent duration during that 30-day period may be determined using any reasonable method. The method(s) that the Department of Labor has prescribed to determine the amount to pay an employee with an irregular schedule who is eligible for paid sick leave under the FFCRA would be considered reasonable for this purpose.

_Example_: Employer F, a large eligible employer operating a grocery store chain, is subject to a governmental order limiting store hours.  In response, Employer F has reduced the hours its employees work, but increases the rate of pay for those employees who continue to provide services by $2 an hour.  Only the amounts paid to employees for time they are not providing services, and at the rate of pay in effect prior to the increase, would be considered qualified wages.

**Question 36**: May a large eligible employer treat the wages paid to hourly and non-exempt salaried employees for hours for which they are not providing services as qualified wages for purposes of the employee retention credit?

**Answer 36**: Yes, assuming the wages otherwise satisfy the requirements to be qualified wages.  For a large eligible employer, wages paid to hourly and non-exempt salaried employees for hours that the employees were not providing services may be considered qualified wages for purposes of the employee retention credit.  For an employee who does not have a fixed schedule of work, the hours for which the employee is not providing services may be determined using any reasonable method. The method that the large eligible employer would use to determine the employee's

60

Exh. A
Complaint

entitlement to leave under the Family and Medical Leave Act would be a reasonable method for this purpose.  Similarly, the method(s) that the Department of Labor has prescribed to determine the number of hours for which an employee with an irregular schedule is eligible for paid sick leave under the FFCRA would be considered reasonable for this purpose.

It is not reasonable for the employer to treat an employee's hours as having been reduced based on an assessment of the employee's productivity levels during the hours the employee is working.

Wages paid by a large eligible employer to its employees for hours for which they provided services are not considered qualified wages for purposes of the employee retention credit.

*Example 1*: Employer G, a large eligible employer operating a manufacturing business, has several locations the operations of which are fully suspended during the second quarter of 2020 due to a governmental order.  Employer G continues to pay hourly employees who are not providing services at the closed locations 50 percent of their normal hourly wage rates.  Employer G also reduced headquarters' administrative staff hours by 40 percent, but continues to pay them at 100 percent of their normal hourly wage rates.  Employer G does not take the wages into account under sections 7001 and 7003 of the FFCRA.  For employees who are not providing services due to the closure of their location, but are receiving 50 percent of their normal hourly wage rates, Employer G may treat the wages paid as qualified wages for purposes of the employee retention credit.  For the administrative staff whose hours were reduced by 40

61

percent, but who are paid for 100 percent of the normal wage rate, Employer G may treat the 40 percent of wages paid for time that these employees are not providing services as qualified wages for purposes of the employee retention credit.  The 60 percent of wages that Employer G pays the administrative staff for hours during which the employees are actually providing services is not considered qualified wages for purposes of the employee retention credit.

_Example 2_: Employer H is a large eligible employer in the business of staging homes that are for sale.  Employer H's non-exempt salaried employees cannot perform their usual services of delivering and installing furniture to be used in staging houses because open houses are prohibited in its service area during the second quarter of 2020.  However, the employees are required to provide Employer H with periodic status updates about furniture that has been leased out and other administrative matters. Employer H continues to pay wages to employees as if they continued to work their typical work hours even though the employees cannot provide their normal services. Using a reasonable method, Employer H has determined that its employees are working 20 percent of their typical work hours.  Employer H does not take the wages into account under sections 7001 and 7003 of the FFCRA.   Employer H may treat 80 percent of the wages paid as qualified wages for purposes of the employee retention credit.

**Question 37**: May a large eligible employer treat wages paid to exempt salaried employees for time for which they are not providing services as qualified wages for purposes of the employee retention credit?

62

Exh. A
Complaint

**Answer 37**:  Yes, provided the wages paid to the exempt salaried employees are for the time that they are not providing services due to either a full or partial suspension of operations (due to a governmental order) or a significant decline in gross receipts. An eligible employer may use any reasonable method to determine the number of hours that a salaried employee is not providing services, but for which the employee receives wages either at the employee's normal wage rate or at a reduced wage rate. Reasonable methods include the method (or methods) the employer uses to measure exempt employees' entitlement to leave on an intermittent or reduced leave schedule under the Family and Medical Leave Act, or the method the employer uses to measure exempt employees' entitlement to and usage of paid leave under the employer's usual practices.  It is not reasonable for the employer to treat an employee's hours as having been reduced based on an assessment of the employee's productivity levels during the hours the employee is working.

*Example 1*: Employer I, a large eligible employer operating a fitness club business, closed all of its locations in City B due to a governmental order issued by City B's mayor.  Employer I continues to pay its exempt managerial employees their regular salaries.  While the clubs are closed and there is not sufficient administrative work to occupy the managerial employees full-time, they continue to perform some accounting and similar administrative functions.  Employer I has determined, based on the time records maintained by employees, that they are providing services for 10 percent of their typical work hours.  Employer I does not take the wages into account under

63

sections 7001 and 7003 of the FFCRA.  In this case, 90 percent of wages paid to these employees during the period the clubs were closed are qualified wages.

*Example 2*: Employer J, a large eligible employer operating a consulting firm, closed its offices due to various governmental orders and required all employees to telework.  Although Employer J believes that some of its employees may not be as productive while working remotely, employees are working their normal business hours. Because employees' work hours have not changed, no portion of the wages paid to the employees by Employer J are qualified wages.

**Question 38**: May an eligible employer treat wages paid to employees pursuant to a pre-existing vacation, sick and other personal leave policy as qualified wages for purposes of the employee retention credit?

**Answer 38**: A large eligible employer may not treat as qualified wages amounts paid to employees for paid time off for vacations, holidays, sick days and other days off. These wages are paid pursuant to existing leave policies that represent benefits accrued during a prior period in which the employees provided services and are not wages paid for time in which the employees are not providing services.

However, a small eligible employer may treat all wages paid with respect to employees during the period of the full or partial suspension of operations or a calendar quarter in which it has a significant decline in gross receipts, even if under a pre-existing vacation, sick and other leave policy, as qualified wages for purposes of the employee retention credit, assuming the wages are not taken into account under sections 7001 and 7003 of the FFCRA.

64

Exh. A
Complaint

**Question 39**: May an eligible employer treat payments made to former employees who have terminated employment as qualified wages for purposes of the employee retention credit?

**Answer 39**: Payments, including severance payments or other post-termination payments, made to a former employee following termination of employment are not considered qualified wages for purposes of the employee retention credit.  Payments may be considered qualified wages only if the payments are made to an employee while employed by the eligible employer.  Payments made in connection with a former employee's termination of employment are not qualified wages because they are payments for the past employment relationship and thus are not payments made with respect to an employee during the time for which the employee retention credit may be claimed.  Whether an employee has terminated employment is based on all of the facts and circumstances, including whether the employer has treated the employment relationship as terminated for purposes other than the continuation of wage payments.

### H.  Allocable Qualified Health Plan Expenses

**Question 40**: Do qualified health plan expenses include both the portion of the cost paid by the eligible employer and the portion of the cost paid by the employee?

**Answer 40**: Yes.  However, amounts that the employee paid for with after-tax contributions are not considered qualified health plan expenses.  The amount of qualified health plan expenses taken into account in determining the amount of qualified wages generally includes both the portion of the cost paid by the eligible employer and the portion of the cost paid by the employee with pre-tax salary reduction contributions.

65

**Question 41**: May a small eligible employer treat its health plan expenses as qualified wages for purposes of the employee retention credit?

**Answer 41**: A small eligible employer may treat its health plan expenses paid or incurred, after March 12, 2020, and before January 1, 2021, with respect to any employee during any period in a calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or during a calendar quarter in which the employer experiences a significant decline in gross receipts as qualified wages, although only $10,000 per employee for all calendar quarters can be taken into account for the employee retention credit.  Small eligible employers may treat health plan expenses allocable to the applicable periods as qualified wages even if the employees are not working and the eligible employer does not pay the employees any wages for the time they are not working.

*Example 1*: Employer A is a small eligible employer subject to a governmental order that partially suspends the operation of its trade or business.  In response to the governmental order, Employer A reduces all employees' hours by 50 percent.  It pays wages to the employees only for the time the employees are providing services, but Employer A continues to provide the employees with full health care coverage.  Employer A's health plan expenses allocable to wages paid during the period its operations were partially suspended may be treated as qualified wages for purposes of the employee retention credit.

*Example 2*: Employer B is a small eligible employer subject to a governmental order that suspends the operation of its trade or business.  In response to the

66

Exh. A
Complaint

governmental order, Employer B lays off or furloughs all of its employees (but does not treat these employees as terminated for employment tax purposes).  It does not pay wages to its employees for the time they are laid off or furloughed and not working, but it continues the employees' health care coverage.  Employer B's health plan expenses allocable to the period its operations were partially suspended may be treated as qualified wages for purposes of the employee retention credit.

**Question 42**: May a large eligible employer treat its health plan expenses as qualified wages for purposes of the employee retention credit if the expenses are allocable to the time that employees were not providing services?

**Answer 42**: A large eligible employer may treat as qualified wages health plan expenses paid or incurred, after March 12, 2020, and before January 1, 2021, allocable to the time that the employees are not providing services during any period in a calendar quarter in which the employer's business operations are fully or partially suspended due to a governmental order or a calendar quarter in which the employer experiences a significant decline in gross receipts, although only $10,000 per employee for all calendar quarters can be taken into account for the employee retention credit. However, a large eligible employer may not treat as qualified wages health plan expenses allocable to the time the employees are providing services.

*Example 1*: Employer C is a large eligible employer subject to a governmental order that partially suspends the operation of its trade or business.  In response to the governmental order, Employer C reduces all employees' hours by 50 percent and pays wages to its employees only for the time that the employees are providing services, but

67

Exh. A
Complaint

Employer C continues to provide the employees with full health care coverage.  The 50 percent of Employer C's health plan expenses allocable to the time that employees are not providing services may be treated as qualified wages.  Employer C may not treat the other 50 percent of health plan expenses allocable to the time the employees are providing services as qualified wages.

*Example 2*: Employer D is a large eligible employer subject to a governmental order that partially suspends the operations of its trade or business.  In response to the governmental order, Employer D reduces its employees' hours by 50 percent, but it reduces its employees' wages by only 40 percent, so that the employees receive 60 percent of their wages for 50 percent of their normal hours.  Employer D continues to cover 100 percent of the employees' health plan expenses.  Employer D may treat as qualified wages: (i) the 10 percent of the wages that it pays employees for time the employees are not providing services, plus (ii) 50 percent of the health plan expenses, because these health plan expenses are allocable to the time that employees were not providing services.

*Example 3*: Employer E is a large eligible employer subject to a governmental order that fully suspends the operations of its trade or business.  Employer E lays off or furloughs its employees (but does not treat these employees as terminated for employment tax purposes) and does not pay wages to the employees, but does continue to cover 100 percent of the employees' health plan expenses.  Employer E may treat as qualified wages the health plan expenses that are allocable to the time that the employees are not providing services.

68

**Question 43**: For an eligible employer that sponsors more than one plan for its employees (for example, both a group health plan and a health flexible spending arrangement (health FSA)), or more than one plan covering different employees, how are the qualified health plan expenses for each employee determined?

**Answer 43**: The qualified health plan expenses are determined separately for each plan. For each plan, those expenses are allocated to the employees who participate in that plan. In the case of an employee who participates in more than one plan, the allocated expenses of each plan in which the employee participates are aggregated for that employee.

**Question 44**: For an eligible employer that sponsors a fully-insured group health plan, how are the qualified health plan expenses of that plan allocated on a pro rata basis?

**Answer 44**: An eligible employer who sponsors a fully-insured group health plan may use any reasonable method to determine and allocate the plan expenses, including (1) the COBRA applicable premium for the employee typically available from the insurer, (2) one average premium rate for all employees, or (3) a substantially similar method that takes into account the average premium rate determined separately for employees with self-only and other than self-only coverage.

If an eligible employer chooses to use one average premium rate for all employees, the allocable amount for each day an employee covered by the insured group health plan is entitled to qualified wages could be determined using the following steps:

69

Exh. A<br>Complaint

(1) The eligible employer's overall annual premium for the employees covered by the policy is divided by the number of employees covered by the policy to determine the average annual premium per employee.

(2) The average annual premium per employee is divided by the average number of work days during the year for all covered employees (treating days of paid leave as a work day and a work day as including any day on which work is performed) to determine the average daily premium per employee.  For example, a full-year employee working five days per week may be treated as working 52 weeks x 5 days or 260 days.  Calculations for part-time and seasonal employees who participate in the plan should be adjusted as appropriate.  Eligible employers may use any reasonable method for calculating work days for part-time and seasonal employees.

(3) The resulting premium should be adjusted to reflect any portion that employees contribute after-tax.

(4) The resulting amount is the amount allocated to each day of qualified wages.

   _Example_: Employer F sponsors an insured group health plan that covers 400 employees, some with self-only coverage and some with family coverage.  Each employee is expected to have 260 work days a year (i.e., five days a week for 52 weeks).  The employees contribute a portion of their premium by pre-tax salary reduction, with different amounts for self-only and family coverage.  The total annual premium for the 400 employees is $5.2 million (this includes both the amount paid by the eligible employer and the amounts paid by employees through salary reduction).

70

For an eligible employer using one average premium rate for all employees, the average annual premium rate is $5.2 million divided by 400, or $13,000.  For each employee expected to have 260 work days a year, this results in a daily average premium rate equal to $13,000 divided by 260, or $50.  This $50 is the amount of qualified health plan expenses allocated to each day of qualified wages per employee.

**Question 45**: For an eligible employer that sponsors a self-insured group health plan, how are the qualified health plan expenses of that plan allocated on a pro rata basis?

**Answer 45**: An eligible employer who sponsors a self-insured group health plan may use any reasonable method to determine and allocate the qualified health plan expenses, including (1) the COBRA applicable premium for the employee typically available from the administrator, or (2) any reasonable actuarial method to determine the estimated annual expenses of the plan.

If the eligible employer uses a reasonable actuarial method to determine the estimated annual expenses of the plan, then rules similar to the rules for insured plans are used to determine the amount of qualified health plan expenses allocated to an employee.  That is, the estimated annual expense is divided by the number of employees covered by the plan, and that amount is divided by the average number of work days during the year for all covered employees (treating days of paid leave as work days and any day on which an employee performs any work as a work day).  The resulting premium should then be adjusted to reflect any portion that employees

71

Exh. A
Complaint

contribute after-tax.  The resulting amount is the amount allocated to each day of qualified wages.

**Question 46**: For an eligible employer who contributes to a health savings account (HSA), or Archer Medical Saving Account (Archer MSA) and sponsors a high deductible health plan (HDHP), are contributions to the HSA or Archer MSA included in the qualified health plan expenses?

**Answer 46**: The amount of qualified health plan expenses does not include an eligible employer's contributions to an HSA or Archer MSA.  An eligible employer who sponsors an HDHP should calculate the amount of qualified health plan expenses in the same manner as an insured group health plan, or a self-insured plan, as applicable.

**Question 47**: For an eligible employer who sponsors a health reimbursement arrangement (HRA), a health flexible spending arrangement (health FSA), or a qualified small employer health reimbursement arrangement (QSEHRA), are contributions to the HRA, health FSA, or QSEHRA included in the qualified health plan expenses?

**Answer 47**: The amount of qualified health plan expenses may include contributions to an HRA (including an individual coverage HRA), or a health FSA, but not contributions to a QSEHRA.  To allocate contributions to an HRA or a health FSA, eligible employers should use the amount of contributions made by or on behalf of the particular employee.

**Question 48**: Are health plan expenses that are allocable to qualified sick leave wages and qualified family leave wages for purposes of credits available under sections

72

Exh. A
Complaint

7001 and 7003 of the FFCRA excluded from the definition of qualified wages for purposes of the employee retention credit?

**Answer 48**: Yes.  Wages for which an eligible employer may claim the employee retention credit do not include the qualified sick leave wages and qualified family leave wages for which it claims credits under sections 7001 and 7003 of the FFCRA.  This exclusion also applies to the health plan expenses that are allocable to these qualified sick leave wages and qualified family leave wages paid under sections 7001 and 7003 the FFCRA.

### I.   Interaction with Paycheck Protection Program (PPP) Loans

**Question 49**: May an employer that received a PPP loan be eligible for the employee retention credit?

**Answer 49**: Yes.  An employer that received a PPP loan may claim the employee retention credit for any qualified wages paid to employees if the employer is an eligible employer that meets the requirements for the credit.[16]  However, qualified wages for which the employer claims the employee retention credit are excluded from payroll costs paid during the covered period (payroll costs) that qualify for forgiveness

---

[16] Section 206(c)(2)(B)(i) of the Relief Act struck section 2301(j) of the CARES Act, effective retroactive to March 27, 2020, the date of enactment of the CARES Act.  As originally enacted, section 2301(j) of the CARES Act provided that an employer that received a PPP loan would not be eligible for the employee retention credit.  With the elimination of this provision, an eligible employer is no longer prohibited from both claiming the employee retention credit and receiving a PPP loan.

Exh. A
Complaint

under the PPP.  See section 7A(a)(12) of the Small Business Act, as amended by section 206(c)(1) of the Relief Act.

Section 2301(g)(1) of the CARES Act, as amended by the Relief Act, permits an eligible employer to elect not to take into account certain qualified wages for purposes of the employee retention credit.  An eligible employer generally makes the election by not claiming the employee retention credit for those qualified wages on its federal employment tax return.  However, an eligible employer that received a PPP loan is deemed to have made the election under section 2301(g)(1) of the CARES Act for those qualified wages included in the amount reported as payroll costs on a Paycheck Protection Program Loan Forgiveness Application (PPP Loan Forgiveness Application). Specifically, the amount for which the eligible employer is deemed to have made the election is the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven.  The employee retention credit does not apply to the qualified wages for which the election or deemed election is made.  An eligible employer is not deemed to have made an election for any qualified wages paid by the eligible employer that are not included in the payroll costs reported on the PPP Loan Forgiveness Application. Notwithstanding a deemed election, if an eligible employer reports any qualified wages as payroll costs on a PPP Loan Forgiveness Application to obtain forgiveness of the PPP loan amount, but the loan amount is not forgiven by reason of a decision under

74

Exh. A
Complaint

section 7A(g) of the Small Business Act, those qualified wages may subsequently be treated as subject to section 2301 of the CARES Act and may be taken into account for purposes of the employee retention credit.  If an eligible employer obtains forgiveness of only a portion of the PPP loan amount, then the employer is deemed to have made an election for the minimum amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application necessary to obtain the forgiveness of that amount of the PPP loan.

   _Example 1_: Employer A received a PPP loan of $100,000.  Employer A is an eligible employer and paid $100,000 in qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020.  In order to receive forgiveness of the PPP loan in its entirety, Employer A was required, under the Small Business Administration (SBA) rules, to report a total of $100,000 of payroll costs and other eligible expenses (and a minimum of $60,000 of payroll costs).  Employer A submitted a PPP Loan Forgiveness Application and reported the $100,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan.  Employer A received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $100,000.

   Employer A is deemed to have made an election not to take into account $100,000 of the qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness

75

Exh. A
Complaint

Application, sufficient to support the amount of the PPP loan that is forgiven.  It may not treat that amount as qualified wages for purposes of the employee retention credit.

*Example 2*: Employer B received a PPP loan of $200,000.  Employer B is an eligible employer and paid $250,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020.  In order to receive forgiveness of the PPP loan in its entirety, Employer B was required, under the SBA rules, to report a total of $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs).  Employer B submitted a PPP Loan Forgiveness Application and reported the $250,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan.  Employer B received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer B is deemed to have made an election not to take into account $200,000 of the qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven.  It may not treat that amount as qualified wages for purposes of the employee retention credit.  Employer B is not treated as making a deemed election with respect to $50,000 of the qualified wages ($250,000 reported on the PPP Loan Forgiveness Application, minus $200,000 reported on the PPP Loan Forgiveness Application up to the amount of the

76

Exh. A
Complaint

loan that is forgiven), and it may treat that amount as qualified wages for purposes of the employee retention credit.

*Example 3*: Employer C received a PPP loan of $200,000.  Employer C is an eligible employer and paid $200,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020.  Employer C also paid other eligible expenses of $70,000.  In order to receive forgiveness of the PPP loan in its entirety, Employer C was required, under the SBA rules, to report a total of $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs).  Employer C submitted a PPP Loan Forgiveness Application and reported the $200,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan, but did not report the other eligible expenses of $70,000.  Employer C received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer C is deemed to have made an election not to take into account $200,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven.  Although Employer C could have reported $70,000 of eligible expenses (other than payroll costs) and $130,000 of payroll costs, Employer C reported $200,000 of qualified wages as payroll costs on the PPP Loan Forgiveness Application.  As a result, no portion of those

77

Exh. A
Complaint

qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit.  Employer C cannot reduce the deemed election by the amount of the other eligible expenses that it could have reported on its PPP Loan Forgiveness Application.

_Example 4_: Same facts as Example 3, except Employer C submitted a PPP Loan Forgiveness Application and reported the $200,000 of qualified wages as payroll costs, as well as the $70,000 of other eligible expenses, in support of forgiveness of the PPP loan.  Employer C received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.  In this case, Employer C is deemed to have made an election not to take into account $130,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with the $70,000 of other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that was forgiven.  As a result, $70,000 of the qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit.

_Example 5_: Same facts as Example 4, except Employer C paid $90,000 of other eligible expenses, and reported the $200,000 of qualified wages as payroll costs, as well as the $90,000 of other eligible expenses, in support of forgiveness of the entire PPP loan.  In this case, Employer C is deemed to have made an election not to take into account $120,000 of qualified wages for purposes of the employee retention credit,

78

which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with the $90,000 of other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that was forgiven.  As a result, $80,000 of the qualified wages reported as payroll costs may be treated as qualified wages for purposes of the employee retention credit.

*Example 6*: Employer D received a PPP loan of $200,000.  Employer D is an eligible employer and paid $150,000 of qualified wages that would qualify for the employee retention credit during the second and third quarters of 2020.  In addition to the qualified wages, Employer D had $100,000 of other payroll costs that are not qualified wages and $70,000 of other eligible expenses.[17]  In order to receive forgiveness of the PPP loan in its entirety, Employer D was required, under the SBA rules, to report $200,000 of payroll costs and other eligible expenses (and a minimum of $120,000 of payroll costs).

Employer D submitted a PPP Loan Forgiveness Application and reported $130,000 of payroll costs and $70,000 of other eligible expenses, in support of forgiveness of the entire PPP loan.  Employer D can demonstrate that the payroll costs reported on the PPP Loan Forgiveness Application consist of $100,000 of payroll costs

---

[17] Employer D may have payroll costs that are not qualified wages for various reasons.  For example, Employer D may be a large eligible employer that paid wages to employees who continued to provide services during the period of a partial suspension of business operations.

Exh. A
Complaint

that are not qualified wages and $30,000 of payroll costs that are qualified wages. Employer D received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer D is deemed to have made an election not to take into account $30,000 of qualified wages for purposes of the employee retention credit, which was the amount of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven.  It may not treat that amount as qualified wages for purposes of the employee retention credit. Employer D is not deemed to have made an election with respect to the $120,000 of qualified wages that are not included in the payroll costs reported on the PPP Loan Forgiveness Application.  Accordingly, Employer D may take into account the $120,000 of qualified wages ($150,000 of qualified wages paid minus $30,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application) for purposes of the employee retention credit.

*Example 7*: Same facts as Example 6 except Employer D's PPP loan is not forgiven by reason of a decision under section 7A(g) of the Small Business Act. Employer D may treat the full $150,000 as qualified wages (the $30,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application, plus the additional $120,000 of qualified wages not included in the payroll costs) as qualified wages for purposes of the employee retention credit.

80

Exh. A
Complaint

### J.  Claiming the Employee Retention Credit

**Question 50**: How does an eligible employer claim the employee retention credit for qualified wages?

**Answer 50**: An eligible employer claims the employee retention credit for qualified wages by reporting its qualified wages and the amount of the credit to which it is entitled on the designated lines of its federal employment tax return(s).  Employers also report any qualified sick leave wages and qualified family leave wages and claim the credit under sections 7001 or 7003 of the FFCRA on the designated lines on their federal employment tax returns.  For most employers, Form 941 is used to report income and social security and Medicare taxes withheld by the employer from employee wages, as well as the employer's share of social security and Medicare tax.

In anticipation of receiving the employee retention credit, eligible employers can (1) reduce their deposits of federal employment taxes, including withheld taxes, that would otherwise be required up to the amount of the anticipated credit, and (2) request an advance of the amount of the anticipated credit that exceeds the reduced federal employment tax deposits by filing Form 7200.

*Example*: Employer A paid $10,000 in qualified wages (including allocable qualified health plan expenses), among other wages.  After deferral of the employer's share of social security tax under section 2302 of the CARES Act, Employer A is otherwise required to deposit $8,000 in federal employment taxes for all of its employees for all wage payments made during the same quarter as the $10,000 in qualified wages.  Employer A did not choose to use the relief under Notice 2020-65 to

81

Exh. A
Complaint

defer the employee's share of social security tax.  Employer A has no credits under sections 7001 and 7003 of the FFCRA.  Employer A is not a tax-exempt organization eligible for the credit under section 303(d) of the Relief Act.  In anticipation of the employee retention credit, Employer A may keep up to $5,000 of the $8,000 of taxes Employer A was otherwise required to deposit, and it will not owe a failure to deposit penalty for keeping the $5,000.  Employer A will later account for the $5,000 it retained when it files Form 941 for the quarter.

**Question 51**: Can an eligible employer receive an advance payment of the employee retention credit if the eligible employer does not have sufficient federal employment taxes set aside for deposit to cover the amount of the anticipated credit?

**Answer 51**: Yes.  If an eligible employer does not have sufficient federal employment taxes set aside for deposit to cover the amount of the anticipated credit, the eligible employer may request an advance payment of the credit.  The amount of the advance payment will depend on the application of other relief provisions to the employer.  For example, eligible employers are permitted to defer the deposit and payment of the employer's share of social security tax under section 2302 of the CARES Act and the employee's share of social security tax under Notice 2020-65 and may do so prior to reducing any deposits in anticipation of the credit.  Therefore, assuming an employer defers deposit of social security tax under section 2302 of the CARES Act and Notice 2020-65, the employer should take into account any permitted reduction in employment tax deposits due to (1) deferral under section 2302 of the CARES Act, (2) deferral under Notice 2020-65, (3) any anticipated credits under

82

Exh. A
Complaint

sections 7001 and 7003 of the FFCRA related to qualified sick leave wages and qualified family leave wages that the employer paid, and (4) for any tax-exempt organization employer, any credit under section 303(d) of the Relief Act, before determining the amount that it should request as an advance payment of the employee retention credit.  If the remaining employment tax deposits set aside are less than the anticipated credit for the qualified wages, the eligible employer can file a Form 7200 to request an advance payment of the credit for the remaining amount of the anticipated credit.

If an eligible employer fully reduces its required deposits of federal employment taxes otherwise due on wages paid in anticipation of receiving the credit, and that reduction covers the full amount of the anticipated credit, it should not file a Form 7200.

*Example*: Employer B paid $20,000 in qualified wages to two employees (each employee was paid $10,000 in qualified wages) and is therefore entitled to a credit of $10,000.  Employer B is otherwise required to deposit $8,000 in federal employment taxes on all wages paid to all employees, after deferring its employer's share of social security tax under section 2302 of the CARES Act.  Employer B did not choose to use the relief under Notice 2020-65 to defer the employee's share of social security tax.  Employer B has no credits under sections 7001 and 7003 of the FFCRA.  Employer B is not a tax-exempt organization eligible for the credit under section 303(d) of the Relief Act.  Employer B can keep the entire $8,000 of taxes that Employer B was otherwise required to deposit without penalty as a portion of the credit it is otherwise entitled to

83

Exh. A
Complaint

claim on the Form 941.  Employer B may make a request for an advance payment of the credit for the remaining $2,000 by submitting Form 7200.

**Question 52**: Is there a minimum advance amount that can be claimed on a Form 7200?

**Answer 52**: After July 2, 2020, the minimum advance amount that can be claimed on a Form 7200 is $25.  A Form 7200 requesting an advance of less than $25 will not be processed.  Taxpayers can claim credits of less than $25 on their federal employment tax returns.

**Question 53**: What is the last day eligible employers may submit a Form 7200 requesting an advance payment of the employee retention credit for qualified wages paid in 2020?

**Answer 53**: Eligible employers that filed quarterly federal employment tax returns for 2020 had the ability to submit a Form 7200 to request an advance for each calendar quarter before the earlier of (1) the date the employer filed the Form 941 for the relevant quarter or (2) the due date for filing the quarterly employment tax return, as provided below:

- For the second quarter of 2020: July 31, 2020;

- For the third quarter of 2020: November 2, 2020;

- For the fourth quarter of 2020: February 1, 2021.

84

Exh. A
Complaint

At the date of publication of this notice, the due dates for the quarterly federal employment tax returns for 2020 have passed, and Forms 7200 submitted after the due dates for credits claimed in the relevant quarters in 2020 will not be processed.

Eligible employers filing a Form 943 or Form 944 for 2020 had the ability to submit a Form 7200 up to the earlier of February 1, 2021 or the date they filed the applicable employment tax return for 2020.  At the date of publication of this notice, the due date for Form 943 and Form 944 for 2020 has passed, and Forms 7200 submitted after February 1, 2021 for credits claimed in 2020 will not be processed.

Eligible employers filing a Form CT-1 for 2020 may submit a Form 7200 up to the earlier of March 1, 2021 or the date they file the Form CT-1, Employer's Annual Railroad Retirement Tax Return for 2020.

**Question 54**: Who can sign a Form 7200?  Should a taxpayer submit additional documents to confirm that a person is authorized to sign a Form 7200?

**Answer 54**: For corporations, the president, vice president, or other principal officer who is duly authorized may sign a Form 7200.  For partnerships (including an LLC treated as a partnership) or unincorporated organizations, a responsible and duly authorized partner, member, or officer having knowledge of the entity's affairs may sign a Form 7200.  For a single-member LLC treated as a disregarded entity for federal income tax purposes, the instructions provide that the owner or a principal officer who is duly authorized may sign the Form.  For trusts or estates, the fiduciary may sign the Form 7200.  Additionally, a Form 7200 may be signed by a duly authorized agent of the taxpayer if a valid power of attorney has been filed.

85

Exh. A
Complaint

In many circumstances, whether the person signing the Form 7200 is duly authorized or has knowledge of the partnership's or unincorporated organization's affairs is not apparent on the Form 7200.  To help expedite and ensure proper processing of Forms 7200, if a taxpayer has duly authorized an officer, partner, or member to sign Form 7200 (and that person is not otherwise explicitly permitted to sign the Form 7200 by nature of their job title), the taxpayer should submit a copy of the Form 2848, *Power of Attorney and Declaration of Representative*, authorizing the person to sign the Form 7200 with the Form 7200.

**Question 55**: For eligible employers that include multiple entities treated as a single employer for purposes of the employee retention credit under the aggregation rules, will the individual entities separately report their credit on their federal employment tax returns?

**Answer 55**: Yes.  Each eligible employer will report its employee retention credit on its federal employment tax return (or on its third-party payer's federal employment tax return) without regard to its aggregation with other entities as a single employer for purposes of the credit.  Each eligible employer's credit will be the amount of the credit apportioned among the members of the aggregated group on the basis of each member's proportionate share of the qualified wages giving rise to the credit per the return period for which the credit is claimed.

**Question 56**: May an eligible employer elect to not take into account qualified wages for purposes of the employee retention credit?

86

Exh. A
Complaint

**Answer 56**: Yes.  Any eligible employer may elect to not take certain qualified wages into account for purposes of the employee retention credit by not claiming the credit for those qualified wages on its federal employment tax return.  In addition, an eligible employer that received a PPP loan is deemed to have made an election to not take qualified wages into account for purposes of the employee retention credit if those qualified wages are included in the payroll costs reported on a PPP Loan Forgiveness Application, up to (but not exceeding) the minimum amount of payroll costs, together with any other eligible expenses reported on the PPP Loan Forgiveness Application, sufficient to support the amount of the PPP loan that is forgiven.  See Q/A–49.

*Example*: Employer C paid $10,000 of wages in the second quarter of 2020.  The wages are not paid pursuant to a pre-existing vacation, sick and other personal leave policy.  The wages may be treated as either qualified sick leave wages under section 7001 of the FFCRA or as qualified wages for purposes of the employee retention credit.  Employer C may elect to not take into account any amount of the $10,000 of wages as qualified wages for purposes of the employee retention credit.

**Question 57**: May an eligible employer that files quarterly federal employment tax returns take into account qualified wages paid in a past calendar quarter in which the eligible employer may have been entitled to claim the credit, but elected not to do so?

**Answer 57**: Yes.  An eligible employer may file a claim for refund or make an interest-free adjustment by filing Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, for a past calendar quarter to claim the employee

87

Exh. A
Complaint

retention credit to which it was entitled on qualified wages paid in that past calendar quarter, following the rules and procedures for making those claims or adjustments.

An eligible employer that received a PPP loan and did not claim the employee retention credit may file a Form 941-X for the relevant calendar quarters in which the employer paid qualified wages, but only for qualified wages for which no deemed election was made.  See Q/A–49.

A special fourth quarter rule, provided by section 206(e)(2) of the Relief Act, is also available for any qualified wages paid in the second or third quarters of 2020 that were reported as payroll costs on a PPP Loan Forgiveness Application if the loan amount was not forgiven by reason of a decision under section 7A(g) of the Small Business Act.

*Example 1*: Employer D is an eligible employer and paid qualified wages during the second quarter of 2020 but did not claim an employee retention credit on its second quarter 2020 Form 941.  Employer D did not receive a PPP loan.  If Employer D subsequently decides to claim the credit to which it is entitled for the second quarter of 2020, Employer D should file a Form 941-X for the previously filed second quarter 2020 Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund.  Employer D should not use a subsequent Form 941 to claim an employee retention credit for qualified wages paid in the second quarter of 2020.

*Example 2*: Employer E received a PPP loan of $200,000.  Employer E is an eligible employer and paid $250,000 of qualified wages that would qualify for the employee retention credit during the second quarter of 2020.  Employer E submitted a

88

Exh. A
Complaint

PPP Loan Forgiveness Application and reported the $250,000 of qualified wages as payroll costs in support of forgiveness of the entire PPP loan.  Employer E received a decision under section 7A(g) of the Small Business Act in the first quarter of 2021 for forgiveness of the entire PPP loan amount of $200,000.

Employer E is not deemed to have made an election with respect to the excess $50,000 of qualified wages that are included in the payroll costs reported on the PPP Loan Forgiveness Application.  Accordingly, Employer E may take into account the $50,000 of qualified wages for purposes of the employee retention credit.  If Employer E decides to take the $50,000 into account to claim the credit to which it is entitled for 2020, Employer E should file a Form 941-X for the previously filed second quarter 2020 Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund for the second quarter, as appropriate.  Under these facts, Employer E should not use a subsequent Form 941 to claim an employee retention credit for qualified wages paid in the second quarter of 2020.

*Example 3*: Same facts as Example 2, except that Employer E's PPP loan is not forgiven by reason of a decision under section 7A(g) of the Small Business Act.  If Employer E decides to claim the credit to which it is entitled for 2020 with regard to the $250,000 of qualified wages, Employer E may file a Form 941-X for the previously filed second quarter Form 941 within the appropriate timeframe to make an interest-free adjustment or claim a refund for the second quarter in 2020.  Alternatively, Employer E may use the special fourth quarter rule with respect to the $200,000 of qualified wages included in the payroll costs reported on the PPP Loan Forgiveness Application since

89

Exh. A
Complaint

the PPP loan was not forgiven, but not with respect to the excess $50,000 of qualified wages even though those amounts were included in the payroll costs reported on the PPP Loan Forgiveness Application.

**Question 58**: How does an eligible employer use the special fourth quarter rule in section 206(e)(2) of the Relief Act?

**Answer 58**: If an eligible employer received a PPP loan, and reported qualified wages paid in the second and/or third quarter of 2020 as payroll costs on its PPP Loan Forgiveness Application, but the loan was not forgiven by reason of a decision under section 7A(g) of the Small Business Act, then the eligible employer may take the qualified wages reported as payroll costs on its PPP Loan Forgiveness Application into account for purposes of the employee retention credit and claim the employee retention credit on those qualified wages on the fourth quarter Form 941.  An eligible employer may also claim the employee retention credit on the fourth quarter Form 941 with respect to any qualified health plan expenses paid in the second and/or third quarter of 2020, for which the employer had not claimed the employee retention credit.

If an eligible employer elects to use this special fourth quarter rule, the eligible employer should add the employee retention credit attributable to the second and/or third quarter qualified wages and qualified health plan expenses on line 11c or line 13d (as relevant) of the original fourth quarter Form 941  (along with any other employee retention credit for qualified wages paid in the fourth quarter).  The eligible employer should also:

90

Exh. A
Complaint

- Include the amount of these qualified wages paid during the second and/or third quarter (excluding qualified health plan expenses) on line 21 of the original fourth quarter Form 941 (along with any qualified wages paid in the fourth quarter);

- Enter the same amount on Worksheet 1, Step 3, line 3a;

- Include the amount of these qualified health plan expenses from the second and/or third quarter on line 22 of the fourth quarter Form 941 (along with any qualified health plan expenses for the fourth quarter);

- Enter the same amount on Worksheet 1, Step 3, line 3b.

Eligible employers are not required to use this special fourth quarter rule.  Eligible employers may instead choose the regular process of making an interest-free adjustment or filing a claim for refund for the appropriate quarter to which the additional employee retention credit relates using Form 941-X for the previously filed Form 941.

### K.  Special Issues for Employees: Income and Deduction

**Question 59**: Are qualified wages excluded from gross income as "qualified disaster relief payments"?

**Answer 59**: No.  Section 139 of the Code excludes from a taxpayer's gross income certain payments to individuals to reimburse or pay for expenses incurred as a result of a qualified disaster (qualified disaster relief payments).  Although the COVID-19 pandemic is a "qualified disaster" for purposes of section 139, qualified wages are not excludible qualified disaster relief payments, because qualified wages are what an individual would otherwise earn as compensation, rather than payment or reimbursement of expenses incurred as a result of a qualified disaster. Therefore,

91

Exh. A
Complaint

qualified disaster relief payments do not include qualified wages paid by an employer, including those that are paid when an employee is not providing services.

### L.  Special Issues for Employers: Income and Deduction

**Question 60**: Does the employee retention credit reduce the expenses that an eligible employer could otherwise deduct on its federal income tax return?

**Answer 60**: Yes.  Section 2301(e) of the CARES Act provides that rules similar to section 280C(a) of the Code shall apply for purposes of applying the employee retention credit.  Section 280C(a) generally disallows a deduction for the portion of wages or salaries paid or incurred equal to the sum of certain credits determined for the taxable year.  Accordingly, a similar deduction disallowance applies under section 2301(e) of the CARES Act with regard to the employee retention credit, such that an employer's deduction for qualified wages, including qualified health plan expenses, is reduced by the amount of the employee retention credit.  (An employer does not, however, reduce its deduction for the employer's share of social security and Medicare taxes by any portion of the credit).

**Question 61**: Does an eligible employer receiving an employee retention credit for qualified wages need to include any portion of the credit in income?

**Answer 61**: No.  An employer receiving a tax credit for qualified wages, including allocable qualified health plan expenses, does not include the credit in gross income for federal income tax purposes.  Neither the portion of the credit that reduces the employer's applicable employment taxes, nor the refundable portion of the credit, is included in the employer's gross income.

92

Exh. A
Complaint

## M. Special Issues for Employers: Use of Third-Party Payers

**Question 62**: Can an eligible common law employer that uses a third-party to report and pay employment taxes to the IRS get the employee retention credit?

**Answer 62**: Yes.  If a common law employer is otherwise eligible to receive the employee retention credit, it is entitled to the credit, regardless of whether it uses a third-party payer (such as a reporting agent, payroll service provider, PEO, CPEO, or 3504 agent) to report and pay its federal employment taxes.  The third-party payer is not entitled to the employee retention credit with respect to the wages it remits on the common law employer's behalf (regardless of whether the third-party is considered an "employer" for other purposes of the Code).  If a common law employer uses a third-party to file, report, and pay employment taxes, different rules will apply depending on the type of third-party payer the common law employer uses for claiming/reporting the employee retention credit.

If an eligible common law employer uses a reporting agent to file its federal employment tax returns, the reporting agent will need to reflect the employee retention credit on the federal employment tax returns it files on the common law employer's behalf.

If an eligible common law employer uses a CPEO or a 3504 agent that received its designation as an agent by submitting Form 2678, *Employer/Payer Appointment of Agent*, to report its federal employment taxes on an aggregate Form 941, the CPEO or 3504 agent will report the employee retention credit on its aggregate Form 941 and Schedule R, *Allocation Schedule for Aggregate Form 941 Filers*, that it already files.  An

93

Exh. A
Complaint

eligible common law employer can submit its own Form 7200 to claim the advance payment of the credit.  The eligible common law employer will need to provide a copy of the Form 7200 to the CPEO or 3504 agent so the CPEO or 3504 agent can properly report the employee retention credit on the Form 941.

If an eligible common law employer uses a non-certified PEO or other third-party payer (other than a CPEO or section 3504 agent that submitted Form 2678) that reports and pays the common law employer client's federal employment taxes under the third-party's Employer Identification Number (EIN), the PEO or other third-party payer will need to report the employee retention credit on an aggregate Form 941 and separately report the employee retention credit allocable to the common law employers for which it is filing the aggregate Form 941 on an accompanying Schedule R.  The PEO or other third-party payer does not have to complete Schedule R with respect to any common law employer for which it is not claiming an employee retention credit.  The eligible common law employer will need to provide a copy of any Form 7200 that it submitted for an advance payment of the credit to the PEO or other third-party payer so the PEO or other third-party payer can properly report the employee retention credit on the Form 941. These rules are similar to the rules that apply with respect to the payroll tax election available under section 41(h) of the Code for the credit for certain research and development expenses.

**Question 63**: May a payroll reporting agent sign and submit Form 7200 on behalf of a client employer?

94

**Answer 63**: Yes.  A payroll reporting agent may sign Form 7200 for a client employer for which it has the authority, via Form 8655, *Reporting Agent Authorization*, to sign and file the federal employment tax return.  The signatory must be the Principal or Responsible Official listed on the Reporting Agent's e-file application.  The signatory may sign with ink on paper or may use the alternative signature method (rubber stamp, mechanical device, or computer software program; for details and required documentation, see Rev. Proc. 2005-39, 2005-28 I.R.B. 82).  Consistent with Rev. Proc. 2005-39, an alternative signature must be in the form of a facsimile signature.

The reporting agent must obtain written authorization from the client employer (paper, fax, or e-mail) to perform these actions regarding the Form 7200.  The reporting agent need not submit that authorization to the IRS, but should retain it in its files so that the reporting agent can furnish it to the IRS upon request.  In the case of a client employer for which a third-party payer does not have a Reporting Agent Authorization, the third-party payer may complete and print the form, or it may provide the client employer a means to complete and print the form, but the client employer will have to sign it.

The signatory for the reporting agent must sign, date, and print his or her name in the relevant boxes on Form 7200.  In the box "Printed Title," the signatory must include the reporting agent company name or name of business as it appeared on line 9 of the Form 8655.  If the reporting agent company name or name of business from the Form 8655 is missing, the Form 7200 cannot be processed.

95

Exh. A
Complaint

**Question 64**: When should the name and EIN of a third-party payer be included on Form 7200?

**Answer 64**: Common law employers who file Form 7200 to claim an advance payment of credits are required to include on the form the name and EIN of the third-party payer they use to file their federal employment tax returns (such as the Form 941) if the third-party payer uses its own EIN on the federal employment tax returns.  This will ensure advance payment of the credits received by the common law employer is properly reconciled to the federal employment tax return filed by the third-party payer for the calendar quarter for which the advance payment of the credits is received.

To help expedite and ensure proper processing of Form 7200 and reconciliation of advance payment of the credits to the federal employment tax return for the calendar quarter, only those third-party payers who will file a federal employment tax return on behalf of a common law employer using the third-party payer's name and EIN should be listed on the Form 7200. Typically, CPEOs, PEOs, and other 3504 agents fall into this category of third-party payers.

If a third-party payer will file the federal employment tax return on a common law employer's behalf using the common law employer's name and EIN and not the name and EIN of the third-party payer, the common law employer should not include the name and EIN of the third-party payer on the Form 7200.  Typically, reporting agents and payroll service providers fall into this category of third-party payers.

96

Exh. A
Complaint

**Question 65**: If a common law employer uses a third-party payer for only a portion of their workforce, should the employer list the third-party payer on the Form 7200?

**Answer 65**: In some cases, a common law employer may use the services of a third-party payer (such as a CPEO, PEO, or other section 3504 agent) to pay wages for only a portion of its workforce.  In those circumstances, the third-party payer files a federal employment tax return for the wages it paid to the common law employer's employees under its name and EIN , and the common law employer files a federal employment tax return for wages it paid directly to employees under its own name and EIN.

If the common law employer is claiming advance payments of credits for both wages paid directly to employees that will be reported on its own federal employment tax return and wages paid to other employees by a third-party payer that will be reported on the third-party payer's federal employment tax return, two separate Forms 7200 should be filed: one for the wages paid by the common law employer with the name and EIN of the common law employer, and one for the wages paid by the third-party payer with the name and EIN of both the common law employer and the third-party payer.

To help expedite and ensure proper processing of Form 7200 and reconciliation of advance payment of the credits to the federal employment tax return when a common law employer uses a third-party payer such as a CPEO, PEO, or other section 3504 agent for only a portion of its workforce, a common law employer should include the

97

Exh. A
Complaint

name and EIN of the third-party payer only on the Form 7200 for advance payment of the credits for wages paid by the third-party payer and reported on the third-party payer's federal employment tax return.  The common law employer should not include the name and EIN of the third-party payer on the Form 7200 for advance payments of the credits claimed for wages paid by the common law employer and reported on the common law employer's federal employment tax return.

**Question 66**: What information must third-party payers obtain from their client employers to claim the employee retention credit on their client employer's behalf?

**Answer 66**: If a third-party payer (such as a CPEO, PEO, or other section 3504 agent) is claiming the employee retention credit on behalf of the client employer, it must collect from the client employer any information necessary to accurately claim the employee retention credit on its client employer's behalf.  This includes obtaining information with respect to the client employer's claims for credits under sections 7001 and 7003 of the FFCRA and under section 45S of the Code, as well as whether the client employer has received a Paycheck Protection Program loan authorized under the CARES Act.

**Question 67**: May third-party payers rely on client employer information regarding the employee retention credit?

**Answer 67**: Yes.  If a third-party payer (such as a CPEO, PEO, or other section 3504 agent) is claiming the employee retention credit on behalf of the client employer, the third-party payer may rely on the client employer's information regarding the client employer's eligibility to claim the employee retention credit.

98

Exh. A
Complaint

Either the third-party payer or the client employer may maintain all records which substantiate the client employer's eligibility for the employee retention credit.  However, if the client employer maintains the records, upon request by the IRS, the third-party payer must obtain from the client employer and provide to the IRS records that substantiate the client employer's eligibility for the employee retention credit.  The client employer and the third-party payer will each be liable for employment taxes that are due as a result of any improper claim of the employee retention credit amounts that are improperly claimed in accordance with their liability under the Code and applicable regulations for the employment taxes reported on the federal employment tax return filed by the third-party payer on which the credit was claimed.

**Question 68**: Upon request by the IRS, what records must third-party payers obtain from their client employers to substantiate the client employer's eligibility for the employee retention credit?

**Answer 68**: If a third-party payer is claiming the employee retention credit on behalf of the client employer, it must, at the IRS's request, be able to obtain from the client employer and provide to the IRS records that substantiate client employer's eligibility for the employee retention credit.

**Question 69**: Are client employers responsible for avoiding a "double benefit" with respect to the employee retention credit and the credit under section 45S of the Code?

**Answer 69**: Yes.  The client employer is responsible for avoiding a "double benefit" with respect to the employee retention credit and the credit under section 45S

99

Exh. A
Complaint

of the Code.  The client employer cannot use wages that were used to claim the employee retention credit and reported by the third-party payer on the client employer's behalf to claim the section 45S credit on its income tax return.

### N.  Substantiation Requirements

**Question 70**: What records should an eligible employer maintain to substantiate eligibility for the employee retention credit?

**Answer 70**: An eligible employer will adequately substantiate eligibility for the employee retention credit if the employer creates and maintains records that include the following information:

- Documentation to show how the employer determined it was an eligible employer that paid qualified wages, including:
    - any governmental order to suspend the employer's business operations;
    - any records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations;
    - any records the employer used to determine it had experienced a significant decline in gross receipts;
    - any records of which employees received qualified wages and in what amounts; and

100

Exh. A
Complaint

- o   in the case of a large eligible employer, work records and documentation showing that wages were paid for time an employee was not providing services.

- Documentation to show how the employer determined the amount of allocable qualified health plan expenses.

- Documentation related to the determination of whether the employer is a member of an aggregated group treated as a single employer for purposes of the employee retention credit and, if so, how the aggregation affects the determination and allocation of the credit.

- Copies of any completed Forms 7200 that the employer submitted to the IRS.

- Copies of the completed federal employment tax returns that the employer submitted to the IRS (or, for employers that use third-party payers to meet their employment tax obligations, records of information provided to the third-party payer regarding the employer's entitlement to the credit claimed on the federal employment tax return).

**Question 71**: How long should an eligible employer maintain records to substantiate eligibility for the employee retention credit?

**Answer 71**: An eligible employer should keep all records of employment taxes for at least 4 years after the date the tax becomes due or is paid, whichever comes later.  These should be available for IRS review.

IV. PAPERWORK REDUCTION ACT

101

Exh. A
Complaint

Any collection of information associated with this notice has been submitted to the Office of Management and Budget for review under OMB control number 1545-0029 in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)).  An agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a valid OMB control number.

V. DRAFTING INFORMATION

The principal authors of this notice are Dixie Pond and Danchai Mekadenaumporn, Office of the Associate Chief Counsel (Employee Benefits, Exempt Organizations, and Employment Taxes), although other Treasury and IRS officials participated in its development.  For further information on the provisions of this notice, please contact Ms. Pond or Mr. Mekadenaumporn at 202-317-6798 (not a toll-free call).

102

Exh. A
Complaint