# Exhibit D

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer ▮ | | Tax Identification Number *(last 4 digits)* ▮ | Year/Period ended 202106 and 202109 |

*RECEIVED NOV 2 8 2023 REDIRECT HEALTH*

### Rebuttal:

This document is a rebuttal to ▮ Protest dated September 28, 2023 ("Protest"). The Protest was submitted by the Taxpayer's representative, ▮

### Issue in Dispute:

Whether ▮ qualifies for the Employee Retention Credit (ERC) for the second and third quarters of 2021.

| Tax Quarter | Claim for Refund Amount | Claim Amount Allowed | Claim Amount Denied |
|---|---|---|---|
| 202106 | ▮ | ▮ | ▮ |
| 202109 | | | |
| Total | | | |

### Facts

As stated in Exam's Form 886-A, ▮ provides comprehensive, integrated health care, including primary care, pain and injury management, diagnostics, and rehabilitation in ▮ It operates both health care clinics and surgery centers in ▮ As stated in ▮ protest, ▮ and operates by and through it affiliated entities (collectively ▮ medical clinics offer a range of in-person healthcare services, with a focus on primary care, family medicine, chronic care management, chiropractic, pain management and specialty programs such as PRP and total joint rejuvenation (regenerative medicine). These locations employ approximately ▮ that are licenses in clinical practice ▮ with an organizational support staff of ▮

▮ did not have gross receipts in the second and third calendar quarter of 2021 that were less than 80% of the gross receipts in the second and third calendar quarters of 2019. As a result, ▮ is not an eligible employer based on a significant decline in gross receipts.

### Law

On March 13, 2020, the President of the United States issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. On or about March 15, 2020, States and local government entities began to issue Orders or other types of proclamations to implement shutdowns to prevent the spread of COVID-19, including the closure of schools and non-essential businesses. Recognizing the significant economic impact the closure of schools and businesses would have on the economy, Congress and Trump Administration (including the Department of Treasury and the Internal Revenue Service)

| Form **886-A**<br>(May 2017) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule number or exhibit | |
|---|---|---|---|
| Name of taxpayer | ███████████ | Tax Identification Number *(last 4 digits)*<br>████ | Year/Period ended<br>202106 and 202109 |

worked rapidly to develop a variety of packages to reduce the negative economic impact COVID-19 would have on the country.

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), P.L. 116-136, 134 Stat. 281, enacted on March 27, 2020, was one of the initial pieces of legislation enacted in response to COVID-19. Section 2301 of the CARES Act, as originally enacted, provides for an employee retention credit for eligible employers that pay qualified wages, including certain health plan expenses, to some or all employees after March 12, 2020, and before January 1, 2021. The ERC was specifically designed to encourage employers experiencing a significant decline in gross receipts and/or whose trade or business was fully or partially suspended as a result of a governmental order related to COVID-19 to keep employees on their payroll through a refundable employment tax credit.

The CARES Act was subsequently amended and modified by the Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, P.L. 116-260, 134 Stat. 1182, on December 27, 2020. Section 206 of the Relief Act adopted amendments and technical changes to section 2301 for qualified wages paid after March 12, 2020, and before January 1, 2021, primarily expanding eligibility for certain employers to claim the credit. Section 206 is effective retroactive to the effective date of section 2301. Section 207 of the Relief Act, which is effective for calendar quarters beginning after December 31, 2020, further amends section 2301 to extend the application of the employee retention credit to qualified wages paid after December 31, 2020, and before July 1, 2021, and to modify the calculation of the credit amount for qualified wages paid during that time.

For wages paid in 2020, the percent of qualified wages eligible for credit equals 50% of qualified wages ($10,000 per employee for the year including certain health care expenses). For employers who averaged 100 or fewer average full-time employees in 2019, qualified wages include only those qualified wages and health care expenses paid to employees providing services and not providing services. For employers who averaged greater than 100 average full-time employees in 2019, qualified wages include those wages (including health care expenses) paid to employees not providing services.

For wages paid in 2021, legislation increased the maximum percentage of qualified wages to 70% ($10,000 per employee per calendar quarter including certain health care expenses) for qualified wages paid between January 1 and June 30, 2021. For 2021, employers who averaged 500 or fewer average full-time employees in 2019, qualified wages include those amounts paid to employees providing services and not providing services. For 2021, employers with greater than 500 average full-time employees in 2019, only wages paid to employees who were not providing services are considered qualified wages.

The ERC was further extended pursuant to section 3134 of the Internal Revenue Code (Code), enacted by section 9651 of the American Rescue Plan Act of 2021 (the ARP), Pub. L. No. 117-2, 135 Stat. 4 (March 11, 2021). Section 3134 of the Code provides for the ERC, effective for calendar quarters beginning after June 30, 2021, for wages paid after June 30, 2021, and before January 1, 2022.

With each enactment, Congress authorized the Secretary (or the Secretary's delegate) to provide such regulations or other guidance as may be necessary to carry out the purposes of the credit, including regulations or other guidance: (1) to prevent the avoidance of the purposes of the limitations; (2) to minimize compliance and

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer | Tax Identification Number *(last 4 digits)* | Year/Period ended 202106 and 202109 |

record-keeping burdens with respect to the credit; (3) to provide for waiver of penalties for failure to deposit amounts in anticipation of the allowance of the credit; (4) to recapture the benefit of the credit in cases where there is a subsequent adjustment to the credit; and (5) to ensure that the wages taken into account for the ERC conform with other credits eligible to be claimed by employers.

This broad grant of authority was provided to Treasury and the Internal Revenue Service to issue guidance (through regulation or other means) in a prompt and expedient manner to provide tax credits to employers that were negatively financially impacted by the pandemic while also ensuring compliance with the limitations and requirements of the Act, as well as legislative intent.

Shortly after enactment, on April 23, 2020, the Joint Committee on Taxation issued a report explaining Congressional intent in enacting the CARES Act. Joint Committee on Taxation, Description of the Tax Provisions of Public Law 116-136, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.

Treasury did not issue regulations addressing entitlement to, or calculation of, the ERC. Rather, consistent with statutory authority allowing the Secretary to issue "other guidance as may be necessary to carry out the purpose of the credit" and consistent with the need to encourage Eligible Employers to keep their employees on their payroll during the COVID-19 pandemic and allow Eligible Employers to claim the credit for qualified wages paid beginning on March 13, 2020, the Service issued guidance in coordination with Treasury in the form of Frequently Asked Questions beginning on April 29, 2020. With each legislative act, the Service continued seeking the highest level of Treasury review and continued updating the postings as the need for answers to frequently asked questions arose.

On March 1, 2021, Notice 2021-20 was issued incorporating the FAQs into more formal guidance. Notice 2021-20 provides guidance on the ERC as it applies to qualified wages paid after March 12, 2020, and before January 1, 2021. As further legislation was enacted, irs.gov was updated to address additional frequently asked questions and additional guidance was provided in subsequent Notices.

The following is a list of guidance issued addressing the ERC:
- For Wages Paid After March 12, 2020, and before Jan. 1, 2021
    - Notice 2021-20
    - Notice 2021-49
    - Revenue Procedure 2021-33
- For Wages Paid After Dec. 31, 2020, and before July 1, 2021
    - Notice 2021-23
    - Notice 2021-49
    - Revenue Procedure 2021-33
- For Wages Paid After June 30, 2021, and before Oct. 1, 2021
    - Notice 2021-49
    - Revenue Procedure 2021-33
- For Wages Paid After Sept. 30, 2021, and before Jan. 1, 2022
    - Notice 2021-49
    - Notice 2021-65

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer ▇▇▇▇▇▇▇▇▇▇ | Tax Identification Number *(last 4 digits)* ▇▇▇ | Year/Period ended 202106 and 202109 |

<u>To the extent that legislation did not modify the original provisions of the ERC, Notice 2021-20 governs the ERC for all periods.</u>

Notice 2021-20, Q/A-6 provides, "under the subsequent governmental order, however, Employer J must enforce social distancing guidelines that require Employer J to admit only a specified number of customers into the store per 1,000 square feet. While the governmental order results in customers waiting in line for a short period of time to enter the store during certain busy times of the week, the size of Employer J's storefront is large enough that it is able to accommodate all of its customers after these short waits outside the store. The governmental order requiring Employer J to enforce social distancing guidelines does not have more than a nominal effect on Employer J's business operations under the facts and circumstances, even though Employer J is required to modify its business operations. During this period, Employer J's business operations are not considered to be partially suspended due to the governmental order because the governmental order requiring enforcement of social distancing guidelines does not have more than a nominal effect on its operations."

Notice 2021-20, Q/A- 11 provides that if a governmental order requires non-essential businesses to suspend operations but allows essential businesses to continue operations, an employer that operates an essential business is not considered to have a full or partial suspension of operations if the governmental order allows all of the employer's operations to remain open. However, an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order. For example, an employer that maintains both essential and non-essential business operations, each of which are more than nominal portions of the business operations, may be considered to have a partial suspension of its operations if a governmental order restricts the operations of the non-essential portion of the business, even if the essential portion of the business is unaffected. In addition, an essential business that is permitted to continue its operations may, nonetheless, be considered to have a partial suspension of its operations if a governmental order requires the business to close for a period of time during normal working hours.
Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

Notice 2021-20, Q/A-13 provides guidance regarding whether a governmental order that causes the customers of a business to stay at home, or otherwise causes a reduction in demand for its products or services, and the business responds to the lack of demand by suspending some or all of its operations, is considered to rise to the level of a suspension of operations due to a governmental order. Q/A- 13 provides that an employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its products or services is not considered to have a full or partial suspension of its operations due to a governmental order.

Notice 2021-20, Q/A-14 states, "If an employer voluntarily suspends operation of a trader or business or voluntarily reduces hours due to COVID-19, but the suspension or reduction in hours is not due to a

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer | ███████ | Tax Identification Number *(last 4 digits)* ███ | Year/Period ended 202106 and 202109 |

governmental order, may the employer qualy as an eligible employer solely on the basis of the voluntary suspension or reduction in hours? No. An employer that voluntarily suspends operation of a trade or business or voluntarily reduces hours due to COVID-19 is no eligible for the employee retention credit on the basis of a full or partial suspension of its operations."

Notice 2021-20, Q/A- 17 and 18 provide guidance regarding circumstances where an employer's workplace is closed due to a governmental order for certain purposes, but the employer's workplace may remain open for other limited purposes. Q/A-17 provides that the employer's operations would be considered to be partially suspended if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner. The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations. For example, an occupancy restriction at a retailer with sufficient physical space to accommodate its customers regardless of the restriction will likely not result in an actual, and more than nominal, reduction of the retailer's ability to provide goods to its customers.

Notice 2021, Q/A-18 states, "The mere fact than an employer must make a modification (such as limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis, changing the format of service, or requiring employees and customers to wear face coverings) to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations.
Further in Answer 18, it states, "Modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations."

Reliance on IRS Public Guidance

As stated above, Treasury did not issue regulations addressing the ERC. Rather, due to the timing of each enactment and the almost immediate (and often retroactive) modification to the ERC, FAQS and Notices were the chosen form of guidance issued to carry out the purpose of the credit. Each piece of public guidance issued, including FAQs, Notices, Press Releases, Tax Forms and Instructions were coordinated with the highest levels of the Treasury Department. In Skidmore v. Swift & Co., (S Ct 1944) 323 U.S. 134, the Supreme Court set forth the standard for deference to sub-regulatory guidance, which requires consideration of the thoroughness evident in its consideration, the validity of its reasoning, and its consistency with earlier and later pronouncements. The Court held that agency rulings, interpretations, and opinions "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

As stated previously, the Federal government's response to the COVID-19 pandemic was swift and continuously evolving. The CARES Act was enacted on March 27, 2020 (only 14 days after the Trump Administration declared a nationwide emergency due to COVID-19 causing the Federal government and state and local entities to implement shutdown orders). Since under the CARES Act, Eligible Employers became entitled to claim the ERC for wages paid after March 12, 2020, the Service worked closely with Congress and the highest levels of the

| Form **886-A**<br>(May 2017) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer ▮ | Tax Identification Number *(last 4 digits)* ▮ | Year/Period ended<br>202106 and 202109 |

Department of Treasury to develop, and issue published guidance. Subsequent to enactment of the CARES Act, three additional pieces of legislation were enacted to extend, modify and/or retroactively eliminate the ERC for certain taxpayers. With each legislative enactment, the Service was required to issue prompt guidance to Taxpayers so as to implement the legislation enabling Taxpayer's to claim the ERC when available for each calendar quarter.

The following Arizona Government Orders were provided in ▮

1) Executive Order 2020-10 on March 21, 2020. This order restricted non-essential or elective surgeries and other procedures.
2) Executive Order 2020-22 on April 2, 2020. This order required certain medical facilities to immediately ensure compliance with CDC and Centers for Medicare and Medicaid Services infection control guidance. The order requires the facilities and institutions to implement additional protocols to safeguard against transmission of the virus, including, separating residents who test positive for COVID-19 from COVID-19 unknown residents, and COVID-19 negative residents, and offering electronic visual communication in lieu of in-person visitation if visitation is restricted.
3) Executive Order 2021-08 on April 5, 2021, which rescinded Executive Orders 2020-10, 2020-22, and 2020-32. This order lifted restrictions on healthcare institutions.
4) Executive Order 2021-05 on March 5, 2021. This order lifted the occupancy limits implemented due to COVID-19. The order directed businesses to continue to assist in efforts to contain the spread of COVID-19 by following all guidance from the CDC, U.S. Department of Labor, OSHA, and ADHS. Under the Order, the capacity limited implemented in Executive Order 2020-47 and related documents are rescinded.
5) Executive Order 2021-16, effective on September 29, 2021, rescinded Executive Order 2021-05, which established the requirement for businesses to follow CFC, Department of Labor, OSHA, and ADHS guidance.

**Protest Arguments:**

▮ tated the following in the Protest:

The continuing restrictions that applied to ▮ business operations during the second and third quarters of 2021 did have more than nominal effect on such operations. ▮ business operations were partially suspended, and as such, ▮ was an eligible employer, for the second and third quarters of 2021.

Applicable orders continued to required ▮ to follow guidance issued by the CDC, U.S. Department of Labor, OSHA and ADHS, and to establish protocols for social distancing, enhanced sanitation and other measures to help avoid the spread of COVID-19. Adherence to State orders requiring these modifications created a more than nominal effect on ▮ business operations.

▮ was required to modify its business operations to comply with the restrictions contained in the governmental orders, and such modifications created a more than nominal effect on ▮ business operations.

Reasons Taxpayer stated to support their position included: The time required to comply with these restrictions

| Form **886-A** (May 2017) | Department of the Treasury - Internal Revenue Service **Explanation of Items** | | Schedule number or exhibit |
|---|---|---|---|
| Name of taxpayer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | Tax Identification Number *(last 4 digits)* ▓▓▓▓ | Year/Period ended 202106 and 202109 |

resulted in the reduction of capacity to provide in-person services by more than 10%. Taxpayer was required to implement screening measures, such as temperature checks. There were physical distancing requirements and enhancing cleaning and disinfection. They had to implement strict visitor policies, they had to provide education and training to staff on infection control measures and offer COVID-19 testing. Social distancing measure and lockdowns led to staff shortages, remote work required a transition, and there were extra administrative tasks. The collaboration was not the same between primary care practices and nursing homes or long-term care facilities. ▓▓▓▓▓▓▓▓ claims they could no longer undertake provider-to-provider marketing and educational business development that it had done previously. ▓▓▓▓▓▓▓▓ claims group hiring events could not be held due to physical distancing requirements. ▓▓▓▓▓▓▓▓ also claims that they were participants in various trade-shows to sell medical care management programs. Finally, Taxpayer states the suspension of in-person events as a result of related governmental orders limiting group meetings through the country had more than a nominal effect on the sales operations of ▓▓▓▓▓▓▓▓

### Exam's Response to Protest Arguments:

Section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code both require two important elements to be considered an "eligible employer" due to a suspension of operations. First, an employer must be subject to orders from an appropriate governmental authority limiting commerce, travel, or group meetings due to COVID-19. Second, such orders must result in a full or partial suspension of an employer's trade or business operations.

As set forth below, the Taxpayer has not provided documentary evidence establishing the existence of a governmental order in effect during the tax periods at issue which order suspended any portion of the Taxpayer's trade or business. The CDC and OSHA guidance provide strategies to mitigate the spread of COVID-19; the CDC and OSH guidance did not mandate or otherwise order the taxpayer to suspend any of its operations. Nothing in section 2301 of the CARES Act or section 3134 of the Code expands the definition of a government order to include guidelines that do not place mandatory obligations on employers. Section III.D., Q&A 20 of Notice 2021-20 provides that an employer merely following CDC or DHS guidelines has not partially suspended operations due to the governmental orders.

Moreover, even assuming the documentation provided by the Taxpayer constitutes a governmental order, the taxpayer has not established that more than a nominal portion of its business operations are suspended by a governmental order. The Taxpayer remained fully open and operational without any restrictions on more than a nominal portion of its operations. As set forth in Notice 2021-20, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operation if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019). The Taxpayer has failed to provide any evidence of a decline in gross receipts, nor established that any of the guidance it relies upon had any impact on the number of hours of service performed by its employees.

| Form **886-A**<br>(May 2017) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer ▮ | Tax Identification Number *(last 4 digits)* ▮ | Year/Period ended<br>202106 and 202109 |

### Social Distancing, Limiting Occupancy, Cleaning and PPE

Taxpayer asserted that its trade or business was partially or fully suspended as a result of social distancing and sanitization orders. Regarding socially distancing, these guidelines do not have more than a nominal effect on Arrowhead's operations. In Notice 2021-20, Q/A-6, Employer J must enforce social distancing guidelines that require Employer J to admit only a specified number of customers into the store per 1,000 square feet. While the governmental order results in customers waiting in line for a short period of time to enter the store during certain busy times of the week, the size of Employer J's storefront is large enough that it is able to accommodate all of its customers after these short waits outside the store and does not have more than a nominal effect.

Notice 2021, Q/A-18 states, "The mere fact than an employer must make a modification (such as limiting occupancy to provide for social distancing, requiring services to be performed only on an appointment basis, changing the format of service, or requiring employees and customers to wear face coverings) to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations." Further in Answer 18, it states, "Modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations. For purposes of the ERC, employers must be able to demonstrate that a governmental order requiring citizens to wear masks, social distance and sanitization had more than a nominal effect on the employer's trade or business. The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations. During this period, Employer J's business operations are not considered to be partially suspended due to the governmental order because the governmental order requiring enforcement of social distancing guidelines does not have more than a nominal effect on its operations."

Having to modify business operations for better hygiene and COVID-10 mitigation procedures and limitations on social distancing for customers, employees, or vendors or that a demand for its services was reduced does not constitute a partial suspension of its trade or operations. All of the Taxpayer's business operations were able to continue and there were no orders provided showing the Taxpayer was required to socially distance, etc. during 2021 Q2 and Q3. Modifications due to recommendations made by governmental entities does not rise to the level of a full or partial suspension of the Taxpayer's trade or business.

### Group Meetings, Marketing, Hiring Events, Remote Work

Taxpayer asserted that its trade or business was partially or fully suspended as a result of an inability to conduct group meetings, to collaborate, and to conduct provider-to-provider marketing. The fact that meetings or events not conducted in person were not "as effective for employee productivity purposes" does not rise to the level of a full or partial suspension. The fact that meetings had to require socially distancing or limited the amount of people in attendance also does not rise to the level of a full or partial suspension. Furthermore, Taxpayer did not show that meetings were not held. The Taxpayer failed to provide any documentation supporting a full or partial suspension of its trade or business based on group meetings, marketing, hiring events, remote work,etc. Also, meetings,

| Form **886-A**<br>(May 2017) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule number or exhibit |
|---|---|---|
| Name of taxpayer ▓▓▓▓▓▓▓▓▓▓ | Tax Identification Number *(last 4 digits)* ▓▓▓▓ | Year/Period ended<br>202106 and 202109 |

events, etc. would not have been required to be done remotely during 2021 Q2 and Q3. Taxpayer did not substantiate how such modifications resulted in the Taxpayer's reduction in their ability to provide services in the normal course of business of not less than 10 percent to fall within the provisions of Notice 2021-2.

The declarations of a state of emergency that limit commerce, travel, and group meetings does not relate to the suspension of Arrowhead's operation of its trade or business for purposes of 2021 Q2 and Q3. Notice 2021-20, Q/A-10 states, "such a declaration of a state of emergency that limits commerce, travel, or group meetings, but does so in a manner that does not relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for purposes of the employer's determination of its eligibility for the employee retention credit." Accordingly, the Taxpayer has failed to substantiate entitlement to the ERC based on an inability to conduct group meetings.

## Training

▓▓▓▓▓▓ mentioned they could no longer hold meetings or training for employee needs as limited by specific government orders. Taxpayer did not provide documentation showing that training could not be conducted in person or by teleconference or other means. Taxpayer failed to provide any documentation showing that training was limited. As such, the Taxpayer failed to establish entitlement to the ERC based on a governmental order due to COVID-19 prohibiting its employees from training.

Contrary to the Taxpayer's assertions, the Taxpayer did not establish a full or partial suspension of the Taxpayer's trade or business due to a governmental order related to COVID-19. Taxpayer did not substantiate how a modification resulted in a reduction in their ability to provide services in the normal course of the employer's business of not less than 10 percent to fall within the provisions of Notice 2021-20. All of the employer's operations were able to remain open in 2021 Q2 and Q3.

## Trade and Shows

The Taxpayer has provided no evidence that its facilities were fully closed during any of the tax quarters at issue. More than a nominal portion of the business has to be **closed**. No records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order were provided. If a portion of the business was not closed, the taxpayer does not qualify for the safe harbor. Also, trade shows were permitted during 2021 Q2 and Q3.

## Conclusion

For the various reasons discussed in Exam's 886-A and for the above-referenced reasons discussed in this Rebuttal, Exam's denial of Taxpayer's ERC claims for the periods ending 202106 and 202109 should be sustained in full.

MS438-POL
Internal Revenue Service
1818 East Southern Avenue, Suite 15A
Mesa, AZ 85204-5230

Official Business
Penalty for Private Use, $300

RECEIVED
NOV 2 8 2023
REDIRECT HEALTH

PHOENIX AZ 852
Retail
RDC 99
85254

U.S. POSTAGE PAID
FCM LETTER
PHOENIX, AZ 85050
NOV 22, 2023
$0.90
R2304E108720-05

Exh. D
Complaint