# Exhibit F

# Office of Chief Counsel
# Internal Revenue Service
# memorandum

Number: **AM 2023-007**
Release Date: 11/3/2023

CC:EEE
POSTN-117042-23

UILC:  3111.03-01, 3134.00-00

date:  October 18, 2023

to:  Mark L. Hulse
(Division Counsel (Tax Exempt & Government Entities))

from:  Rachel D. Leiser Levy
(Associate Chief Counsel (Employee Benefits, Exempt Organizations, and Employment Tax))

subject:  Issues Related to Whether an Employer Experienced a Full or Partial Suspension of the Operation of a Trade or Business under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act or Section 3134 of the Internal Revenue Code Due to Communications from the Occupational Safety and Health Administration

This Generic Legal Advice Memorandum (GLAM) responds to your request for assistance. This GLAM may not be used or cited as precedent.

ISSUE:

Whether an employer may rely on communications[1] from the Occupational Safety and Health Administration (OSHA) on mitigating and preventing the spread of COVID-19 in the workplace to meet the definition of an "eligible employer" under section 2301(c)(2)(A)(ii)(I) of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), and section 3134(c)(2)(A)(ii)(I) of the Internal Revenue Code (Code).

---

[1] "Communications" for purposes of this memorandum include guidance published on the official Occupational Safety and Health Administration website (OSHA.gov), such as guidance provided to Area Offices and Compliance Safety and Health Officers (CSHOs) for enforcing OSHA standards and the General Duty Clause. "Communications" for purposes of this memorandum do not include the COVID-19 Healthcare Emergency Temporary Standard applicable to settings where healthcare or healthcare support services are provided, *Occupational Exposure to COVID–19; Emergency Temporary Standard* (86 FR 32376), the COVID-19 Emergency Temporary Standard to protect unvaccinated employees of large employers, *COVID-19 Vaccination and Testing Emergency Temporary Standard* (86 FR 61402), or "orders," as defined in this Memorandum, under 29 U.S.C. §§ 657(b), 659, or 662.

POSTN-117042-23                                      2

FACTS:

Scenario 1

Employer A is located in a state and a local jurisdiction that lifted all COVID-19 related health orders and restrictions in the first calendar quarter of 2021. At that time, Employer A ceased any mitigation measures other than encouraging employees to wear masks and practice routine hygienic practices such as frequent handwashing. Employer A claimed the employee retention credit in the second and third calendar quarters of 2021 on the basis that the operation of Employer A's business was partially suspended under section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code by the communications from OSHA.

Scenario 2

Same facts as Scenario 1, except that prior to 2020, Employer A's employees teleworked between two to three times a week. In March 2020, Employer A allowed employees to telework or work remotely full-time and continued this policy through the end of the third calendar quarter of 2021.

LAW:

Employee Retention Credit Statutory Language and IRS Notices

Section 2301 of the CARES Act, as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act) (enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (December 27, 2020)), provides an employee retention credit for employers subject to closure due to COVID-19.

Section 2301(a) of the CARES Act, as amended by section 206 of the Relief Act, provides that in the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 50 percent of the qualified wages with respect to each employee of such employer for such calendar quarter.

Section 2301(m) of the CARES Act, as amended by section 206 of the Relief Act, limits the employee retention credit under section 2301 of the CARES Act to wages paid after March 12, 2020, and before January 1, 2021.

Section 2301(a) of the CARES Act, as amended by section 207 of the Relief Act, provides that in the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 70

POSTN-117042-23                                       3

percent of the qualified wages with respect to each employee of such employer for such calendar quarter.

Section 2301(m) of the CARES Act, as amended by section 207 of the Relief Act, limits the employee retention credit under section 2301 of the CARES Act to wages paid after March 12, 2020, and before July 1, 2021.

Section 207(k) of the Relief Act provides that the amendments made by section 207 of the Relief Act shall apply to quarters beginning after December 31, 2020. Therefore, the employee retention credit under section 2301 of the CARES Act is equal to 50 percent of the qualified wages with respect to each employee of an eligible employer for calendar quarters in 2020 and 70 percent of the qualified wages with respect to each employee of an eligible employer for the first and second calendar quarters in 2021.

Section 9651 of the American Rescue Plan Act of 2021 (ARP Act), Pub. L. 117-2, 135 Stat. 4, enacted section 3134 of the Code. Section 3134 of the Code provides an employee retention credit for employers subject to closure due to COVID-19 that is substantially similar in structure to that of section 2301 of the CARES Act, as amended by section 207 of the Relief Act, with certain changes.

Section 3134(a) of the Code provides that in the case of an eligible employer, there shall be allowed as a credit against applicable employment taxes for each calendar quarter an amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter.

Section 3134(n) of the Code, as amended by section 80604 of the Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429 (2021), limits the employee retention credit under section 3134 of the Code to wages paid after June 30, 2021, and before October 1, 2021 (or, in the case of wages paid by an eligible employer which is a recovery startup business, January 1, 2022).

Section 2301(c)(2)(A)(ii)(I) of the CARES Act defines the term "eligible employer," in part, as any employer which was carrying on a trade or business during the calendar quarter for which the credit is determined under section 2301(a) of the CARES Act, and with respect to any calendar quarter, for which the operation of the trade or business is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to coronavirus disease 2019 (COVID-19).

Section 3134(c)(2)(A)(ii)(I) of the Code similarly defines the term "eligible employer," in part, as any employer which was carrying on a trade or business during the calendar quarter for which the credit is determined under section 3134(a) of the Code, and with respect to any calendar quarter, for which the operation of the trade or business is fully or partially suspended during the calendar quarter due to orders from an appropriate

POSTN-117042-23 4

governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to coronavirus disease 2019 (COVID-19). Notice 2021-20, 2021-11 I.R.B. 922, provides guidance on the employee retention credit under section 2301 of the CARES Act, as amended by section 206 of the Relief Act.

Section III.C. of Notice 2021-20 provides specific guidance on orders from an appropriate governmental authority (also referred to as governmental orders).

Section III.D. of Notice 2021-20 provides specific guidance on when the operation of an employer's trade or business is fully or partially suspended for purposes of the employee retention credit under section 2301 of the CARES Act.

Notice 2021-23, 2021-16 IRB 1113, provides guidance on the employee retention credit under section 2301 of the CARES Act, as amended by section 207 of the Relief Act. Notice 2021-23 amplified Notice 2021-20; under Notice 2021-23, the provisions of section III.D. of Notice 2021-20 continued to apply to section 2301 of the CARES Act, as amended by section 207 of the Relief Act.

Notice 2021-49, 2021-34 IRB 316, provides guidance on the employee retention credit under section 3134 of the Code. Notice 2021-49 amplified Notice 2021-20 and Notice 2021-23; under Notice 2021-49, the provisions of section III.D. of Notice 2021-20 continued to apply to the third and fourth calendar quarters of 2021 for purposes of the employee retention credit under section 3134 of the Code.

Notice 2021-65, 2021-51 IRB 880, modified Notice 2021-49 to implement statutory changes made by the Infrastructure Act. Under Notice 2021-65, section III.D. of Notice 2021-20 no longer applied to the fourth calendar quarter of 2021 for purposes of the employee retention credit under section 3134 of the Code.

Section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code both require two important elements to be considered an "eligible employer" due to a suspension of operations. First, an employer must be subject to orders from an appropriate governmental authority limiting commerce, travel, or group meetings due to COVID-19. Second, such orders must result in a full or partial suspension of an employer's trade or business operations.

Section III.C., Q&A 10 of Notice 2021-20 provides that orders, proclamations, or decrees from the Federal government or any State or local government may be taken into account by an employer as "orders from an appropriate governmental authority" only if they limit "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)" and relate to the suspension of an employer's operation of its trade or business. Orders that are not from the Federal government must be from a State or local government that has jurisdiction over the employer's operations. Statements from a governmental official do not rise to the level of a governmental order for purposes of the employee retention credit.

POSTN-117042-23                              5

Section III.D., Q&A 11 of Notice 2021-20 provides, in part, that an employer may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order. Solely for purposes of the employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

Section III.D., Q&A 15 of Notice 2021-20 provides, in part, that if an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are not considered to have been fully or partially suspended as a consequence of a governmental order.

Section III.D., Q&A 16 of Notice 2021-20 provides a list of various factors to consider in determining whether an employer is able to continue comparable operations.

Section III.D., Q&A 18 of Notice 2021-20 provides that modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or that require employees to wear masks and gloves while performing their duties will not result in more than a nominal effect on the business operations.

Section III.D., Q&A 20 of Notice 2021-20 provides that an employer merely following CDC or DHS guidelines has not partially suspended operations due to the governmental orders.

Section III.N., Q&A 70 of Notice 2021-20 provides information regarding what records an eligible employer should maintain to substantiate eligibility for the employee retention credit.[2]

Occupational Safety and Health Act

The Occupational Safety and Health Act (OSH Act) was passed in 1970 to assure safe and healthful working conditions. The OSH Act gives OSHA authority to establish and enforce workplace safety and health standards. See generally 29 U.S.C. §§ 651 – 678.

Section 5(a)(1) of the OSH Act, 29 U.S.C. § 654(a)(1), known as the General Duty Clause, requires each employer to furnish to each of his employees employment and a place of employment free from recognized hazards that are causing or likely to cause

---

[2] See also Treas. Reg. § 31.6001-1 and Treas. Reg. § 1.6001-1 for more information on record keeping.

POSTN-117042-23                             6

death or serious physical harm. In addition, the OSH Act requires employers to comply with OSHA's health and safety standards. See 29 U.S.C. § 654(a)(2).

Section 6 of the OSH Act, 29 U.S.C. § 655, provides that OSHA can adopt occupational safety or health standards, as well as emergency temporary standards. Occupational safety and health standards are rules that require conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment. See 29 U.S.C. § 652. For OSHA to promulgate an emergency temporary standard (ETS) that takes immediate effect upon publication, the OSH Act requires the agency to determine (i) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (ii) that such emergency standard is necessary to protect employees from such danger.

Sections 6(b)(6) and 6(d) of the OSH Act, 29 U.S.C. § 655(b)(6) and § 655(d), provide opportunities for employers to apply to the Secretary of Labor (Secretary) for a variance from an OSHA standard.

Section 8 of the OSH Act, 29 U.S.C. § 657(b), permits the Secretary to require the attendance and testimony of witnesses and the production of evidence under oath, and to apply for judicial enforcement of such orders upon the witnesses' failure or refusal to comply.

Section 10(a) of the OSH Act, 29 U.S.C. § 659(a), provides that if, after an inspection or investigation, the Secretary issues a citation for a violation of a requirement of the OSH Act, or a standard promulgated under the Act, he shall notify the employer of the penalty proposed to be assessed and that the employer has fifteen working days within which to notify the Secretary that he wishes to contest the citation or proposed assessment of penalty. If, within fifteen working days from the receipt of the notice issued by the Secretary the employer fails to notify the Secretary that he intends to contest the citation or proposed assessment of penalty, and no notice is filed by any employee or representative of employees contesting the reasonableness of the time fixed in the citation for abatement of the violation, the citation and the penalty assessment, as proposed, shall be deemed a final order of the Occupational Safety and Health Review Commission (Commission) and are not subject to review by any court or agency. 29 U.S.C. § 659(a). Section 10(c) of the OSH Act provides that if there is a timely notice of contest, the Commission shall afford an opportunity for a hearing and issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation or proposed penalty, or directing other appropriate relief. 29 U.S.C. § 659(c).

Section 11 of the OSH Act, 29 U.S.C. § 660, provides that any person adversely affected or aggrieved by an order of the Commission issued under section 10(c) may obtain judicial review of such order.

POSTN-117042-23                                    7

Section 13 of the OSH Act, 29 U.S.C. § 662, gives OSHA authority to petition district courts for orders to restrain conditions or practices that pose imminent dangers. An order under section 13 may require that steps be taken to avoid, correct, or remove such imminent danger and prohibit the employment or presence of any individual in locations or under conditions where such imminent danger exists, except individuals whose presence is necessary to avoid, correct, or remove such imminent danger or to maintain the capacity of a continuous process operation to resume normal operations without a complete cessation of operations, or where a cessation of operations is necessary, to permit such to be accomplished in a safe and orderly manner.

Section 17 of the OSH Act, 29 U.S.C. § 666, sets forth the civil and criminal penalties applicable to various types of OSHA violations, including willful and repeated violations and failure to correct violations. The Commission has authority to assess all civil penalties under section 17 of the OSH Act. Nothing in section 17 of the OSH Act addresses the shutting down of business operations.

OSHA Communications Released During 2020 and 2021

OSHA published on its website communications related to COVID-19 during both 2020 and 2021. The communications included instructions to field offices and CSHOs as well as nonbinding guidance for employers and employees.

*Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, April 13, 2020 provided "instructions and guidance to [OSHA] Area Offices and . . . CSHOs[] for handling COVID-19-related complaints, referrals, and severe illness reports."[3] The memorandum was subsequently updated three times (May 19, 2020; March 12, 2021; and July 7, 2021) (hereinafter collectively referred to as the "OSHA memo" or "*Interim Enforcement Response Plan*").[4] The *OSHA memo* provides guidance to help CSHOs identify workplaces and job tasks with a risk-based potential for COVID-19 exposures and explains that workplace exposures to COVID-19 may depend on a variety of factors. Each version of the OSHA memo contains an Attachment 1 providing "Specific Guidance for COVID-19 Enforcement." In all iterations of the memo, Attachment 1 provides that various OSHA standards may apply to COVID-19 hazards, including standards for personal protective equipment (PPE), respiratory protection, and sanitation, and that the General Duty Clause of the OSH Act may also apply. All versions of Attachment 1 also state that compliance personnel should consult the most

---

[3] OSHA Memorandum, *Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, April 13, 2020, https://www.osha.gov/memos/2020-04-13/interim-enforcement-response-plan-coronavirus-disease-2019-covid-19.

[4] OSHA Memorandum, *Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, May 19, 2020, https://www.osha.gov/memos/2020-05-19/updated-interim-enforcement-response-plan-coronavirus-disease-2019-covid-19; OSHA Memorandum, *Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, March 12, 2021, https://www.osha.gov/memos/2021-03-12/updated-interim-enforcement-response-plan-coronavirus-disease-2019-covid-19; OSHA Memorandum, *Updated Interim Enforcement Response Plan for Coronavirus Disease 2019 (COVID-19)*, July 7, 2021, https://www.osha.gov/laws-regs/standardinterpretations/2021-07-07.

POSTN-117042-23                                        8

current guidance from the Centers for Disease Control and Prevention (CDC) in assessing potential workplace COVID-19 hazards. In the document, OSHA also recommends implementing multiple layers of controls to mitigate risks (*e.g.*, implementing physical distancing, maintaining ventilation systems, and properly using face coverings or PPE when appropriate.).

As disclaimed in the heading of the document posted on the OSHA website, "OSHA requirements are set by statute, standards and regulations" and interpretations (including those contained in the OSHA memo) "cannot create additional employer obligations." The OSHA memo is not addressed to employers. Additionally, nothing in the OSHA memo establishes a blanket mandate or any new requirements applicable to all workplaces. The OSHA memo simply contains instructions and guidance for OSHA field personnel with regards to evaluating and addressing workplace COVID-19 hazards.

*Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace,*[5] January 29, 2021 (updated June 10, 2021 and August 13, 2021[6]) (hereafter collectively referred to as "*Protecting Workers* guidance"), provides guidance on the OSHA website to help employers protect workers from COVID-19 hazards. As noted in the Purpose section, although the guidance references "mandatory OSHA standards," the recommendations in the guidance "are advisory in nature and informational in content and are intended to assist employers in providing a safe and healthful workplace free from recognized hazards that are causing or likely to cause death or serious physical harm." As further noted in the Scope section, the guidance "is not a standard or regulation, and it creates no new legal obligations."

The *Protecting Workers* guidance on OSHA's website includes information about how employers can implement multi-layered interventions to protect workers and mitigate the spread of COVID-19, including information about (1) facilitating employees getting vaccinated; (2) instructing workers who experience COVID-19 symptoms to stay home from work; (3) educating and training workers on the employer's COVID-19 policies and procedures; and (4) maintaining ventilation systems.

Other OSHA Guidance

Directive Number CPL 2-0.125, effective February 25, 2000, provides guidance to OSHA's compliance personnel about inspection policies and procedures concerning worksites in an employee's home. This guidance states that OSHA respects the privacy of the home and has never conducted inspections of home offices.

---

[5] Available at https://www.osha.gov/coronavirus/safework
[6] A summary of changes made August 13, 2021, is available at https://www.osha.gov/coronavirus/safework.  Those updates included revisions to reflect the July 27, 2021, CDC mask and testing recommendations for fully vaccinated people, a reorganizing of appendix recommendations for manufacturing, meat and poultry processing, seafood processing, and agricultural processing industries, and adding links to additional sources of guidance.

POSTN-117042-23                                             9

Section VII of Directive Number CPL 2-0.125 defines "home-based worksite" as the areas of an employee's personal residence where the employee performs work of the employer and "home office" as office work activities in a home-based worksite (e.g., filing, keyboarding, computer research, reading, writing). Such activities may include the use of office equipment (e.g., telephone, facsimile machine, computer, scanner, copy machine, desk, file cabinet).

Section IX of Directive Number CPL 2-0.125 provides that OSHA will not conduct inspections of employees' home offices nor will OSHA hold employers liable for employees' home offices. Furthermore, OSHA does not expect employers to inspect the home offices of their employees.

ANALYSIS:

OSHA is one of the many federal agencies that released guidance and general recommendations related to COVID-19 during the pandemic. Some taxpayers have argued that their businesses were fully or partially suspended for purposes of the employee retention credit because OSHA communications, including those described above, constituted an "order" that suspended the operations of their trade or business.

Orders

To meet the definition of an eligible employer due to a suspension of operations, an employer must be able to identify orders from an appropriate governmental authority limiting commerce, travel, or group meetings due to COVID-19 that cause a full or partial suspension of the employer's trade or business operations. Assumptions, vague statements, and news articles are insufficient to meet the definition of orders for the purposes of qualifying as an eligible employer under section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code. Further, recommendations, guidelines, and suggestions do not constitute orders for purposes of the employee retention credit. The language of section 2301 of the CARES Act and section 3134 of the Code requires orders; neither statute mentions recommendations, guidelines, or other informal standards.

Neither section 2301(c)(2)(A)(ii)(I) of the CARES Act nor section 3134(c)(2)(A)(ii)(I) of the Code explicitly define the term "orders." Therefore, accepted principles of statutory construction will generally apply to determine the meaning of the term.

*Ordinary Meaning of "Order"*

Courts have interpreted undefined terms with the ordinary meaning of the term at the time Congress enacted the statute. See *Wisconsin Central Ltd. v. U.S.*, 138 S. Ct. 2067, 2070 (2018) (citing to *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L.Ed.2d 199 (1979)). "To discern that ordinary meaning, those words 'must be read' and interpreted 'in their context,' not in isolation." *Southwest Airlines Co. v. Saxon*, 142 S.

POSTN-117042-23                                    10

Ct. 1783, 1788 (2022) (quoting *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019)).

Since the CARES Act and the ARP were passed in 2020 and 2021, respectively, contemporary meanings of the word "order" will generally apply. An "order" is generally understood to be a command or mandate delivered by a government official. See, e.g., Black's Law Dictionary (11th ed. 2019) ("order n. (16c) 1. A command, direction, or instruction. See MANDATE (1). 2. A written direction or command delivered by a government official, esp. a court or judge. The word generally embraces final decrees as well as interlocutory directions or commands.").

The OSHA communications explicitly do not command or mandate any employer to take any specific action, leaving it outside the ordinary meaning of the term "orders." Both the instructions to OSHA compliance officers as well as the guidance on the OSHA website contain disclaimers that they do not impose new obligations on employers.

Nothing in section 2301 of the CARES Act or section 3134 of the Code expands the definition of a government order to include guidelines that do not place mandatory obligations on employers. As explained above, the language of section 2301 of the CARES Act and section 3134 of the Code requires orders.

*Use of "Order" under the OSH Act*

In some instances, the governmental authority used by the employer to claim eligibility has its own statutory definition of the term "orders" which can be used to evaluate whether a particular statement or communication made by that authority constitutes an order for the purposes of the credit. General, nonbinding guidance is not considered an "order" under OSHA's statutory authority provided in the OSH Act. The term "order" is used in the OSH Act as an action directed at a particular employer or applicable to an order permitting a variance from a standard or a final order after OSHA has identified a violation and issued a citation. See 29 U.S.C. § 655(b)(6)(A) and § 655(d); 29 U.S.C. § 659.[7]

OSHA provided recommendations throughout 2020 and 2021 on how employers could make their workplaces safer for employees and how to comply with pre-existing standards. Examples include OSHA's *Interim Enforcement Response Plan* and OSHA's *Protecting Workers* guidance. These OSHA communications do not fall within the meaning of the term "orders" as it is used in the OSH Act.

Given that the communications disseminated by OSHA do not conform to the ordinary meaning of the term "orders" at the time Congress enacted the statute and do not conform to the meaning of the term "orders" in the OSH Act, these issuances are not

---

[7] OSHA maintained a public catalog of inspections with COVID-19 related violations. See https://www.osha.gov/enforcement/covid-19-data/inspections-covid-related-citations. OSHA issued roughly 750 COVID-19 related citations during 2020 and 2021.

POSTN-117042-23                                11

"orders" for purposes of the credit and cannot be used to claim the credit by employers, even if employers took steps in response to the communications.

<u>Orders limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to coronavirus disease 2019 (COVID-19)</u>

To be considered an "eligible employer" for the credit, an order used to claim the credit must be both (a) from an appropriate governmental authority and (b) limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to coronavirus disease 2019 (COVID-19).

All standards referenced in OSHA communications discussed in this document (whether or not they are orders) applied to occupational exposure to infectious diseases prior to the emergence of COVID-19. [8] For example, the pre-existing standards applicable to infectious diseases referenced in the OSHA memo include:

- Recording and Reporting Occupational Injuries and Illness, 29 CFR Part 1904
- General Requirements – Personal Protective Equipment, 29 CFR Part 1910.132
- Respiratory Protection, 29 CFR Part 1910.134
- Sanitation, 29 CFR Part 1910.141
- Specification for Accident Prevention Signs and Tags, 29 CFR Part 1910.145
- Access to Employee Exposure and Medical Records, 29 CFR Part 1910.1020
- General Duty Clause, Section 5(a)(1) of the OSH Act

An employer cannot simply reference pre-existing OSHA standards to claim entitlement to the credit due to a full or partial suspension of operations.  Assuming, for the sake of argument, that the above pre-existing standards referenced in the OSHA memo are "orders" for purposes of applying for the credit, an employer must still demonstrate how the pre-existing standard, as applied to its particular circumstances due to COVID-19, was implemented to limit commerce, travel, or group meetings. In this context, "commerce" is generally understood to mean the exchange of goods and services. See, e.g., Black's Law Dictionary (11th ed. 2019) ("commerce n. (16c) 1. The exchange of goods and services, esp. on a large scale involving transportation between cities, states, and countries"). These determinations will depend on the specific facts and circumstances in each case.[9]

<u>Full or Partial Suspension of Operations</u>

---

[8] A violation of pre-existing OSHA standards or the General Duty Clause that results in a citation and then an order under section 659 of the OSH Act may constitute an order for purposes of the employee retention credit. This analysis is outside the scope of this memorandum.

[9] This memorandum does not address whether the pre-existing standards referenced in the OSHA memorandum as applied to Employer A's particular circumstances limit commerce, travel, or group meetings due to the lack of specific facts relating to the operation of Employer A's trade or business. Thus, a conclusion on this issue is outside the scope of this memorandum.

POSTN-117042-23                                        12

In order to qualify as an "eligible employer" for the purposes of the credit, an employer must be able to substantiate that orders from an appropriate governmental authority caused an employer's trade or business operations to be fully or partially suspended. See Section III.N., Q&A 70 of Notice 2021-20; see also Treas. Reg. § 31.6001-1 and Treas. Reg. § 1.6001-1. The relevant inquiry is whether an employer could continue operating its trade or business (even if the employer ceased operations) despite there being an order from an appropriate governmental authority in place. If an employer can operate its trade or business under the governmental order, then the employer's operations are not fully or partially suspended.

To fall within the provisions of Section III.D., Q&A 11 of Notice 2021-20, the determination of whether an employer experienced a full or partial suspension of operations depends upon whether more than a nominal portion of an employer's trade or business operations was suspended by a governmental order or a governmental order had more than a nominal effect on an employer's trade or business operations.

While these determinations depend on the specific facts and circumstances of each case, Section III.D., Q&A 18 of Notice 2021-20 provides that modifications altering customer behavior (for example, mask requirements or making store aisles one way to enforce social distancing) or requiring employees to wear masks and gloves while performing their duties will likely not result in more than a nominal effect on the business operations. The recommendations set forth in OSHA guidance related to modifications, such as requiring masks, providing sanitization supplies, and encouraging social distancing, are not considered orders from an appropriate governmental authority described in section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code.  Moreover, even assuming, for the sake of argument, that the recommendations were orders described in section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code, they were not likely to impact an employer's ability to operate their trade or business. If an employer maintains that modifications had more than a nominal effect on the employer's trade or business operations, the employer needs to substantiate that the modifications resulted in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent to fall within the provisions of Notice 2021-20.

CONCLUSION:

Generally, communications from OSHA are not considered "orders from an appropriate governmental authority that limit commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)" for purposes of section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code. The language of both section 2301 of the CARES act and section 3134 of the Code require an employer be subject to "orders" and that such orders "limit commerce, travel, or group meetings . . . due to the coronavirus disease 2019 (COVID–19)." Generally, OSHA communications are insufficient to meet the

POSTN-117042-23                                        13

requirements under section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(ii)(I) of the Code.

During the time an employer could be eligible to claim the credit due to a full or partial suspension of operations, OSHA produced guidance interpreting pre-existing standards and the General Duty clause in light of COVID-19 and additionally provided nonbinding recommendations for employers on the official OSHA website. OSHA did not adopt and enforce any widely applicable standards that limited commerce, travel, or group meetings due to COVID-19.

Because OSHA communications are not considered "orders from an appropriate governmental authority," even if an employer took steps following guidance or recommendations disseminated through OSHA communications, the employer will not be considered an eligible employer for purposes of section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(ii)(I) of the Code.

If the implementation of OSHA recommendations and guidance became mandatory due to orders from an appropriate governmental authority (e.g., an executive order from a Governor), an employer may be eligible to claim the employee retention credit. To fall within the provisions of Notice 2021-20, employers must be able to demonstrate that implementation of the recommendations suspended more than a nominal portion of the employer's trade or business operations or had more than a nominal effect on the employer's trade or business. Modifications must have had more than a nominal effect on the employer's business operations. Modifications that required minor alterations to customer behavior or employee behavior (for example, masking or making store aisles one way to enforce social distancing) most likely did not result in more than a nominal effect on business operations because generally employers could continue operation of their trade or business without a reduction of their ability to provide goods or services in the normal course of the employer's business.

Scenario 1

Employer A must be subject to orders from an appropriate governmental authority to be eligible for the employee retention credit. Under these facts, Employer A is not subject to any governmental order in the second or third calendar quarters of 2021.[10] As stated above, orders from an appropriate government authority involve mandates or commands, or an order as defined under the relevant statute. OSHA communications did not mandate that employers implement specific modifications to an employer's trade or business operations and did not constitute an "order" as that term is used under the OSH Act.

---

[10] Although this conclusion specifically relates to whether Employer A is an eligible employer for the second or third calendar quarters of 2021, the broader analysis and conclusion of whether an employer may rely on communications from OSHA on mitigating and preventing the spread of COVID-19 in the workplace to meet the definition of an "eligible employer" applies to all calendar quarters in 2020 and 2021.

POSTN-117042-23                                            14

Furthermore, Employer A cannot demonstrate that encouraging employees to wear masks and practice routine hygienic practices such as frequent handwashing had more than a nominal effect on its business operations. Employer A cannot substantiate that it implemented modifications pursuant to a governmental order. Therefore, the employer does not meet the definition of "eligible employer" under section 2301(c)(2)(A)(ii)(I) of the CARES Act and section 3134(c)(2)(A)(ii)(I) of the Code.

Scenario 2

In addition to the conclusion in Scenario 1, Employer A is able to continue operations in a manner comparable to operations prior to any closure. Employer A's employees teleworked at least part of the time, indicating that Employer A's employees were already equipped to work from a location other than Employer A's offices and without a disruption to Employer A's operations. In addition, the fact that Employer A continued to allow employees to telework in the second and third calendar quarters of 2021 despite there being no restrictions suggests the employees' absence from the physical workspace did not disrupt operations.

Furthermore, OSHA's policies have long stated that OSHA does not conduct inspections of home offices and thus any orders from OSHA, if any, would not apply to the home offices of Employer A's employees. Under these facts, Employer A cannot substantiate that a governmental order fully or partially suspended its business operations.

***

This writing may contain privileged information.  Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information.  If disclosure is determined to be necessary, please contact this office for our views.

Please call Dixie Pond at (202) 317-6798 or Matthew Leiwant at (202) 317-4774 if you have any further questions.